# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AXIOM INVESTMENT ADVISORS, LLC, on Behalf of Itself and All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>DEUTSCHE BANK AG,<br><br>        Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      This is a class action brought to recover the damages that Plaintiff and a class of similarly situated participants in the foreign exchange ("FX") market suffered as a result of Defendant Deutsche Bank AG's ("Deutsche Bank") practice of reneging on its limit orders offered through its own and third-party electronic trading platforms.  The allegations herein are based on information and belief, except as to Plaintiff's own actions.

2.      Deutsche Bank is one of the largest currency dealers in the FX market and is a well-known "Liquidity Provider" or "Market Maker."  As a Liquidity Provider, it acts as both a buyer and seller of currencies through its own proprietary electronic trading platform, known as Autobahn, and through third-party electronic communications networks ("ECNs"), described below by placing limit orders to buy or sell a stated amount of a currency at particular prices.

3.      Plaintiff and the Class members are Deutsche Bank's counterparties in these FX transactions.  Through Autobahn and other ECNs, Plaintiff placed market orders to trade a given

volume of currency.  These orders constituted offers to trade that given currency at the best, immediately available prices.  Deutsche Bank, on the other hand, was a matched counterparty to those transactions with corresponding offers to trade that given currency at a specified price. Plaintiff's trade order operates as an acceptance of Deutsche Bank's outstanding unilateral offer to trade, and conversely, Deutsche Bank's outstanding offer to trade simultaneously operates as an acceptance of the customer's unilateral offer to trade, and Deutsche Bank accepted those offers through its placement of a limit order that matched Plaintiff's order.

4.      Many times, however, Plaintiff and the Class members did not receive the agreed-on contract price (*i.e.*, the best immediately available price), but rather, received a worse price. Instead, Deutsche Bank delayed the execution of matched trades, and when it determined during the delay that the trade would be unfavorable to its position or that it could extract a larger profit, it reneged on the agreed price and often then filled Plaintiff's and Class members' orders at worse prices.  This practice has been dubbed "Last Look," and Deutsche Bank's Last Look practices caused significant damages to Plaintiff and the Class while unjustly enriching Deutsche Bank.

5.      Throughout the Class Period (defined herein), Deutsche Bank has used Last Look to reject millions of trades that would have been otherwise executed but for Deutsche Bank reneging on its matched orders.  As a result, Deutsche Bank breached those contracts, as well as breached the covenant of good faith and fair dealing.  Alternatively, by promoting its prices as "executable," when they were not, Deutsche Bank has unfairly deceived Plaintiff and the Class.

Deutsche Bank's conduct caused injury to Plaintiff and the Class members and caused Deutsche Bank to be unjustly enriched at their expense.[1]

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d), because the Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one Class member is a citizen of a State different than Deutsche Bank.

7.     This Court has personal jurisdiction over Deutsche Bank.  Deutsche Bank has: (1) transacted business in the United States, including in this District; (2) exchanged currency with Class members throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of its unlawful scheme in the United States, including in this District.

8.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d).  Deutsche Bank resided, transacted business, was found, and had agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

9.     Plaintiff Axiom Investment Advisors, LLC ("Axiom Investment Advisors") is a Delaware limited liability company headquartered in New York, NY during times relevant to this Complaint.

---

[1]     Except as alleged in this Complaint, neither Plaintiff nor other members of the public have access to the underlying facts relating to Deutsche Bank's improper activities.  Rather, that information lies exclusively within the possession, custody, or control of Deutsche Bank and other insiders, which prevents Plaintiff from further detailing Deutsche Bank's misconduct. Plaintiff believes further evidentiary support for its allegations will come to light after a reasonable opportunity for discovery.

10.     Upon information and belief, Plaintiff was subjected to Last Look and suffered damages as a result.

11.     Defendant Deutsche Bank AG is a German corporation headquartered at Taunusanlage 12, 60325 Frankfurt Am Main, Germany.  Deutsche Bank AG is licensed by the New York Department of Financial Services with a registered address at 60 Wall Street, New York, New York 10005.  Defendant Deutsche Bank AG, on its own behalf and through its control of Autobahn, engaged in FX transactions with Plaintiff and the Class that are the subject matter of this lawsuit.

12.     Defendant Deutsche Bank AG is referenced in this Complaint as "Deutsche Bank."  Deutsche Bank, as used in this Complaint, includes all of Deutsche Bank's predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

## FACT ALLEGATIONS

**Background on the FX Market**

13.     The FX market is where currencies are traded.  It is the largest and most actively traded financial market in the world.  According to the most recent BIS Triennial Central Bank Survey,[2] global trading in FX averaged $5.3 trillion per day in April 2013, up from $4.0 trillion

---

[2]     The BIS Triennial Central Bank Survey describes itself as "the most comprehensive source of information on the size and structure of global foreign exchange (FX) and OTC derivatives markets."   Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results (available at https://www.bis.org/publ/rpfx13fx.pdf) (hereinafter BIS, Triennial Bank Survey, Preliminary Results 2013), at 3.  Central banks, including the Federal Reserve Bank of New York, and other authorities in 53 jurisdictions participated in the survey, collecting data from 1,300 banks and other financial institutions throughout the world.  *Id*.

in April 2010.[3]   United States trading in FX averaged $1.263 trillion per day in April 2013, up

from $864 billion in April 2010.[4]

14.     The FX market revolves primarily around spot transactions.  A spot transaction

involves the exchange of currencies between two counterparties on a value date that is within

usually two bank business-days' time, which is typically how long it takes a currency trade to

settle.   Spot transactions account for approximately half of daily FX turnover in the United

States, roughly $620 billion.[5]

15.     Forward transactions are another major component of the FX market.   In FX

forwards – also called "outright forwards" – the exchange (settlement) of the currencies is

delayed beyond the customary two bank business-days' time, often months into the future.  FX

forwards trade just like FX spots; their market prices simply reflect the impact of differing

interest rates over time. Forward transactions account for approximately 18% of daily FX

turnover in the United States, or roughly $228 billion.[6]

16.     Approximately 98% of FX trading occurs over the counter ("OTC"),[7] meaning

that it does not occur on a centralized exchange.  FX trading is thus predominately accomplished

through bilateral contracts between two counterparties.

17.     Almost all FX trading occurs with Liquidity Providers such as Deutsche Bank.

One of the top ten Liquidity Providers in the FX market acts as a counterparty in approximately

98% of spot trading volume in the United States. In the forward market, the market share of the

---

[3]     BIS Triennial Bank Survey, Preliminary Results 2013, at 3.

[4]     Fed Triennial Bank Survey 2013, at 1.

[5]     Fed Triennial Bank Survey 2013, at 3.

[6]     Fed Triennial Bank Survey 2013, at 3.

[7]     BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 1.

top ten Liquidity Providers is approximately 88%.[8]  According to the *EUROMONEY* FX Survey for 2013, Deutsche Bank held the largest percentage of the FX market, with an overall market share of 15.18%.[9]

18.     Large banks, such as Deutsche Bank, act as liquidity providers or market makers. They represent the "sell side" and are typically "price makers."  Plaintiff and the Class represent the "buy side," which includes institutional investors, asset managers, corporations, hedge funds, and wealthy private investors.   They are typically "price takers."

19.     Market makers quote prices for a given volume of a specific currency pair.  The price consists of both a "bid" and an "ask."[10]  The "bid" is the price at which the market maker is willing to buy a given volume of the base currency.  The "ask" is the price at which the market maker is willing to sell a given volume of the base currency.  A market maker is willing to either buy or sell.

20.     By way of example, a market maker might quote the following price for Euros:

| Currency Pair | Bid | Ask |
| --- | --- | --- |
| EUR/USD | 1.0588 | 1.0591 |

21.     In this example, the currency pair is Euros to U.S. dollars, reflected by EUR/USD. Euros are the base currency, *i.e.*, the currency the market maker is willing to buy or sell.  The U.S. dollar is the reference or quote currency, *i.e.*, the currency which is used for pricing.  Here, the market maker is willing to buy Euros from a customer at a price of $1.0588 per Euro.  The market maker is willing to sell Euros to a customer at a price of $1.0591 per Euro.

---

[8]     Fed Triennial Bank Survey 2013, at 6.

[9]     *Euromoney FX Survey 2013 Results Revealed*, EUROMONEY, http://www.euromoney. com/Article/3202090/Euromoney-FX-survey-2013-results-revealed.html.

[10]     The "ask" is also referred to as the "offer."

22.    The difference between the bid and ask is called the "bid-ask spread."  In the above example, the bid-ask spread is $0.0003, calculated as the difference between the price the market maker will sell Euros ($1.0591) and buy Euros ($1.0588).  The bid-ask spread is one way in which the market maker is compensated.

**Electronic Trading of FX**

23.    Traditionally, most FX was traded via voice (telephone) trading.  A customer would simply call one or more banks and request a quote for a given volume of currency.  The bank would offer the customer a spread on the currency.  If the customer accepted by buying or selling at the offered spread, the trade would be processed.  This process was known as a "request for quote" or "RFQ."

24.    Over the last 15 years or so, FX trading has moved from voice to electronic trading platforms.  Electronic trading offers customers the advantages of speed, convenience, automation, and precise record-keeping.  Today, most FX trades occur electronically.

25.    There are two general types of platforms used to electronically trade FX.  The first type is known as a single-dealer platform.  A single-dealer platform, as its name suggests, is an electronic platform where liquidity is traditionally provided by a single dealer, *i.e.*, the operator of the platform.[11]  Deutsche Bank's proprietary platform Autobahn ("Autobahn") is one of the most popular single-dealer platforms.  Most major banks have established single-dealer platforms on which their customers can trade.

26.    Autobahn has its own website (https://autobahn.db.com/index.html).  It bills itself as providing "competitive and reliable prices in over 200 currency pairs and precious metals" with "dynamically priced executable streaming prices customized to suit each client's

---

[11]    Today, many single-dealer platforms, such as Autobahn, also allow their customers to access liquidity from outside sources.

requirements" and "24-hour availability 6 days a week."[12]  According to its website, Autobahn has distinct contact numbers for clients across the world, its own support staff, and its own sales personnel.  It has been operating as an FX platform since 2000.[13]  One article described Autobahn as the "FX platform that revolutionized electronic trading in the past decade."[14]  In 2011, Deutsche Bank launched the Autobahn App Market, billing it as the "ground-breaking" first "App-based electronic client offering in the financial services industry."[15]  Deutsche Bank incorporated Last Look on the Autobahn FX platform beginning in 2003.

27.    Deutsche Bank operated a second foreign exchange trading platform, dbFX, between 2006 and 2011.  dbFX, a retail foreign currency trading platform, advertised "world-class pricing, research, and execution in a single state-of-the-art FX trading platform."[16]  The platform offered 34 currency pairs, with "streaming real-time executable currency quotes, 24 hours a day."  On its website, Deutsche Bank touted dbFX's "tight spreads from as low as 1.5 pips."  dbFX incorporated Last Look beginning with its launch in 2006.  In April of 2011, Deutsche Bank sold dbFX to Gain Capital, an online provider of retail FX trading.

28.    The second type of electronic FX trading platform is a multi-dealer platform, commonly referred to as an ECN.  Some of the most popular ECNs used by the buy side are

---

[12]    https://autobahn.db.com/microSite/docs/Autobahn_Electronic_FX_Trading_factsheet. pdf (last visited Dec. 21, 2015).

[13]    http://www.fxweek.com/fx-week/news/2192332/deutsche-bank-unveils-hybrid-blotter-on-revamped-autobahn-fx-platform (last visited Dec. 21, 2015).

[14]    http://www.euromoney.com/Article/3065639/Deutsche-Bank-launches-next-generation-Autobahn.html (last visited Dec. 21, 2015).

[15]    https://autobahn.db.com/microSite/html/news2011.html;  http://www.gtb.db.com/content/ en/1732.html (last visited Dec. 21, 2015).

[16]    http://www.cbs.db.com/new/content/dbfx.html (last visited Dec. 21, 2015).

Hotspot FX, FXall, and Currenex.  These ECNs provide a user with access to multiple Liquidity Providers, including Deutsche Bank.

29.     Deutsche Bank's FX trading is conducted through three broad categories: (1) clients that trade directly on Autobahn using Deutsche Bank's graphical user interface ("GUI"); (2) clients that trade using ECNs (such as Hotspot FX, FXall, and Currenex), that provides access to multiple Liquidity Providers, including Deutsche Bank; and (3) clients that trade directly with Deutsche Bank using a financial information exchange application program interface ("FIX/API").

30.     Whether a single-dealer platform or another ECN, all electronic FX trading platforms work basically the same way.  They provide the end-user with price and quantity data for various currency pairs.  Depending on the platform and the user settings, that data can come from a single Liquidity Provider, such as Deutsche Bank, multiple Liquidity Providers, or all participants sharing data on the platform.

31.     The following is a screenshot of the user interface for Autobahn:



32. To illustrate the similarity between the interfaces of different platforms, below is a screenshot for a leading multi-bank ECN, HotSpot FX:



33. Subject to exceptions not relevant here, on Autobahn, Deutsche Bank alone would provide the data that appears. On other ECNs, the data would come from various Liquidity Providers, as well as other buy-side market participants.

34. Liquidity Providers, such as Deutsche Bank, set the market price for a given volume of particular currency pairs by placing limit orders, an order to buy or sell at a particular price that is valid until it is cancelled, at the prices at which the Liquidity Provider is willing to buy or sell a specified quantity (*e.g.*, $1 million, $5 million, or $10 million) of that currency at a given moment. Because the FX market is extremely active, these orders are quickly filled or

withdrawn and replaced with new limit orders reflecting the new market price for that currency pair.  As a result, these limit orders are presented as a constantly updating stream of executable bid and ask prices for a currency pair.

35.     Consistently, Deutsche Bank markets Autobahn as providing "dynamically priced executable streaming prices customized to suit each client's requirements," trading "in over 200 currency pairs and precious metals" with "24-hour availability 6 days a week."[17]

36.     When trading on a single-dealer platform such as Autobahn, end-users typically see only one bid and ask price at any given time – that of the current limit order of a single Liquidity Provider prepared to act as counterparty.  On a multi-dealer ECN, by contrast, end-users see a stack of prices reflecting limit orders from various Liquidity Providers and other market participants sorted to show the best available prices on both the bid and ask side (referred to alternatively as a "price ladder" or "market depth").  For example:

---

[17]     https://autobahn.db.com/microSite/docs/Autobahn_Electronic_FX_Trading_factsheet. Pdf (last visited Dec. 21, 2015).



37.     Another way that Liquidity Providers such as Deutsche Bank offer to trade on electronic trading platforms is by responding to a buy-side market participant's request for quote ("RFQ") or request for stream ("RFS") on a specified quantity of currency.   The Liquidity Provider then responds to that request with a price for which it is willing to trade that takes into account the size of the order and the identity of the market participant placing the order, including any special relationship that the Liquidity Provider has with the market participant. Like the limit orders, the market participant has the option to place a trade at the quoted price until that quote is cancelled.

38.     The bid and ask prices that Liquidity Providers quote to a counterparty as a result of a request for quote, or request for stream, often differ from the executable bid and ask prices that Liquidity Providers stream to the market.

39.     All platforms clearly distinguish between executable streaming prices that result from a market maker's limit orders and prices that result from a request for quote, or request for stream.  The former can change in milliseconds as they are filled, replaced or cancelled.  The latter appear only as a result of a specific request from an end-user, which are usually valid for a set period of time.

40.     Buy-side market participants' electronic orders can be broadly grouped into one of two categories: (1) market orders, which execute at the prevailing market price; and (2) limit orders, which execute only if the prevailing market price is equal to or better than a specific price input by the end-user.

41.     When a buy-side market participant enters an order, sophisticated computer algorithms match that order to other orders within the electronic FX platform, including by Liquidity Providers.  For limit orders, the algorithms are supposed to match and execute an order only if there are orders within the platform matching the desired limit price.  For market orders, the algorithms will match and execute an order to the order representing the best available market price currently within the platform.  Once two orders are matched, a contract is formed and neither can be withdrawn or matched with another order.

42.     As noted above, for orders placed on a single-dealer platform, the matching and execution algorithms are programmed by the Liquidity Provider – in the case of Autobahn – Deutsche Bank.  For orders placed on multi dealer ECNs, the matching and execution algorithms are ostensibly programmed by the ECN.

**Deutsche Bank Uses "Last Look" Algorithms to Avoid Agreed Pricing**

43.     One of the major benefits of trading electronically is the speed with which trades can be executed.  A second represents an eternity in the FX market.  Market activity can quickly

move market prices.  The speed of execution is particularly important during times of market volatility, where the speed and magnitude of price movements are exacerbated.

44.     During the Class Period, most platforms, including Autobahn, had technology enabling them to match and execute nearly 100% of all trades in under five milliseconds.[18] Similarly, all Liquidity Providers, including Deutsche Bank, had technology enabling them to place and withdraw limit orders (*i.e.*, a streaming price) within one or two milliseconds.

45.     Deutsche Bank understood the importance of fast execution of electronic trades. Market prices can vary significantly in a second.  Accordingly, Deutsche Bank has the technology to execute matched orders in a matter of milliseconds.  In the interdealer market, Deutsche Bank quickly executes electronic trades with other large banks.

46.     However, when dealing with Plaintiff and the Class, Deutsche Bank programmed an unnecessary delay of anywhere from several hundred milliseconds to several seconds into its execution algorithms.  This intentional delay has been dubbed the Last-Look period.

47.     Deutsche Bank first implemented this intentional delay, its Last Look, on Autobahn in 2003.  In May 2003, Currenex, an emerging ECN at the time, attracted liquidity providers by allowing them to stream prices on the condition that they were subject to being rejected. Deutsche Bank was one of three liquidity providers that used this early version of the Last Look functionality.  On Autobahn, Deutsche Bank further applied Last Look to all API/FIX and ECN trades, as well as a portion of those customers using Deutsche Bank's GUI.

48.     With Last Look, when a customer entered a market order for a particular currency on Autobahn that corresponded with a Deutsche Bank's limit order, Deutsche Bank's algorithms matched the customer's market order to Deutsche Bank's limit order within several milliseconds.

---

[18]     1,000 milliseconds equal one second.  Five milliseconds thus equal 1/200th of one second.

Absent its Last look, Deutsche Bank would have executed the matched order in several more milliseconds. Instead, however, Deutsche Bank's algorithms delayed the execution for sometimes at least several hundred milliseconds, during which time Deutsche Bank used the information derived from the order (quantity, buy or sell, etc.) to its trading advantage.

49. Deutsche Bank programmed into its execution algorithms the unilateral ability to renege on an otherwise executable transaction by withdrawing, after it had already been accepted, Deutsche Bank's limit order to which the buy-side order was matched.

50. When the bid-ask spread at the end of the hold time moved in the client's favor beyond a predetermined threshold, Deutsche Bank reneged on the trade. When the mid-price at the time the counterparty executed the trade moved beyond a predetermined threshold by end of the hold period, Deutsche Bank rejected the trade. When clients executed multiple trades during the hold period, Deutsche Bank could reject some, or all, of the multiple trades placed within the hold period.

51. In some circumstances, Deutsche Bank's use of Last Look would not only result in trades being rejected, but also filled at a worse price as Deutsche Bank would fill the order at the price at the end of the hold time if – and only if – the prices moved in Deutsche Bank's favor beyond a predetermined threshold. For example, customers that traded "at market" through FIX/API would have their prices adjusted by Deutsche Bank at the end of the hold period if the market moved in the customer's favor beyond a predetermined threshold.

52. Deutsche Bank also implemented Last Look on customer orders that were entered as "stop loss" or "stop limit" orders, which are designed to limit an investor's loss in a position. In these orders, the customer predetermines that a trade should be executed once the market price reaches a particular level. The order remains on Deutsche Bank's order book until the price is

reached.   Except, Deutsche Bank would apply a hold period, and the order would not be executed until the end of hold time (or otherwise adjusted or rejected depending on if other Last Look protocols applied).   As a result, the order would be executed at a price that was less advantageous to the customer.

53.   By reneging on its limit orders when doing so was to its financial benefit, Deutsche Bank significantly and artificially increased its FX trading profits at the expense of buy-side counterparties.

54.   Not only did Deutsche Bank program the ability to delay and reject matched buy-side orders on its own Autobahn platform, but it also used the same practices on ostensibly independent ECNs.

55.   Although buy-side market participants can (and do) execute trades directly with each other on ECNs, Liquidity Providers, such as Deutsche Bank, still act as a counterparty in the vast majority of FX trades executed on ECNs.   Because relatively few dealers are willing or able to act as market-makers – to take either side of a trade even in volatile markets; to carry substantial FX exposure on their books – ECNs had to attract major Liquidity Providers, such as Deutsche Bank, to their platforms in order to generate any appreciable exchange volume.

56.   ECNs earn money by charging a fee based on the volume of currency exchanged through their platforms.   Without the liquidity provided by Deutsche Bank and other major dealers, there would be significantly less flow of FX volume on ECN platforms, and ECNs would go out of business.

57.   As a condition of providing liquidity to ECNs open to buy-side market participants, Deutsche Bank used its leverage to implement Last Look on ECNs.   Granting such

concessions to liquidity providers, such as Deutsche Bank, was essential to any start-up ECN's economic survival: ECNs were hostage to Deutsche Bank's demands.

58.     Thus, while the matching of orders on ECNs is controlled by the ECN's algorithms, once any order is matched to Deutsche Bank's limit order, Deutsche Bank's algorithms still delayed execution of matched orders and determined whether the trade would execute at all.

59.     This happens notwithstanding the fact that ECNs claim that the prices appearing on their platforms represent immediately executable offers to trade on the stated terms.  Leading ECN Hotspot FX, for example, advertises on its website that the benefits of trading on its platform "include full depth-of-book view, centralized price discovery, direct and anonymous market access, ***instantaneous trading on live, streaming price***s and robust real-time pricing, benchmark, and reference data."[19]

60.     At least the following ECNs have granted or continue to grant Deutsche Bank last-look privileges, including the ability to renege on matched orders: Currenex, Hotspot, FXAll, and 360T.   These ECNs cater to clients all over the United States and the world.  Notably, when Liquidity Providers trade directly with each other on multi-dealer platforms, they do not use Last Look.

**Examples of How Deutsche Bank Used Last Look to Damage Buy-Side Market Participants**

61.     When a buy-side market order is matched to Deutsche Bank's limit order   on either Autobahn or an ECN, Deutsche Bank knows that its limit order is the best available price

---

[19]     http://www.kcghotspot.com/overview/index.jsp (emphasis added) (last accessed on Dec. 21, 2015).

at which that market order can execute and that while it is matched, the market order cannot match with any other order.

62.     While delaying the execution of the matched order and preventing the order from proceeding with another counterparty, Deutsche Bank places a new limit order that is slightly more profitable for Deutsche Bank and withdraws the matched trade, so that the buy-side order will match with its new limit order, giving it the ability to execute the trade at a more profitable price-point.

63.     The ECN market depth example below can provide an illustrative example.



64.     This ECN interface shows the market depth for the currency pair GBP/USD, sorted from highest to lowest price on the bid side (buy orders), and from lowest to highest on the ask side (sell orders).  A market participant wanting to buy one million GBP at the current market price sees that the best offer to sell is at the price of $1.60388, which is significantly cheaper than the next-best price of $1.60393.  The market participant thus places a market order and should receive a price of $1.60388 as it would have matched with the corresponding limit order.  However, if Deutsche Bank placed the limit order at $1.60388, Deutsche Bank's Last Look protocols may renege on the trade at $1.60388 and place a new limit order for $1.60392.  With $1.60392 now reflecting the best price, and the buyer's order unable to match with another order while it was matched with Deutsche Bank, the ECN's algorithm would then match the buyer's market order with Deutsche Bank's limit order at the higher price and Deutsche Bank's algorithms would again use its logic to decide whether to perform and realize the profit created by its breach or renege on this new agreement and repeat the cycle.

65.     Through this bait-and-switch – which takes place in less than half of a second – Deutsche Bank extracted additional profit at the expense of the unsuspecting buy-side market participant.  The buy-side participant would only see the final terms of the trade, and would assume that the sell order at $1.60388 was either withdrawn or filled by another trade in the milliseconds before their market order was placed.

66.     Significantly, if a buy-side market order was matched to the order of another buy-side market participant on an ECN, the platform's algorithms would execute the matched trade immediately (in a matter of a few milliseconds).  And because trading on ECNs is typically anonymous, a buy-side participant would not know whether its counterparty was a Liquidity

Provider, such as Deutsche Bank, whether its order had been last-looked, or whether its order had been rejected and subsequently executed at a less favorable price.

**Deutsche Bank Systematically Used Last Look to Injure Plaintiff and Other Buy-Side Market Participants**

67.     Deutsche Bank is a counterparty to thousands of electronic spot and forward FX transactions daily.   Collectively, these daily transactions are worth hundreds of billions of dollars.

68.     On a flyer for Autobahn, Deutsche Bank states that its "award winning Foreign Exchange trading platform delivers the liquidity and services clients need in a fast moving market and evolving regulatory landscape."[20]   Deutsche Bank invites customers to "experience excellence," touting Autobahn's "seamless electronic execution and liquidity across multiple asset classes and markets."[21]   An Autobahn brochure from 2011 advertises the "streaming, dealable prices for Spot, Outrights, and Swap trades" that are "displayed on dedicated liquidity windows."[22]   The brochure claims that Deutsche Bank customers will "gain unparalleled access to markets and liquidity," as well as benefit from "competitive and reliable prices."   Deutsche Bank did not publicly disclose that its ability to Last Look was programmed into its algorithms.

69.     Deutsche Bank's misrepresentations, omissions of material facts, acts of concealment, and failures to disclose, were knowing and intentional, and made for the purpose of deceiving Plaintiff and Class members and obtaining their monies for Deutsche Bank's gain.

70.     To the limited extent that the buy-side community was aware that something called "last look" existed, even its benign name belied its nefarious purpose.   Where Last Look

---

[20]     https://autobahn.db.com/microSite/img/ABFX_flyer_June_2015.pdf (last visited Dec. 21, 2015).

[21]     https://autobahn.db.com/microSite/html/about.html (last visited Dec. 21, 2015).

[22]     *FX Electronic Trading: Passion to Perform*, Sept. 2011.

was ostensibly directed at preventing sophisticated traders from putting currency dealers at a disadvantage, Deutsche Bank and others used its functionality to turn the tables and put those same traders at a disadvantage.

71.     Moreover, that functionality – particularly including the excessive hold times Last Look Deutsche Bank imposed on its customers – at a minimum, put Deutsche Bank in a position to exploit the information it gleaned from its customers' orders to trade on its own account at a large advantage.  While Plaintiff and Class members are not yet in a position to confirm that Deutsche Bank necessarily did that with any frequency, the profits it might have earned by doing so are such that Deutsche Bank was surely at least well aware of the possibility.

72.     The stark differences between FX trading and trading of other assets in this context is reflected in a recent report entitled "*Restoring trust in global FX markets*" ("LMAX Report") issued by LMAX Exchange, which touts its "complete pre and post-trade transparency and order execution where no 'last look' is standard."[23]   That report identifies the high prevalence of "Firm liquidity/No 'last look'" in the markets for other assets, and corresponding low to medium prevalence in the FX market during the Class Period.  *Id.* at 11.

---

[23]     The complete report is available at https://www.lmax.com/restoring-trust-report.  *See also id.* at 70 (LMAX promotional quote).

**Illustration: Emergence of exchange trading practices in the FX Market**

Key: Indicating level of prevalence

● High   ◖ Med   ○ Low

| | | Exchange-traded asset classes | Pre-2010 OTC – traded FX | 2010-2015 OTC – traded FX |
|---|---|---|---|---|
| Market Structure | Centralised market structure | ● | ○ | ◖ |
| | Formal market making requirements | ● | ○ | ◖ |
| Trading Practices | Transparent price discovery | ● | ○ | ◖ |
| | Firm liquidity/No 'last look' | ● | ◕ | ◖ |
| | Anonymous trading | ● | ◖ | ◖ |
| | Bi-lateral trading | ○ | ● | ◕ |
| | Transaction based fees | ● | ◕ | ◖ |
| | Post-trade transparency | ● | ○ | ◕ |
| | Centralised clearing | ● | ○ | ◕ |
| Regulation/ Standardisation | Rules-based trading environment | ● | ○ | ◕ |
| | Formally regulated | ● | ○ | ◕ |

73.    Moreover, 450 FX industry professionals who responded to an LMAX survey overwhelmingly identified Last Look as a key factor precluding transparency in FX markets as compared to other financial markets, and as the FX practice most open to abuse:

Indeed, in the LMAX Exchange industry survey, respondents strongly supported the benefits of introducing trading practices from the exchange world, and agreed that trading practices prevalent in the OTC marketplace are open to abuse:



**Practices to enhance transparency in FX**
% of respondents agreed

| | |
|---|---|
| One public rulebook | 90 |
| No 'last look' | 87 |
| Price/time priority order matching | 87 |
| Disclosure of the use of 'last look' | 84 |
| Reducing 'last look' provision time | 82 |
| Latency floors | 65 |
| Randomisation | 59 |

**FX practices open to abuse**
% of respondents agreed

| | |
|---|---|
| Use of 'last look' | 85 |
| Inconsistent timestamping | 83 |
| Relationship pricing | 77 |
| Bi-lateral trading | 69 |

*Id.* at 12.  *See also id.* at 7 (reflecting scope of survey).

74.     Deutsche Bank nevertheless rejected hundreds of matched electronic FX trades every business day from 2005 to 2015 using Last Look.  Over the course of the last ten years, Deutsche Bank has rejected tens of thousands of matched electronic FX trades on Autobahn and on various ECNs using Last Look.  These rejected trades have injured thousands of unsuspecting buy-side market participants such as Plaintiff and Class members by causing their orders to be executed at less favorable prices.  Simultaneously, Deutsche Bank has used Last Look to generate millions of dollars of profit that it would not have earned had it allowed matched electronic FX trades to execute as intended, and as Class members expected.

75.     Furthermore, Currenex, an independent ECN, provided liquidity providers such as Deutsche Bank with a built-in functionality – an algorithm nicknamed 'Aaron' – that allowed liquidity providers to systematically collect and analyze clients' trade data and transfer it to their internal trading teams in order to front run their clients.  Last Look enabled Deutsche Bank to use this advanced knowledge to its financial gain.

76.     As noted in a July 2014 article titled "*FX Focus – Look back in Anger*" – published in leading industry publication, FX WEEK – the use of Last Look to reject matched trades is difficult to prove with currently available information because what goes on inside electronic trading platforms is largely opaque to buy-side market participants.[24]  But the article also described how one senior trader at a buy-side bank was able to find "compelling evidence" of Liquidity Providers' abuse of Last Look:

> Such behaviour is hard to prove, but a senior e-FX trader at a large, London-based bank believes he has found compelling evidence of it, after completing some research for a client.  "We put together a chart on the response times and order fill ratios of the 12 banks this client traded with.  They were all big banks – essentially the top dozen liquidity providers in the market," he says.
>
> The trader found that, of the 12 banks, four had average response times of less than 100ms and order fill rates of 88–98%.  A further four had average response times of 250–350ms and an average fill rate of around 75%.  "That's quite a significant increase in latency when you consider all these pricing engines are co-located.  There should be very minimal differences in latency between the top providers," he says.
>
> The trader's suspicions of last look being abused were heightened by the data from the final four banks, which had an average latency of 450–550ms and fill rates of 50–65%.  "That basically means those dealers are using last look to throw away every single trade they don't like.  That is not about latency protection – it's about unfair liquidity provision."
>
> While 500ms might not sound a long delay to the average person, the FX market has numerous price updates every second of every trading day.  "If you think about it in terms of a hundred metres race, the difference between 25ms latency and 500ms latency is the difference between being first and being five or 10 metres behind the guy who comes first.  Half a second is an eternity in this market," he says.

*              *              *

---

[24]     http://www.fxweek.com/fx-week/analysis/2354192/fx-focus-look-back-in-anger       [note that this is a subscription website].

> The heads of e-FX trading at three other global dealer banks also
> say they have noticed such behaviour.  All three wished to remain
> anonymous and declined to point the finger at specific firms, but
> one indicated that at least 60% of his sell-side competitors engaged
> in the practice.  Several other major banks either declined to
> comment on this topic or were unable to provide a response by
> press time.

77.     Similar evidence is not available to Plaintiff because it does not have access to the

detailed trade logs that would show whether and when Plaintiff's market orders were matched to

Deutsche Bank's orders; whether Deutsche Bank last-looked Plaintiff's orders, and if so, for how

long; whether Deutsche Bank rejected Plaintiff's orders via Last Look and if so, whether those

rejections caused Plaintiff's orders to be filled at less favorable prices.

78.     Likewise, Plaintiff does not have access to Deutsche Bank's algorithms that were

used to initiate the Last-Look delay on Plaintiff's orders or that contained the logic by which

these algorithms rejected Plaintiff's and other buy-side market participants' orders.   This

information can only be obtained through discovery.

79.     Nevertheless, because Plaintiff routinely executed spot FX trades with Deutsche

Bank both on Autobahn and on third-party ECNs, and because Deutsche Bank routinely used

Last Look with respect to the matched orders of buy-side users, it is inconceivable that Deutsche

Bank did not reject at least one of Plaintiff's matched orders using Last Look.

80.     Plaintiff and the other Class members were directly and proximately injured by

Deutsche Bank's use of Last Look to renege on matched orders on electronic trading platforms.

Deutsche Bank rejected matched trades that would have been favorable to Plaintiff and the Class

and detrimental to Deutsche Bank.  As a consequence, matched buy-side orders were filled at a

less favorable market price.  Deutsche Bank's and ECNs' electronic trading records will show

the amount of damages Plaintiff and the Class members suffered as a result of Deutsche Bank's

use of Last Look, but Plaintiff expects that class-wide damages will be in the millions of dollars.

**Deutsche Bank Concealed that It Used Last Look to Renege on Otherwise Executable Orders**

81.    Deutsche Bank did not disclose its use of Last Looks on Autobahn or other ECNs through which it operated.

82.    Deutsche Bank has never directly disclosed to buy-side FX platform users the fact that it programmed its execution algorithms to delay and reject matched orders.  Indeed, buy-side market participants have no way of knowing either that the execution of a trade was delayed by Deutsche Bank's use of Last Look, or that Deutsche Bank reneged on an order after it was matched to a buy-side order.  All that market participants can see is the final product of the executed trade; the steps taken on the path to execution are opaque and not disclosed.  And because the entire chain of events from order to confirmation of execution usually takes place in less than a second, nothing puts buy-side participants on notice that their orders were delayed or rejected through Last Look.

83.    For those trades that were not filled due to Deutsche Bank's use of Last Look, Deutsche Bank took additional steps to obfuscate its actions.

84.    Although the news of a "last look" being used by major Liquidity Providers first surfaced several years ago, they publicly insisted that Last Look was a necessary byproduct of providing FX liquidity on multiple FX platforms.  Because Liquidity Providers simultaneously place the same order on multiple different eFX platforms, they are ostensibly exposed to the risk of having that order executed on more than one platform – even if they intend to enter into only a single transaction on those terms.  Liquidity Providers thus claimed that Last Look was necessary to ensure that multiple trades were not executed on a single order.

85.    That explanation of Last Look proved to be both pretextual and highly misleading.  The explanation was pretextual because Liquidity Providers, such as Deutsche

Bank, have the technology to withdraw an order from an ECN in several milliseconds; they do not need several hundred times that long to determine whether their order has been filled on another platform.  The explanation was highly misleading because it suggested that Liquidity Providers only used Last Look to reject trades on orders that had already been filled elsewhere. But, in fact, Deutsche Bank routinely reneged on its executable orders for reasons other than that the order has been filled on another platform.

86.    The abuse of Last Look only started garnering attention in the buy-side FX community – albeit very limited attention – in the summer of 2014.  A July 11, 2014 article in FX WEEK titled "Last look orders come under scrutiny" warned, for example, that "[b]anks engaged in 'unfair liquidity provision' that could turn into [the] next FX scandal."  The article likewise noted that "[m]arket-makers stand accused of using Last Look order types aggressively to dial up the profitability of their books, with some buy-side participants warning the practice deserves as much regulatory scrutiny as the allegations of benchmark manipulation."[25]

87.    An August 28, 2014 article in FX WEEK titled "Clients switch off dealers using aggressive last-look strategies" reported that due to the recent revelation of Defendant's abusive practices, "[b]uy-side clients have begun to switch off banks that use aggressive last-look strategies and deliberately increase reject ratios, as market awareness of the pitfalls of this type of ordering grows."  The article went on to note that "[s]ome buy-side participants believe the practice could result in as big a scandal as the allegations of benchmark fixing that have blighted the industry for many months," and that "[i]t is understood sell-side participants have made the Bank of England aware of the issue."

---

[25]    http://www.fxweek.com/fx-week/news/2362297/clients-switch-off-dealers-using-aggressive-last-look-strategies.

**Regulatory and Industry Investigations of Last Looks**

88.     On the eve of announcements by regulators around the world that they had reached settlements with numerous Liquidity Providers for their roles in the manipulation of benchmark rates such as the WM Reuters Closing Spot Rates, on November 11, 2014, FX WEEK published an article titled "'Last look' will prevent settlement with regulators, warns New Change FX.'"  The article quoted sources claiming that United States regulators, including the Department of Justice ("DOJ"), were investigating Liquidity Providers' last-look practices – though those investigations were "currently at an early stage."

89.     A December 11, 2014 BLOOMBERG article for the first time revealed that "New York regulators have found evidence that Barclays Plc and Deutsche Bank AG may have used algorithms on their trading platforms to manipulate foreign-exchange rates, a person with knowledge of the investigation said."[26]  According to an anonymous source familiar with the investigation, "[t]he algorithms were embedded in Barclays's BARX trading platform and Deutsche Bank's Autobahn system."  On February 12, 2015, BLOOMBERG reported that the New York Department of Financial Services had "ordered Barclays Plc and Deutsche Bank AG last year to hire monitors to examine their foreign-exchange operations," and by the end of 2014, "Barclays had its monitor in place, and Deutsche Bank was in the process of installing one."[27]

90.     A Reuters article published on February 10, 2015 indicated that Credit Suisse, Goldman Sachs, Société Générale, and BNP Paribas have also been served with subpoenas issued by the New York regulators.  The article goes on to note the following:

---

[26]     http://www.bloomberg.com/news/articles/2014-12-10/ny-regulator-said-to-probe-deutsche-bank-barclays-fx-algorithms.

[27]     http://www.bloomberg.com/news/articles/2015-02-13/lawsky-says-he-s-probing-banks-last-look-option-on-fx-trades.

The banks started to produce information in response in late January and have met with officials handling the investigation, the sources said.

At issue is a latency period between the time an offer is floated and accepted, and whether the banks are gaming their clients during that time, the people said.  At least one bank claims the pause in the programs is designed to protect it from high-frequency traders, one source said.

But others familiar with the practice say the time lag is a way for banks to manipulate the rates so they favor them.

Transcripts of traders in online chat rooms that led to the settlements in November show them working together to move rates.

There also are transcripts in which they discuss the manipulation of algorithms, one source said. [28]

91.     On or around March 3, 2015, it was reported that the DOJ and the Securities and Exchange Commission asked Barclays for information relating to BARX and its Last Look practices.  On November 18, 2015, Barclays entered into a Consent Order with the New York State and Department of Financial Services.  Barclays admitted it used Last Look in the manner described herein, agreed to pay $150 million civil monetary penalty, agreed to terminate a Managing Director and Global Head of Electronic Fixed Income, Currencies, and Commodities ("eFICC") Automated Flow Trading, and agreed to an independent monitor.

## CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following persons:

All persons in the United States who, between January 1, 2005 and the present (the "Class Period"), placed an order either on

---

[28]     http://www.reuters.com/article/2015/02/10/usa-banks-probes-idUSL4N0VK61V20150210.

Autobahn or a third party ECN that (1) was matched to Deutsche Bank's streaming price; (2) was rejected by Deutsche Bank and (3) was subsequently filled at price less favorable than the original Deutsche Bank's price to which it was matched.

Specifically excluded from this Class are Defendant; the officers, directors, or employees of Defendant; any entity in which Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of Defendant and any person acting on its behalf.

Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

93.     The Class is readily ascertainable and is one for which records should exist.

94.     Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of geographically dispersed Class members, the exact number and their identities being known to Deutsche Bank and the ECNs to which it streamed prices.

95.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class sustained damages arising out of Deutsche Bank's common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Class were directly caused by Deutsche Bank's wrongful conduct.

96.     There are questions of law and fact common to the Class, including, but not limited to, the following:

A.  Whether Deutsche Bank programmed its eFX execution algorithms to reject executable orders via Last Look;

B.  whether Plaintiff and Class members' orders constituted offers;

C.  whether Deutsche Bank's limit orders constituted offers;

D.  whether Class members' orders that were matched to Deutsche Bank's limit orders constituted acceptance of Deutsche Bank's outstanding offers;

E.  whether Class members' orders that were matched to Deutsche Bank's limit orders constituted acceptance of Plaintiff's and Class members' outstanding offers;

F.  whether Deutsche Bank's matching of customer trade orders constituted acceptance of customers' offers;

G.  whether Deutsche Bank's use of Last Look to reject matched orders on eFX platforms constituted breaches of contract;

H.  whether Deutsche Bank's use of Last Look to reject matched orders on eFX platforms breached its duties of good faith and fair dealing; and

I.  the appropriate Class-wide measures of damages.

97.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and FX-related litigation to represent themselves and the Classes.

98.    Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

99.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Deutsche Bank, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would

not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Contract on Autobahn

100.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

101.     Plaintiff's and Class members' orders for currency trades to be executed at the best available market price constituted unilateral offers that Deutsche Bank could accept through performance.  Plaintiff's and Class members' offers required their orders to be matched using the FX platforms' algorithms and required that any such matched orders would be immediately executed.

102.     When a Deutsche Bank's limit order matched Plaintiff and Class members' market order and prevented the trade from matching with another order, Deutsche Bank accepted Plaintiff's and Class members' offers, thereby contractually binding Deutsche Bank to trade at the matched price.

103.     Each time Deutsche Bank failed to consummate a matched trade, Deutsche Bank breached its contracts with Plaintiff and Class members.

104.     Plaintiff and Class members were directly and proximately damaged by Deutsche Bank's breaches of contract because following the Deutsche Bank's rejection of the matched trades via Last Look, Plaintiff's and Class members' market orders were filled at less favorable prices or not at all.  Plaintiff and Class members are thus entitled to recover the difference between the prices offered by Deutsche Bank and the prices at which Plaintiff's and the Class members' orders were ultimately filled.

## SECOND CLAIM FOR RELIEF
### Breach of Contract on Other ECNs

105.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

106.    Plaintiff's and Class members' orders for currency trades to be executed at the best available market price constituted unilateral offers that Deutsche Bank could accept through performance.

107.    Likewise, Deutsche Bank's orders for currency trades to be executed at specified prices constituted unilateral offers that Plaintiff and Class members could accept through performance.

108.    Simultaneously, Plaintiff's and Class members' orders for currency trades to be executed at the best available market price constituted acceptances of any outstanding algorithmically-matched orders.

109.    Likewise, Deutsche Bank's orders for currency trades to be executed at specified prices constituted acceptances of any outstanding algorithmically-matched orders.

110.    When Plaintiff's and Class members' orders for currency trades were algorithmically-matched with Deutsche Bank's orders for currency trades, those complementary trade orders became binding contracts.

111.    Each time Deutsche Bank failed to honor Plaintiff's and Class members' algorithmically-matched trade orders, Deutsche Bank breached its contracts with Plaintiff and Class members.

112.    Plaintiff and Class members were directly and proximately damaged by Deutsche Bank's breaches of contract because following the Deutsche Bank's rejection of the matched trades via Last Look, Plaintiff's and Class members' market orders were filled at less favorable

prices or not at all. Plaintiff and Class members are thus entitled to recover the difference between the prices offered by Deutsche Bank and the prices at which Plaintiff's and the Class members' orders were ultimately filled.

## THIRD CLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing

113.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

114.     Upon the formation of a contractual relationship between Plaintiff and Class members and Deutsche Bank, Deutsche Bank had the obligation to perform its obligations under the contract in good faith and not contrary to the intention of the parties in forming the contract.

115.     To the extent that Deutsche Bank's use of Last Look to reject matched orders on Autobahn and other ECNs was not strictly a breach of contract, it was a breach of Deutsche Bank's covenant of good faith and fair dealing.

116.     Deutsche Bank knew that Plaintiff and Class members created accounts and trading relationships with Deutsche Bank with the understanding and expectation that any orders matched to Deutsche Bank's limit orders would be executed at the matched prices.

117.     By rejecting matched orders that should have been executed in the normal course, Deutsche Bank acted in bad faith and specifically with the intent to generate additional FX trading profit at Plaintiff's and Class members' expense.

118.     Deutsche Bank's conduct in violation of its covenant of good faith and fair dealing had the effect of destroying Plaintiff's and Class members' benefit of the bargain in establishing accounts and trading relationships with Deutsche Bank.

119.     As a direct and proximate result of Deutsche Bank's breaches of the covenant of good faith and fair dealing when rejecting matched orders on Autobahn and ECNs, Plaintiff and

Class members were directly and proximately damaged by having their orders execute at prices that were less favorable than Deutsche Bank's originally matched prices.

## FOURTH CLAIM FOR RELIEF
### Violation of N.Y. General Business Law §349

120.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

121.     Deutsche Bank's actions constitute unfair, unconscionable, and/or deceptive trade practices in the course of its business and in the conduct of trade or commerce, in violation of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. §349, *et seq*.   Deutsche Bank's actions have caused and will continue to cause financial harm to Plaintiff and the Class.

122.     Deutsche Bank's conduct as alleged herein has damaged and will continue to damage Plaintiff and Class members in an amount that is unknown at the present time.

123.     Such conduct includes the use of Last Look to invalidate binding contracts with FX customers, which conduct was never disclosed to such customers.

124.     Further, the conduct alleged herein also constitutes fraud, intentional misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, and violates N.Y. Gen. Bus. L. §349, *et seq*., as set forth below.

125.     The conduct herein is "unfair" because it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to custodial customers.

126.     Deutsche Bank's unfair, unlawful, and deceptive acts and practices alleged herein were "fraudulent" and have deceived and/or are likely to deceive Plaintiff and other reasonable FX customers.

127.    Deutsche Bank's unfair, unlawful, and deceptive acts and practices alleged herein were specifically designed to induce Plaintiff and the Class to permit their FX trades to be executed on Deutsche Bank's electronic trading systems.

128.    Deutsche Bank's misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making decisions concerning purchases of FX custodial services.

129.    Deutsche Bank's misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

130.    Deutsche Bank exploited its superior bargaining position and superior knowledge in implementing and executing Last Look.

131.    Plaintiff and Class members relied to their detriment on Deutsche Bank's misrepresentations and omissions in conducting FX trades pursuant with it.

132.    Plaintiff and each member of the Class have lost money and been damaged as a result of Deutsche Bank's unfair, unlawful, and deceptive conduct alleged herein.  They are accordingly entitled to injunctive relief and restitution, in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### Violation of N.Y. General Business Law §350

133.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

134.    Deutsche Bank's actions constitute acts of untrue and misleading advertising in violation of the N.Y. Gen. Bus. L. §350, *et seq*., by, *inter alia*, failing to disclose the use of Last Look to the detriment of customers and fraudulently advertising its electronic trading networks as accurate and trustworthy.

135.    Deutsche Bank's misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the benefits of its electronic trading networks, and did deceive and mislead Plaintiff and the members of the Class.

136.    Deutsche Bank's misrepresentations and omissions alleged herein were the type of misrepresentations and omission that are material, *i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in using Deutsche Bank's electronic trading networks Deutsche Bank knew that its omissions and misrepresentations were material when it made them.

137.    Deutsche Bank's misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore, reliance upon such misrepresentations may be presumed as a matter of law.

138.    Deutsche Bank's false advertising is ongoing.  Unless restrained by this Court, Deutsche Bank could continue to engage in untrue and misleading advertising, as alleged above, in violation of N.Y. Gen. Bus. L. §350, *et seq*.

139.    As a result of the foregoing, Plaintiff and each member of the Class has been injured and has lost money or property, and is entitled to restitution and injunctive relief.

### SIXTH CLAIM FOR RELIEF
**Unjust Enrichment**

140.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

141.    By using Last Look to reject matched orders on Autobahn and ECNs in order to increase Deutsche Bank's FX profits at the expense of Plaintiff and Class members, Deutsche Bank knowingly engaged in conduct that was unfair, unconscionable, and oppressive.

142.    Deutsche Bank knowingly received and wrongfully retained excess profits that rightfully belonged to Plaintiff and Class members.  In so doing, Deutsche Bank acted with conscious disregard for the rights of Plaintiff and Class members.

143.    By rejecting matched orders that should have been executed, Deutsche Bank has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members.

144.    Deutsche Bank's unjust enrichment is traceable to, and resulted directly and proximately from, its wrongful use of Last Look.

145.    Under the common law doctrine of unjust enrichment, it is inequitable for Deutsche Bank to be permitted to retain the benefits it received, and is still receiving, from its wrongful use of Last Look.  Deutsche Bank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

146.    The financial benefits derived by Deutsche Bank rightfully belong to Plaintiff and Class members.  Deutsche Bank should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Deutsche Bank traceable to Plaintiff and Class members.

## REQUESTED RELIEF

147.    Plaintiff requests relief as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B. That the Court enter an order declaring that Defendant's actions, as set forth in this Complaint, violate the law;

C.  That the Court award Plaintiff and Class members damages and/or restitution in an amount to be determined at trial;

D.  That the Court issue appropriate injunctive and other equitable relied against Defendant;

E.  That the Court award Plaintiff pre- and post-judgment interest;

F.  That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

G.  That the Court award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

148.   Plaintiff demands a jury trial of all issues so triable.

Dated:  December 21, 2015               SCOTT+SCOTT, ATTORNEYS AT LAW, LLP


                                         s/ Christopher M. Burke
                                        Christopher M. Burke (CB-3648)
                                        Walter W. Noss (WN-0529)
                                        Kristen M. Anderson
                                        Kate Lv
                                        707 Broadway, Suite 1000
                                        San Diego, CA 92101
                                        Telephone: (619) 233-4565
                                        Facsimile:  (619) 233-0508

                                        David R. Scott
                                        Sylvia Sokol
                                        Thomas K. Boardman
                                        SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                        The Chrysler Building
                                        405 Lexington Avenue
                                        New York, NY 10174-4099
                                        Telephone: (212) 223-6444
                                        Facsimile:  (212) 223-6334

George A. Zelcs
Robert E. Litan
Randall P. Ewing, Jr.
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile:  (312) 641-9751

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Michael E. Klenov
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile:  (314) 241-3525

Michael D. Hausfeld
Reena A. Gambhir
Jeannine M. Keeney
HAUSFELD, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201

Bonny E. Sweeney
Michael P. Lehmann
HAUSFELD, LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile:  (415) 358-4980

Linda P. Nussbaum
Bart D. Cohen
Bradley J. Demuth
NUSSBAUM LAW GROUP, P.C.
570 Lexington Avenue
New York, NY 10022
Telephone: (212) 702-7053
Facsimile:  (212) 681-0300