UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/6/2018

--------------------------------------------------------X
                          :

AXIOM INVESTMENT ADVISORS, LLC, et al.:
                          :

                    Plaintiffs,  :          15 Civ. 9945 (LGS)
                          :

          -against-        :        **OPINION AND ORDER**
                          :

DUETSCHE BANK AG,          :
                    Defendant.  :
--------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      This putative class action arises out of Defendant Deutsche Bank AG's ("Deutsche Bank") alleged practice of delaying execution of electronically matched trade orders in the foreign exchange ("FX") market in order to take advantage of how the market moved in the interim -- a practice known as "Last Look." Plaintiffs Axiom Investment Advisors, LLC and Axiom Investment Company, LLC, by and through their Trustee Gildor Management, LLC (collectively "Axiom"), assert claims against Deutsche Bank for breach of contract and unjust enrichment. Axiom now moves to certify two classes under Federal Rules of Civil Procedure 23(a) and 23(b)(3). For the following reasons, the motion is denied.

## I.    BACKGROUND

### A.    Factual Background

      The FX market is one of the largest and most actively traded liquid markets in the world. Currency trading in the FX market is centered on "spot" transactions, where a spot dealer quotes its customer a "bid" (the price at which it will buy a currency) and an "ask" (the price at which it will sell). Large banks like Deutsche Bank serve as liquidity providers, or FX dealers, quoting both bids and asks and trading in either direction with FX customers.

Today, most FX trading occurs on electronic trading platforms, with electronic foreign exchange trading accounting for over $2.7 trillion in trades per day. Deutsche Bank provides liquidity through two types of electronic trading platforms: single-dealer, proprietary trading platforms and multi-dealer platforms owned and operated by third-party providers. Deutsche Bank's single dealer platform Autobahn, or ABFX, allows Autobahn clients to trade manually through a graphical user interface ("GUI") or an application program interface ("API"). In 2012, Deutsche Bank also introduced a next-generation trading platform, RAPID, which allows for trades only over an API. The multi-dealer platforms, called electronic communications networks ("ECNs"), enable one or more clients to trade with one or more banks, either on a disclosed basis or anonymously. For example, Currenex and Hotspot are ECNs.

Autobahn GUI clients are required to accept Deutsche Banks's Terms and Conditions ("Ts&Cs"), which govern GUI trading over Autobahn. Clients using an API to trade on Autobahn or RAPID are generally required to execute Service Level Agreements ("SLAs"). Sections 2 and 3 of the SLA set forth the procedures for FX trading. Deutsche Bank also requires some counterparties accessing its liquidity on certain third-party ECNs to execute Electronic Platform Terms ("EPTs"), which similarly set forth the bank's FX trading procedures. However, some counterparties trade with Deutsche Bank anonymously on ECNs, and counterparties on certain ECNs, like FX All and Currenex, do not execute EPTs or any other agreement with Deutsche Bank.

Axiom traded with Deutsche Bank through an API in over 8,000 Autobahn transactions, presumably subject to an SLA, although neither party was able to produce an SLA that Axiom had signed. Axiom asserts that it also traded anonymously with Deutsche Bank on ECNs without any express agreement.

Deutsche Bank's electronic trading platforms display indicative two-way (bid/ask) prices to each client for various currency pairs and amounts. The overall life cycle of a trade can be measured in fractions of seconds, with indicative prices that can change multiple times within seconds. When a client wishes to trade, it sends a trade instruction at the indicative price supplied by Deutsche Bank. Once Deutsche Bank receives the trade instruction, it performs a series of checks, including credit, liquidity, system, and price checks, to determine whether it will accept the client's request.

Beginning in 2010, Deutsche Bank introduced an artificial delay between the time it received the trade instruction and the time it determined whether to accept or reject the trade. This delay was referred to as "delayed trade acceptance" ("DTA"). DTA added a fraction-of-a-second delay before Deutsche Bank performed its price check.

Deutsche Bank's stated purpose for DTA was that it acted as a defensive measure against the small sub-set of clients who employed predatory execution styles that produced what is called "toxic flow." Toxic flow can refer to execution strategies that take advantage of inherent latencies in electronic trading allowing certain of the Bank's sophisticated counterparties to detect market movement milliseconds before the Bank's systems have properly adjusted its price. Another type of toxic flow, called "spraying the market," occurs when a sophisticated client obtains a better price by breaking up and spreading fractions of its total order volume across several liquidity providers. The near-simultaneous trades with these providers quickly move the price away from the market makers, causing them consistent losses.

During the artificial delay induced by DTA, Deutsche Bank employed algorithms that compared the customer's requested price for its order against the Bank's latest indicative price for that customer and currency pair at the end of the latency period. If the price moved in the

client's favor beyond Deutsche Bank's pre-determined tolerance for that client, the Bank rejected the trade. Deutsche Bank appears to have revealed the DTA practice and post-receipt price withdrawals to some, but not all clients.

After 2012, most of Deutsche Bank's clients subject to DTA migrated to the bank's RAPID platform, whose users located their servers next to a Deutsche Bank server, reducing latencies due to geographic distance between servers and facilitating faster trading. This allowed RAPID clients to measure the amount of DTA Deutsche Bank applied and discuss it with the bank. In October 2015, Deutsche Bank published a disclosure on the internet explaining the bank's use of DTA and post-receipt price withdrawals, and stating that this practice can result in a greater proportion of rejections when the price moves in the client's favor. In May 2017, Deutsche Bank updated this disclosure to describe the process in greater detail. In relevant part, the disclosure states:

> The price check feature of last look is a control that is used to identify whether a customer's trade request is made at a price that, at the moment of the trade acceptance decision, is within Deutsche Bank's price tolerance for execution for that customer. This control may be applied . . . after a short delay. . . . If the price check shows that the refreshed price has moved relative to the price included in the customer's trade request by more than the relevant price tolerance for that customer, Deutsche Bank will reject the trade request.

Axiom contends that Deutsche Bank went beyond combatting toxic flow and programmed its algorithms selectively to execute profitable trades and reject unprofitable ones, in violation of the Bank's obligations to its counterparties under express and implied agreements.

On June 20, 2018, Deutsche Bank and the New York State Department of Financial Services entered into a consent order regarding Deutsche Bank's FX trading business between 2007 and 2013 ("NYDFS Consent Order"). The Department found that Deutsche Bank had engaged in illegal misconduct, much of which is the subject of a separate lawsuit and class action

settlement.  *See generally In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ.

7789 (S.D.N.Y.), ECF Nos. 1095-110.  With respect to "last look," the practice at issue here, the

Department stated, "While the use of last look in electronic trading can serve as a legitimate tool

to defend against toxic flow and assist in keeping spreads tight for customers, it is best employed

when (a) tailored to the risk involved, and (b) adequately disclosed to customers."  The

Department found that, "as a general matter, Deutsche Bank properly calibrated its deployment

of 'last look' buffers.  The 'last look' functionality was adequately tailored to the risks involved

with a broad range of Deutsche Bank customers, and was properly disclosed in trading

agreements and elsewhere."

### B.    Procedural History

This putative class action was filed in December 2015.  Axiom brought claims against

Deutsche Bank for breach of contract, breach of the implied covenant of good faith and fair

dealing, violations of New York General Business Law ("NYGBL") § 349 and § 350, and unjust

enrichment.

Deutsche Bank moved to dismiss the complaint, and the motion was granted in part and

denied in part in February 2017.  The Court dismissed Axiom's claims for breach of the implied

covenant of good faith and fair dealing, violations of NYGBL § 349 and § 350, and unjust

enrichment as to transactions that occurred on Autobahn.  The surviving claims are breach of

contract when there was an express agreement, and breach of implied contract or unjust

enrichment in the absence of an express agreement.  Relevant to this motion, the Court found

that the Ts&Cs -- which govern Autobahn GUI transactions -- are ambiguous as to whether they

permit post-receipt price withdrawals.  Although the clients who engaged in these transactions

are not included in Axiom's proposed classes, the terms of the Ts&Cs are similar to the terms of the SLAs and EPTs, which govern the transactions of the putative Express Contract Class.

Axiom now moves to certify two classes under Rule 23(b)(3), for the period on or after December 21, 2011 (the Class Period):

### 1. The Express Contract Class

All persons who (1) entered into a Service Level Agreement or Electronic Platform Terms with Deutsche Bank that contained a provision calling for the application of New York law; (2) submitted an FX order to Deutsche Bank on or after December 21, 2011, via an application programming interface on ABFX, RAPID, or an ECN subject to Electronic Platform Terms; and (3) had their order rejected by Deutsche Bank because of a price generated after Deutsche Bank received the order.

### 2. The Implied Contract Class

All persons who (1) submitted an FX order to Deutsche Bank on or after December 21, 2011, on an ECN not subject to Electronic Platform Terms; (2) had their order rejected by Deutsche Bank because of a price generated after Deutsche Bank received the order; and (3) were either (a) domiciled in the United States, or (b) if domiciled elsewhere, had their order routed over a Deutsche Bank or ECN server based in New York.

By their terms, these definitions do not include GUI Autobahn users, who were subject to the Ts&Cs.

## II.    STANDARD

Federal Rule of Civil Procedure 23(a) provides that plaintiffs may sue on behalf of a class where:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The Second Circuit "has also 'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *In re Petrobras*

*Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Where, as here, a plaintiff seeks to certify a class under Rule 23(b)(3), the plaintiff also must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Second Circuit gives Rule 23 a "liberal rather than restrictive construction, and courts are to adopt a standard of flexibility." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *accord In re J.P. Morgan Stable Value Fund ERISA Litig.*, No. 12 Civ. 2548, 2017 WL 1273963, at *5 (S.D.N.Y. Mar. 31, 2017). But "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores*, *Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A plaintiff must establish by a preponderance of the evidence that each of Rule 23's requirements is met. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016). A certifying court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (quoting *In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)) (internal quotation marks omitted).

## III.    DISCUSSION

The class certification motion is denied as to both putative classes. Both proposed classes fail to satisfy Rule 23(b)(3) because Plaintiffs have not proven predominance as to either class. "Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to

individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)) (internal quotation marks

omitted).  Plaintiffs need not prove, however, that the legal or factual issues that predominate

will be answered in their favor.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468

(2013).

### 1. Express Contract Class

The key question underlying the claims of the Express Contract Class is whether

Deutsche Bank's post-receipt price withdrawals breached the SLAs and EPTs.  The relevant

contractual provisions of the SLAs are ambiguous, and extrinsic evidence suggests that a

substantial proportion of class members understood the provisions to allow the practice.  Thus,

this question cannot be answered on a class-wide basis as to customers subject to SLAs.

Moreover, the EPT submitted with this motion explicitly allows post-receipt price withdrawals.

In ruling on the motion to dismiss, this Court found that the relevant language in the

Ts&Cs is ambiguous.  Although the Ts&Cs are not at issue on this motion, the SLAs and EPTs

contain language similar to that found in the Ts&Cs.  Plaintiffs correctly point out that the SLAs

and EPTs are separate agreements from the Ts&Cs and should be interpreted on their own terms.

Upon examination of the SLA and EPT submitted with this motion,[1] it is apparent that the

analysis applied to the Ts&Cs at the motion to dismiss stage also applies to the SLAs and EPTs.

"The threshold question in a dispute over the meaning of a contract is whether the

contract terms are ambiguous.  Under New York law, the meaning of a contract that is

---

[1] Deutsche Bank points to deposition testimony and emails suggesting that at least some SLAs
and EPTs were individually negotiated by counsel.  Any variations in the terms at issue here
would provide an additional basis to find lack of predominance as to the Express Contract Class.

unambiguous is a question of law for the court to decide."[2] *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (applying New York law) (citing *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). A contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted) (applying New York law). On the other hand, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (alteration in original) (internal quotation marks omitted); *accord Banco Espírito Santo, S.A. v. Concessionária Do Rodoanel Oeste S.A.*, 951 N.Y.S.2d 19, 24 (1st Dep't 2012).

A court's primary objective in interpreting a contract is "to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (applying New York law). A contract should be read "as a whole to ensure that undue emphasis is not placed upon particular words and phrases and to safeguard against adopting an interpretation that would render any individual provision superfluous." *Law Debenture Tr. Co.*, 595 F.3d at 468 (internal citation and quotation marks omitted). "[T]he words and phrases [in a contract] should be given their plain meaning . . . ." *Chesapeake Energy Corp. v. Bank of N.Y.*

---

[2] The SLA and EPT submitted with this motion both contain New York choice-of-law provisions.

9

*Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations in original) (internal quotation marks omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)) (applying New York law).

Sections 2 and 3 of the SLA submitted with this motion state the procedures for FX trading for API users. Deutsche Bank "shall supply prices" from time to time, which "shall be effective and may be used in a trade instruction prior to the earlier of its expiration time, the provision of a new price and the time, if any, at which it is otherwise withdrawn by Deutsche Bank." "[T]hese prices . . . may be withdrawn or changed without notice." Clients, such as Axiom, may input a trade instruction, which "constitutes an offer to enter into a Transaction" at the supplied price. Deutsche Bank may execute or reject a Client's trade instruction "at its discretion in accordance with the criteria set forth in this Service Agreement." The SLA states that "Deutsche Bank may reject a trade instruction" for specified reasons, including that "[t]he price shall have expired, been superseded by a subsequent price or has been withdrawn or is an untradable [*sic*] price." A binding agreement to trade arises upon "[e]xecution of a trade instruction . . . which shall occur upon receipt of such instruction by Deutsche Bank and verification by Deutsche Bank that such instruction complies with the requirements of this section [3.]" The EPT contains virtually identical terms.[3]

---

[3] Section 2(a) of the EPT requires a client's FX trade instructions to comply with certain limitations, including that "[t]he price shall be the latest price received by Client for such currency pair from Deutsche Bank and, at the time the applicable trade instruction is received by Deutsche Bank, shall not have expired, been withdrawn or been superseded on Deutsche Bank's server by another price." Section 2(b) of the EPT provides that "[a] trade instruction entered by [a] Client constitutes an offer to enter into a Transaction . . . and may be executed or rejected by Deutsche Bank at its discretion in accordance with the criteria set forth in these Terms." Section 2(b) further provides that execution of a trade instruction, "(which shall occur upon receipt of such instruction . . . and verification by Deutsche Bank that such instruction complies with the requirements of this section 2) shall constitute a binding agreement."

Whether Deutsche Bank can withdraw a price after it receives a trade instruction depends on when compliance with Deutsche Bank's criteria for trade instructions is to be measured. As with the Ts&Cs, the SLA is silent, and therefore "could suggest more than one meaning when viewed objectively," as to when that moment occurs. *Law Debenture Trust*, 595 F.3d at 466.

One interpretation, consistent with Deutsche Bank's position, is that the time to determine whether the price has been withdrawn is upon execution, as the SLA provides that no binding agreement to trade exists prior to execution. Therefore, Deutsche Bank can withdraw a price at any time before it executes a trade instruction.

Alternatively, Axiom argues that, unlike the Ts&Cs, the SLAs and EPTs expressly limit when Deutsche Bank can reject a trade instruction, and those circumstances do not include upon a post-receipt price change. Specifically, the SLA and EPT require a trade instruction to comply with certain "limitations," including in the SLA that the instruction include currency pair, the principal amount to be traded and "the latest price received by Client for such Currency Pair from Deutsche Bank"; and in the EPT that the instruction include the "terms specified by Deutsche Bank." Both the SLA and EPT also provide that "Deutsche Bank shall have no obligation to accept any trade instruction which does not comply with the limitations set forth above . . . ." This sentence can be interpreted to mean that Deutsche Bank is obligated to accept a fully compliant trade instruction. Axiom argues that its interpretation is buttressed by the additional language in the SLA and the EPT that "[e]xecution of a trade instruction by Deutsche Bank (*which shall occur upon receipt of such instruction . . . and verification by Deutsche Bank that such instruction complies with the requirements . . .*) shall constitute a binding agreement . . . *on the terms of such/the*[4] *instruction*[.]" (emphasis added). As both interpretations are

---

[4] The SLA says "the" and the EPT says "such" in this otherwise identical quotation.

reasonable, the SLA is ambiguous.

In contrast, Section 2(a) of the EPT submitted with this motion contains an additional provision, which expressly provides that "Deutsche Bank may withdraw a price after it has been the subject of a trade instruction if the price has changed since it was transmitted to [the] Client . . . ."  In other words, the EPT explicitly allows post-receipt price withdrawals.  Because this express authorization is included in the EPT, but not the SLA, putative class members that signed EPTs are differently situated from those who signed SLAs, making certification of the Express Contract Class inappropriate.[5]

Because the SLA does not expressly prohibit post-receipt price checks, a finder of fact would have to review extrinsic evidence to conclude that this practice was prohibited by Deutsche Bank's agreement with any Express Contract Class member.  *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985); *accord Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

When construing an ambiguous contract, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (internal quotation marks omitted) (applying New York law).  Extrinsic evidence may include "the acts and circumstances surrounding execution of the ambiguous term," *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989) (citing *Bray Terminals, Inc. v. Grand Union Co.*, 425 N.Y.S.2d 886, 888 (3d Dep't 1980)), "conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written [agreement]," *Mooney v. AXA Advisors, L.L.C.*,

---

[5] In theory, a subclass of Deutsche Bank clients who signed such EPTs could be certified, but this subclass would have no claim against the bank for Last Look.

19 F. Supp. 3d 486, 506 (S.D.N.Y. 2014) (alteration in original) (internal quotation marks omitted) (quoting *67 Wall St. Co. v. Franklin Nat'l Bank*, 333 N.E.2d 184, 186 (N.Y. 1975)), and "the parties' course of conduct throughout the life of the contract," *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (citing *Big Tree Energy Partners v. Bradford*, 640 N.Y.S.2d 270, 273 (3d Dep't 1996)). Extrinsic evidence may also include industry custom and practice if certain requirements are met. *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992) (citing *London Assur. Corp. v. Thompson*, 62 N.E. 1066, 1067 (N.Y. 1902); *accord Last Time Beverage Corp. v. F & V Distribution Co., LLC*, 951 N.Y.S.2d 77, 81–82 (2d Dep't 2012) ("A party who seeks to use trade usage to define language or annex a term to a contract must show either that the other party was actually aware of the trade usage, or that the usage was so notorious in the industry that a person of ordinary prudence in the exercise of reasonable care would be aware of it.").

The record contains undisputed evidence that at least some, and perhaps many, of Deutsche Bank's clients were aware of the bank's post-receipt price withdrawals and understood the relevant agreements to allow them. First, the practice is commonly known in the FX market as a measure to protect against predatory trading strategies by certain sophisticated customers; the practice has been discussed in industry publications since at least late 2006. For example, a 2014 *FX Week* article explains that

> The origins of last look lie in the early days of e-FX trading, when technological constraints meant the time taken for a bank in London and a client in Singapore to contact one another, negotiate a price and execute a trade could run into dozens of seconds or longer. As they ticked by, the market may have moved to the disadvantage of either participant. In response, trading platforms introduced the last look order type, which gave banks a final opportunity to reject a trade after negotiation in the event of an adverse price move. In the years since, e-FX technology has evolved handsomely. . . . But, last look is still in use.

In a 2012 *FX Week* article, Bill Goodbody, a managing director at Hotspot FX in New York, is

quoted as stating that "one of the main safeguards that last look provides is the ability to validate . . . that the price is the best you can get at that instant." As explained in the NYDFS Consent Order, "the use of last look in electronic trading can serve as a legitimate tool to defend against toxic flow and assist in keeping spreads tight for customers."[6]

Second, evidence suggests that Deutsche Bank disclosed the practice to at least a significant number of customers. According to the NYDFS Consent Order, "While the use of last look in electronic trading can serve as a legitimate tool to defend against toxic flow and assist in keeping spreads tight for customers, it is best employed when (a) tailored to the risk involved, and (b) adequately disclosed to customers," and found that "as a general matter, Deutsche Bank properly calibrated its deployment of 'last look' buffers. The 'last look' functionality was adequately tailored to the risks involved with a broad range of Deutsche Bank customers, and was properly disclosed in trading agreements and elsewhere." Deutsche Bank provided written disclosures beginning in 2015 discussing the bank's use of post-receipt price information to evaluate and potentially reject trade requests. Clients who reviewed or had access to these disclosures and who have since continued to trade with Deutsche Bank will have particular difficulty proving their contract claims.

Third, clients on RAPID, which included most clients subject to DTA after 2012, can measure Deutsche Bank's use of DTA. For RAPID users, the record contains evidence that clients on RAPID did not understand the SLAs or EPTs to prohibit post-receipt price withdrawals. For example, two email exchanges with Deutsche Bank clients, one from March

_____

[6] Findings in the NYDFS Consent Order are admissible under Federal Rule of Evidence 803(8)(A)(iii) as "a record or statement of a public office . . . in a civil case . . . [that includes] factual findings from a legally authorized investigation." *See, e.g.*, *Coleman v. City of Niagara Falls*, No. 09 Civ. 157S, 2015 WL 4208602, at *3–4 (W.D.N.Y. July 10, 2015).

2012 and another from March 2013, show that these clients were unsatisfied with low acceptance rates and slow response times, and negotiated faster response times and higher fill rates in return for wider spreads.

Through their expert Mr. Reto Feller, Plaintiffs present a contrasting view of the evidence.  Based on his 31 years of experience as an FX professional, Feller opines that "Deutsche Bank's use of post-receipt price checks to renege on otherwise valid trades was contrary to market convention and the expectations of fair dealing by FX traders."  In support of his opinion, Feller argues that Deutsche Bank's practices are outside the bounds of the 2011 Bank of England Non-Investment Products ("NIPS") Code, a voluntary code "drawn up by market practitioners," "intended only as guidance on what is currently believed to constitute good practice in these markets."  According to Feller, post-receipt price withdrawals contravene the 2011 NIPS Code because "there is no unavoidable technological latency that prevents Deutsche Bank from verifying the price based on its own, then-existing price at the time it received the instruction."  In his supplementary declaration, he cites emails and chats from 2011 -- before the start of the Express Contract Class Period -- suggesting that Deutsche Bank limited the time delay it imposed on trades to avoid detection by human traders, and that Deutsche Bank support personnel were directed not to disclose the bank's use of DTA to clients.

Feller's arguments are unavailing because the weight of the evidence contradicts them.[7] He does not cite a single industry publication or other authority suggesting that participants in the FX industry were unaware of liquidity providers' use of post-receipt price withdrawals, much less universally so.  As discussed above, industry publications throughout the Class Period

---

[7] Deutsche Bank's *Daubert* motion to strike Feller's expert testimony is denied as moot because the Court does not rely on Feller's testimony in ruling on Plaintiff's motion for class certification.

discussed the practice, and NYDFS has described it as "a legitimate tool to defend against toxic

flow and assist in keeping spreads tight for customers." The 2011 NIPS Code that Feller cites

does not prohibit or discourage post-receipt price withdrawals; it merely advises industry

participants:

> Participants should also not deliberately place orders that they have no intention of honouring or accepting to be traded on, even just for price discovery, by using a 'last look' mechanism as a control to prevent any possible subsequent trades. Using a 'last look' mechanism is within best practice when showing genuine interest at specific price levels or when providing a support price, in order to mitigate technological anomalies and latencies.

The emails and chats Feller cites about limiting time delays and disclosures by support personnel

lack sufficient context to determine the extent of their relevance. More importantly, they do not

refute the ample evidence discussed above that many Deutsche Bank clients were aware of the

bank's practices, either through the bank's disclosures or through general familiarity with

industry practices.

Given the substantial evidence in the record that many of Deutsche Bank's clients were

aware of the bank's use of post-receipt price withdrawals, any Express Contract Class member

seeking to prove breach of contract would have to show through individualized extrinsic

evidence that it had reached an understanding with the bank that post-receipt price checks were

prohibited under the SLA the parties signed. (As noted above, the EPTs contain a provision that

explicitly permits post-receipt price withdrawals.) This individualized inquiry would be the crux

of any such lawsuit and would overwhelm common questions as to Deutsche Bank's general use

of Last Look. *See, e.g.*, *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs.,

Inc.*, 601 F.3d 1159, 1176–77 (11th Cir. 2010) ("Even the most common of contractual questions

-- those arising, for example, from the alleged breach of a form contract -- do not guarantee

predominance if individualized extrinsic evidence bears heavily on the interpretation of the class

members' agreements."); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010) (predominance not satisfied where plaintiffs sought certification on claims for breach of a form annuity contract because "the existence of two or more reasonable interpretations opens the door for extrinsic evidence about what each party intended when it entered the contract").

Plaintiffs cite case law suggesting that ambiguities in form contract language need not defeat class certification. These cases are inapplicable here. In *In re U.S. Foodservice, Inc. Pricing Litigation*, the Second Circuit addressed alleged fraudulent overbilling by a food distributor, in violation of state contract law. 729 F.3d 108, 112 (2d Cir. 2013). There, the class members had all signed "cost-plus" contracts with the defendant, but these contracts were not identical. The Second Circuit held that "argument[s] as to the importance of individualized extrinsic evidence as to the contract claims" failed because the record lacked evidence of "any USF customer's contract negotiations or individualized conduct in performing pursuant to the contract that tend[ed] to show either that the customer understood his contract to authorize the [pricing] arrangements or that he otherwise acquiesced in them." *Id.* at 124–25. The court credited expert testimony that the contracts at issue "'essentially all say the same thing' and that in the food service industry, 'it is well understood what a cost plus contract is.'" *Id.* at 124 (alterations omitted). In contrast, in this case, the SLAs are ambiguous as to the central issue of this case -- whether or not they permit post-receipt price withdrawals. Furthermore, the evidence shows that many Express Contract Class members likely understood their contracts to authorize the practice.

In *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 757 (3d Cir. 2017) (summary order), the Third Circuit vacated a denial of class certification based on consumers' individual understandings of a variable rate provision in a company's form service agreement. Interpreting

Pennsylvania law, the unpublished, out-of-circuit summary order holds that "extrinsic evidence of one party's undisclosed, subjective understanding, intent, or opinion about the meaning of ambiguous contract language cannot be used to substantiate a particular interpretation of that language." *Id.* at 756. The opinion explains that the court's objective in considering extrinsic evidence is "to discover the meaning 'that . . . each party *had reason to know* would be given to the words by the other party.'" *Id.* (alteration in original) (emphasis in original) (quoting *Celley v. Mut. Benefit Health & Accident Ass'n*, 324 A.2d 430, 435 (Pa. Super. Ct. 1974)). In this case, Deutsche Bank's extrinsic evidence does not show its undisclosed subjective understanding. Instead, it shows what defendants in *Gillis* could not show -- that many of the bank's clients *had reason to know* about the bank's use of post-receipt price withdrawals when they traded under the SLA; thus supporting an interpretation of the SLA that the practice was permissible.

Plaintiffs cite *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432 (1st Cir. 2013), in which the court declined to consider extrinsic evidence in a putative class action involving uniform mortgage contracts, *id.* at 451. Plaintiffs rely on *Kolbe* for the proposition that "[e]xtrinsic evidence of the parties' unique intentions regarding a uniform clause is generally uninformative because unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties to a contract." *Id.* at 436. As an initial matter, this out-of-circuit opinion, decided en banc by a divided court, is not controlling here. *Kolbe* is also distinguishable because the contracts at issue in this case are not uniform. First, as discussed, the SLA and EPT submitted with this motion contain materially differing provisions relevant to the permissibility of post-receipt price withdrawals. Second, Deutsche Bank has proffered deposition testimony and emails suggesting that at least some SLAs and EPTs were individually negotiated by counsel. Plaintiffs also cite *Steinberg v. Nationwide Mutual Insurance Company*,

224 F.R.D. 67, 74 (E.D.N.Y. 2001), a case involving form insurance contracts, for the

proposition that "claims arising from interpretations of a form contract appear to present the

classic case for treatment as a class action," *id.*at 74. *Steinberg* is inapplicable here for the same

reasons as *Kolbe*. For all of these reasons, the Express Contract Class fails to satisfy

predominance.

## 2. Implied Contract Class

Because many participants in the FX market were aware of liquidity providers' use of

post-receipt price withdrawals, the Implied Contract Class fails the predominance requirement as

well. Under New York law, "a contract may be implied where inferences may be drawn from

the facts and circumstances of the case and the intention of the parties as indicated by their

conduct." *Transcience Corp. v. Big Time Toys, L.L.C.*, 50 F. Supp. 3d 441, 455 (S.D.N.Y.

2014). Notably, "there must be an indication of a meeting of minds of the parties constituting an

agreement." *Berlinger v. Lisi*, 731 N.Y.S.2d 916, 917 (3d Dep't 2001). "Whether a contract has

been formed does not depend on either party's subjective intent; instead, the determination must

be based on the 'objective manifestations of the intent of the parties as gathered by their

expressed words and deeds.'" *Brighton Inv., Ltd. v. Har-Zvi*, 932 N.Y.S.2d 214, 216 (3d Dep't.

2011) (quoting *Brown Bros. Elec. Contactors v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001

(N.Y. 1977)). To succeed on a claim for breach against Deutsche Bank, an Implied Contract

Class member must prove that, as manifested by the conduct of the parties, it had somehow

reached an understanding with the bank that precluded the bank's use of post-receipt price

withdrawals. Given the general understanding in the market that liquidity providers like

Deutsche Bank used this practice, such proof would have to be individualized. As with the

Express Contract Class, this issue would be central to any lawsuit brought by Implied Contract

Class members, thus defeating the predominance requirement.  *See, e.g.*, *Vega v. T-Mobile USA*, 564 F.3d 1256, 1274 (11th Cir. 2009) (predominance not satisfied on claims for breach of implied contract where a cellular company changed its employee compensation plan, resulting in sales employees having to pay back previously earned commission, because "[s]orting out and proving the claims, if any, of these class members, and others with similar understandings . . . would require substantial individualized evidence different from and in addition to that which [class plaintiff] would proffer to establish his own claim.").[8]

Axiom's alternative claim for unjust enrichment on behalf of the Implied Contract Class fares no better.  Under New York law, to prevail on a claim for unjust enrichment, a plaintiff must establish: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff."  *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 273 F.3d 509, 519 (2d Cir. 2001); *accord Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011).  Proving the second and third elements of an unjust enrichment claim would require individualized inquiries.  As to the second element, evidence in the record suggests that post-receipt price checks benefited some customers overall even if more of their orders were rejected because the practice allowed Deutsche Bank to offer them tighter spreads.  The third element could likely not be satisfied as to the many customers who elected to trade on ECNs with full knowledge the liquidity providers engaged in Last Look.  *See, e.g.*, *Vega*, 564 F.3d at 1275 ("[W]hether or not a given commission charge back was

---

[8] To the extent that proof of breach of implied contract might differ materially for Implied Contract Class members based on variations in the governing state law, such differences would provide additional reasons why predominance is not met.

'unjust' will depend [in part] on what each employee was told and understood about the commission structure . . . .").[9]  The Implied Contract Class does not satisfy the requirement that common issues predominate.

## IV.   CONCLUSION

For the foregoing reasons, Axiom's motion to certify the Express Contract Class and the Implied Contract Class in this action is DENIED.  The motions to strike the declarations of experts Feller, McFarlane, Hendershott and Weisberg are DENIED as moot because the Court did not rely on their expert opinions in ruling on class certification.

The Clerk of Court is directed to close the motions at Docket Nos. 129, 136, 137, 141 and 142.


Dated:  September 6, 2018
         New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

---

[9] As with the implied contract claim, any material differences in the applicable state law would further undermine any showing of predominance.