# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

AXIOM INVESTMENT ADVISORS, LLC, by
and through its Trustee, Gildor Management,
LLC, and AXIOM INVESTMENT COMPANY,
LLC, by and through its Trustee, Gildor
Management, LLC,

                               Plaintiffs,

        vs.

DEUTSCHE BANK AG,

                             Defendant.

Case No. 15-cv-09945 (LGS)

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**

---

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

    1.    Electronic FX Trading ..........................................................................................4

    2.    Deutsche Bank's Electronic FX Trading .............................................................4

    3.    Deutsche Bank's Execution Algorithms ..............................................................6

    4.    Deutsche Bank's Obfuscation and Concealment ................................................9

PROPOSED CLASSES .....................................................................................................12

LEGAL STANDARD ........................................................................................................13

ARGUMENT ......................................................................................................................14

    1.    The Proposed Classes are Sufficiently Numerous .............................................14

    2.    Multiple Questions of Law and Fact Are Common to All Members of Each Class ...........15

    3.    Axiom's Claims Are Typical of the Claims of All Class Members .........................15

    4.    Axiom and its Counsel Will Adequately Protect the Interests of Both Classes ...................16

    5.    Common Issues of Law and Fact Predominate Over Any Individual Ones .......................17

    6.    Common Issues Predominate in Plaintiffs' Proof of Damages ................................22

    7.    A Class Action is the Superior Method of Adjudicating this Controversy ...........................23

CONCLUSION ...................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .......................................................... 13, 16, 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
133 S. Ct. 1184 (2013) ........................................................................................................ 14

*Axiom v. Barclays Bank PLC,*
1:15-cv-09323 (S.D.N.Y.) .................................................................................................. 17

*Ballinger v. Advance Magazine Publishers, Inc.,*
2014 WL 7495092 (S.D.N.Y. Dec. 29, 2014) .................................................................... 13

*Brown v. Pro Football, Inc.,*
146 F.R.D. 1 (D.D.C. 1992) ................................................................................................ 21

*In re Checking Account Overdraft Litig.,*
307 F.R.D. 630 (S.D. Fla. 2015) ......................................................................................... 20

*Claridge v. N. Am. Power & Gas, LLC,*
2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ................................................................... 19

*Consolidated Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995) ................................................................................................. 14

*In re Drexel Burnham Lambert Grp., Inc.,*
960 F.2d 285 (2d Cir. 1992) ............................................................................................... 16

*Dupler v. Costco Wholesale Corp.,*
249 F.R.D. 29 (E.D.N.Y. 2009) .............................................................................. 15, 19, 21

*Fed. Ins. Co. v. Distinguished Properties Umbrella Managers Inc.,*
721 F. Supp. 2d 293 (S.D.N.Y. 2010) ................................................................................ 20

*In re Flag Telecom Holdings, Ltd., Sec. Litig.,*
574 F.3d 29 (2d Cir. 2009) ................................................................................................. 16

*Flanagan v. Allstate Ins. Co.,*
242 F.R.D. 421 (N.D. Ill. 2007) ......................................................................................... 19

*Gillis v. Respond Power, LLC,*
677 F. App'x 752 (3d Cir. 2017) ........................................................................................ 20

*Intellectual Cap. Partner v. Int'l Credit Partners LLC*,
  2009 WL 1974392 (S.D.N.Y. July 8, 2009) ...................................................21

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
  2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017) ...............................................13

*Jinno Intern. Co. v. Premier Fabrics, Inc.*,
  2013 WL 4780049 (S.D.N.Y. May 24, 2013) ................................................21

*Keilholtz v. Lennox Hearth Prods. Inc.*,
  268 F.R.D. 330 (N.D. Cal. 2010) ...................................................................22

*Kolbe v. BAC Home Loans Servicing, LP*,
  738 F.3d 432 (1st Cir. 2013) .........................................................................20

*Kottler v. Deutsche Bank AG*,
  2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010).................................................16

*Mahon v. Chicago Title Ins. Co.*,
  296 F.R.D. 63 (D. Conn. 2013) ................................................................ 21, 22

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997) ..........................................................................13

*Menocal v. GEO Grp., Inc.*,
  2017 WL 880882 (D. Colo. Feb. 27, 2017) ...................................................21

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  257 F.R.D. 46 (D.N.J. 2009).........................................................................22

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015)..............................................................13

*In re Nigeria Charter Flights Contract Litig.*,
  233 F.R.D. 297 (E.D.N.Y. 2006) ...................................................................21

*Oakley v. Verizon Commc'ns, Inc.*,
  2012 WL 335657 (S.D.N.Y. Feb. 1, 2012) ....................................................15

*In re Petrobas Secs.*,
  2017 WL 2883874 (2d Cir. July 7, 2017).......................................................14

*Pichardo v. Carmine's Broadway Feast Inc.*,
  2016 WL 4379421 (S.D.N.Y. June 13, 2016) ................................................13

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ..............................................................18

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ..................................................................22

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ..................................................................16

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
    2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) .............................................14

*Slapikas v. Mezzo Land Servs., LLC*,
    250 F.R.D. 232 (W.D. Pa.2008) ............................................................21

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (E.D.N.Y. 2004) ............................................................19

*Sykes v. Mel S. Harris and Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ....................................................................18

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ...........................................................16

*In re U.S. Foodservice Inc. Pricing Litig.*
    729 F.3d 108 (2d Cir. 2013) .......................................................17, 19, 21

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ...........................................................17, 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..............................................................................15

**Other Authorities**

Restatement (Second) of Contracts § 211(2) (1981) ...................................19

Rule 23 ...................................................................................................14

Rule 23(a) .........................................................................................13, 14

Rule 23(a)(2) ..........................................................................................15

Rule 23(a)(4) ..........................................................................................17

Rule 23(b) ...............................................................................................13

Rule 23(b)(3) ...................................................................................2, 14, 24

# INTRODUCTION

In the world of electronic FX trading, liquidity providers such as Deutsche Bank constantly stream currency prices to multiple trading venues so that counterparties can place orders to instantly trade at those prices. The time between when a liquidity provider receives an order (also known as a trade instruction) and when it confirms that trade is often referred to as the "last-look" period. That period is supposed to be used to ensure that the standard conditions necessary for a trade to be executed have been met—such as that the price being shown at the time of the order has not changed or been withdrawn before order receipt, and that the counterparty placing the order is eligible to trade. During the class period, however, Deutsche Bank programmed its trade execution algorithms to game the last-look period to its unilateral advantage across all trading venues. Rather than merely checking to verify that prices had not changed *before* order receipt, Deutsche Bank monitored price changes occurring *after* order receipt (i.e., during the last-look period) and used those post-receipt price changes to make trade execution decisions based strictly on whether they would benefit Deutsche Bank.

Deutsche Bank electronically streamed prices to two types of FX trading venues: proprietary Deutsche Bank platforms and third-party platforms called electronic communication networks ("ECNs"). Deutsche Bank required all counterparties trading on its proprietary platforms, and some counterparties trading on certain ECNs, to execute standardized service contracts with materially identical terms. Those form contracts provided that "[e]xecution of a trade instruction … shall occur upon receipt of such instruction" and "shall constitute a binding agreement … on the terms of such instruction." The contracts further provided that the execution price "shall be the latest price received by Client," unless that price "shall have expired, been superseded by a subsequent price or … been withdrawn" by the time Deutsche Bank received the order. By programming its algorithms

to use *post-receipt* price movements to reject trades that should have been executed at the price received, Deutsche Bank breached these written agreements.

While some counterparties trading through ECNs did not enter into any written agreements with Deutsche Bank concerning those trades, implied-in-fact contracts were formed every time that the ECNs' algorithms matched a counterparty's order to a Deutsche Bank streaming price. Streaming prices on ECNs are the equivalent of "limit" orders where a party agrees to trade a specific quantity of currency at a specific price if there is a counterparty also willing to trade on those terms. Once an ECN's algorithms matched a Deutsche Bank streaming price to a willing counterparty, and assuming the standard trade conditions were satisfied during the last-look period, Deutsche Bank should have executed the trade at the agreed-upon terms. By programming its algorithms to use *post-match* price movements to reject trades where the price moved against Deutsche Bank, Deutsche Bank breached the implied-in-fact contracts with its counterparties using ECNs.

To facilitate the compensation of counterparties damaged by Deutsche Bank's breaches of contract (written and implied-in-fact), Axiom respectfully requests that the Court certify two classes under Rule 23(b)(3): one consisting of counterparties that traded with Deutsche Bank on venues governed by Deutsche Bank's standardized written contracts, and the other consisting of counterparties that traded with Deutsche Bank on ECNs governed only by implied-in-fact contracts.[1] The class period covers trade rejections and executions taking place on or after December 21, 2011, within four years before Axiom filed this lawsuit. Axiom is a typical and adequate representative of both classes because, during the class period, it was damaged by Deutsche Bank's improper rejection of otherwise executable orders on both types of venues.

---

[1] The precise definitions of the two classes are on p. 12, below.

Axiom's proposed classes are particularly well-suited for class certification. The claims of both classes focus on Deutsche Bank's uniform practice of programming its algorithms to make trade execution and pricing decisions based on price movements that took place *after* Deutsche Bank received or was matched to a counterparty's order. The classes are defined in such a way that every class member was not only exposed to Deutsche Bank's uniform practice, but also was damaged by having a trade rejected precisely because of a post-receipt price movement. Class members are easily ascertainable from Deutsche Bank's own trading records. Moreover, the standardized terms of the written contracts at issue do not vary materially among class members and all call for the application of New York law, meaning that Deutsche Bank's execution practices will be judged by a common standard. Additionally, the implied contracts for orders matched on ECNs depend on reasonable commercial expectations derived from fundamental and uniform aspects of multi-party trading venues and thus do not differ by counterparty.

The questions of fact and law common to the members of each class predominate over any hypothetical individual questions. Deutsche Bank will almost certainly argue that some class members may have learned about its improper rejection of trades during the last-look period yet continued to trade anyway. That argument is irrelevant to whether Deutsche Bank breached its contracts. The written contracts here are not ambiguous, but even if they were, they would not be susceptible to different interpretations based on individualized extrinsic evidence. They were form contracts drafted by Deutsche Bank for the purpose of creating uniform rules governing trades with all counterparties. The contracts could also be modified only in writing. Accordingly, individualized extrinsic evidence cannot lead to an interpretation that varies by counterparty. That is equally true of the implied contracts formed on ECNs, which also depend on uniform rules of engagement that cannot vary based on a counterparty's individualized knowledge.

## FACTUAL BACKGROUND

**1.      Electronic FX Trading**

In FX trading, large banks such as Deutsche Bank act as "liquidity providers" that simultaneously quote potential counterparties' prices for both buying and selling various currency pairs and stand ready to enter into either type of transaction. Declaration of Reto Feller, ¶¶ 16-17 ("Feller Decl."). Deutsche Bank is one of the largest FX liquidity providers in the world and was the largest for much of the class period.

Throughout the class period, more FX traders adopted electronic FX trading such that today a majority of trades are completed electronically. Feller Decl., ¶ 19. Prompt execution is *critical* to market participants. Feller Decl., ¶¶ 29-31, 37. Prices in the FX market move rapidly—sometimes multiple times within the space of only one second. *Id.* ¶ 29. Market prices can also move almost instantaneously in reaction to an order being placed or executed. *Id.* Reflecting the speed with which the market moves, Deutsche Bank received price updates from external sources as often as every one-tenth of a second (100 milliseconds) and could generate its own streaming prices at least that quickly. Ex. 1 at 01241496.[2]

**2.      Deutsche Bank's Electronic FX Trading**

Deutsche Bank engaged in electronic FX trading both through its proprietary "single-dealer platforms" such as Autobahn, ABFX, and RAPID, and through third-party ECNs such as Currenex, Hotspot, and FXAll. Ex. 2 at 35:6-36:7, 37:15-24 (Leigh). Counterparties could connect directly to Deutsche Bank's platforms either via a graphical user interface ("GUI") on the Autobahn website, or via an application programming interface ("API") that allowed counterparties to use their own

---

[2] References to "Ex." are to the Exhibits attached to the Declaration of Randall Ewing in support of Plaintiffs' Motion for Class Certification. Where a parenthetical is included after the citation, it refers to the name of the deponent.

trading platforms to communicate with Deutsche Bank's ABFX or RAPID platforms. *Id.* Counterparties could also access Deutsche Bank's liquidity via an API on third-party ECNs. *Id.*

Much of Deutsche Bank's electronic FX trading was conducted pursuant to standardized written contracts. For example, Deutsche Bank required all counterparties that connected to its single-dealer platforms using an API to execute standardized "Service Level Agreements," or Service Agreements. Ex. 3 at 35:5-8, 73:3-9 (Prata).[3] Deutsche Bank also required counterparties accessing its liquidity on certain third-party ECNs to execute standardized "Electronic Platform Terms." Ex. 4 at 01913539. However, Deutsche Bank traded with counterparties on certain other ECNs, such as Currenex, without requiring them to sign a written contract. Ex. 3 at 53:19-54:5 (Prata).

Deutsche Bank's Service Level Agreements referred to orders as "trade instructions" and explained that its streaming prices "shall be effective and may be used in a trade instruction prior to the earlier of its expiration time, the provision of a new price and the time, if any, at which it is otherwise withdrawn by Deutsche Bank." *See, e.g.,* Ex. 5 at 02368548. They further provided that the "[e]xecution of a trade instruction by Deutsche Bank (which shall occur upon receipt of such instruction by Deutsche Bank and verification by Deutsche Bank that such instruction complies with the requirements of this Section 2) shall constitute a binding agreement … on the terms of such instruction." *See, e.g., id.* at 550.

Although Section 2 of the Service Level Agreements set forth certain customary reasons for why an order could be rejected—e.g., the order did not contain the required information or did not concern a permitted currency pair within the counterparty's credit limits—it said nothing about

---

[3] Notably, not all of Deutsche Bank's counterparties executed the Autobahn Terms and Conditions that were the focus of Deutsche Bank's motion to dismiss—only counterparties that connected to Autobahn using a GUI did so. Ex. 3 at 182:3-13 (Prata); Ex. 7 at 133:8-135:19 (O'Flaherty). The Autobahn Terms and Conditions did not apply to counterparties that traded with Deutsche Bank via an API. *Id.*

Deutsche Bank's ability to reject a trade based on price changes *after* order receipt. *Id.* On the contrary, the Service Level Agreements provided that the execution price "shall be the latest price received by Client" unless that price "shall have expired, been superseded by a subsequent price or has been withdrawn." *Id.*

Deutsche Bank's standardized Electronic Platform Terms contained materially identical terms concerning prices, order receipt, and trade execution to the Service Level Agreements. The only difference was that the Electronic Platform Terms made explicit something that was obvious but merely implicit in the Service Level Agreements: that the execution price "shall be the latest price received by Client" so long as, "*at the time the applicable trade instruction is received by Deutsche Bank,*" that price "shall not have expired, been withdrawn, or been superseded on Deutsche Bank's server by another price." *See, e.g.,* Ex. 6 at 01469972 (emphasis added). Both standardized agreements also required that any amendments "be in writing and signed by the parties hereto," and called for the application of New York law for U.S.-based counterparties. *Id.* at 974; Ex. 5 at 02368559.[4]

Discovery has failed to turn up an executed agreement between Axiom and Deutsche Bank. But as a U.S.-based counterparty that connected exclusively via an API and traded with Deutsche Bank both through its proprietary platforms and through ECNs, Axiom would at a minimum have executed a Service Level Agreement containing a New York choice-of-law clause. Ex. 3 at 34:24-35:8, 73:3-9, 251:11-252:22 (Prata).

### 3.     Deutsche Bank's Execution Algorithms

Throughout the class period, Deutsche Bank constantly streamed prices to potential counterparties on various proprietary and third-party trading platforms that those counterparties could use in placing orders. These were "executable streaming prices." Ex. 7 at 106:9-10

---

[4] A summary chart of a sample of a sample of the written agreements and the identical provisions contained in all of them is included as Exhibit 8 to the Ewing Declaration.

(O'Flaherty); Ex. 3 at 44:5-12 (Prata). Once a counterparty sent an order, that order could not be cancelled. Ex. 9 at 01279897.[5] Regardless of platform, Deutsche Bank's algorithms determined whether a counterparty's order would be executed. Deutsche Bank's "trade acceptance processes" were "common across all client activity." Ex. 2 at 69:12-19 (Leigh).

Once Deutsche Bank received an order, its algorithms used the post-receipt period commonly referred to as the last-look period so that Deutsche Bank could perform several legitimate checks to verify that the standard trade conditions had been satisfied. Ex. 10 at 151:9-13 (Oomen); Ex. 2 at 64:13-17 (Leigh). One such standard condition was that the order contained all the fields necessary to be read by Deutsche Bank's computer system. Ex. 2 at 64:18-25 (Leigh). Another was that the counterparty placing the order had sufficient credit. Ex. 2 at 65:1-15 (Leigh); Ex. 3 at 91:16-92:4 (Prata). Yet another was that the liquidity was still available and that the streaming price had not expired or changed during the *pre-receipt* latency period that unavoidably occurred between the time the order was placed and Deutsche Bank received it. Ex. 10 at 154:16-155:10 (Oomen).

Unbeknownst to counterparties, however, not all of the checks performed by Deutsche Bank were legitimate. Deutsche Bank also programmed its algorithms to use the last-look period to monitor price changes *after* it received the order but before the ultimate execution decision. Ex. 10 at 155:12-156:11 (Oomen); Ex. 3 at 179:25-180:16 (Prata). If the market moved against Deutsche Bank relative to the price at the time it received the order, Deutsche Bank's algorithms would often reject an otherwise executable trade that satisfied all the standard conditions. If the market moved in Deutsche Bank's favor during the last-look period, however, Deutsche Bank's algorithms would

---

[5] The one exception is stop loss orders, which are orders to execute a trade in the future if a price reaches a certain level. Limit orders could be cancelled at any time until a Deutsche Bank streaming price matched the execution price specified in the order.

always execute the trade.Ex. 2 at 75:25-76:24 (Leigh); Ex. 11 at 01314382. Deutsche Bank applied

this algorithm to all counterparty orders regardless of platform. Ex. 2 at 69:12-19 (Leigh).

      Deutsche Bank's use of post-receipt price changes to make execution decisions is illustrated

below:



On this chart, point 1 represents the time of order receipt, point 2 represents the time of the

price check, and point 3 represents the time of the execution decision. While Deutsche Bank could

and should have verified the price existing at point 1 even though the check was being conducted at

point 2, Deutsche Bank instead rejected trades based on market information it received, and prices it

generated, after point 1. Deutsche Bank recorded and still maintains trade logs that show when an

order was first received, the price specified in the order (if any), and the prevailing price at the time

that Deutsche Bank received the order. Ex. 12 at 113:15-114:4 (Ivic); Ex. 13; McFarlane Decl., ¶¶

29-30. Deutsche Bank's records also reflect which otherwise executable trades were rejected because

of this post-receipt price check. McFarlane Decl., p. 8, fig. 4.

      Beginning in 2010, after technological advances enabled much faster verification and

execution, Deutsche Bank decided to artificially prolong the last-look period so that it could

continue to selectively make execution decisions based on post-receipt price changes. Deutsche Bank referred to this artificial increase in the last-look period as "Delayed Trade Acceptance," or "DTA." Ex. 2 at 74:1-5 (Leigh). According to Deutsche Bank's own witnesses, DTA did not change the post-receipt price-check feature in its previous execution algorithms, but merely imposed an additional "buffer" during which Deutsche Bank could leverage post-receipt price changes to selectively execute profitable trades. Ex. 7 at 96:25-97:9 (O'Flaherty). Deutsche Bank knew ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Ex. 14.

According to Deutsche Bank's records, at least 900 counterparties, including Axiom, were subject to DTA. Ex. 2 at 147:2-12 (Leigh). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮. Ex. 15 at 02285379; Ex. 16 at 02405310. In a market that moves by the millisecond, Deutsche Bank's use of artificial delays to monitor changing market prices gave it an unfair advantage. Feller Decl., ¶¶ 44, 46-51, 53-59. Deutsche Bank was able to selectively execute profitable trades and reject unprofitable ones, all the while denying counterparties the ability to execute trades elsewhere or to profit from favorable market movements during the last-look period.

### 4.    Deutsche Bank's Obfuscation and Concealment

Throughout the class period, Deutsche Bank maintained a consistent policy of concealing and obfuscating the fact that its algorithms were programmed to reject unfavorable trades based on price changes taking place after it received counterparty orders. Deutsche Bank primarily did so through rejection messages that it transmitted to counterparties once trades were rejected, its marketing materials, and technical guides that ostensibly explained the details of using an API.

9

When a trade was rejected because the price changed before Deutsche Bank received an order due to an unavoidable technological latency, Deutsche Bank informed its counterparties that the reason for the rejection was a "stale quote." *Id.*, Ex. 17 at 02419337. But it also used the very same "stale quote" justification when rejecting unprofitable trades based on price changes that took place after it had already received an order. *Id.* Not only did Deutsche Bank fail to distinguish between rejections based on pre- and post-receipt price updates, it also falsely suggested that the "most likely" reason for the rejection was the client's own hardware:

> The trade is rejected because you attempted to trade on a quote object that has expired or been superseded by a more recent quote. *This is most likely indicative of a coding or performance issue in your adaptor.* All quote objects should be processed as quickly as possible, and all trade requests need to be placed against the latest quotes object received.

Ex. 18 at 01205293 (emphasis added); *see also* Ex. 19 at 01657669. Deutsche Bank did not provide counterparties with timestamps indicating when their orders were received by Deutsche Bank's servers, thus preventing those counterparties from being able to independently investigate the reasons for trade rejections. Ex. 12 at 118:10-119:19 (Ivic).

In the API Integration Guide that Deutsche Bank provided to counterparties—which one of the principal Deutsche Bank technical integrations employees testified contained the "rules of the road" for customers to understand order processing—Deutsche Bank represented that trade requests or limit orders would be "immediately accepted or rejected by the platform at the limit price specified by the client." *See, e.g.,* Ex. 9 at 01279883; Ex. 19 at 01657657; Ex. 12 at 59:7-60:5 (Ivic). The above-referenced standardized written contracts instructed counterparties to contact Deutsche Bank's Internet Services Group if they did not receive confirmation of prompt execution. Ex. 5 at 02368551; Ex. 6 at 01469972. But Deutsche Bank specifically instructed the Internet Service Group to avoid discussing DTA settings with counterparties. Ex. 20 at 01314484 (Ex. 23). Many of the Deutsche Bank e-FX salespeople who had primary responsibility for managing counterparty

relationships were unfamiliar with the details of Deutsche Bank's trade acceptance practices or how they changed over time. Ex. 7 at 97:10-25 (O'Flaherty); Ex. 10 at 249:1-251:17 (Oomen). Deutsche Bank witnesses also could not identify or recall a single marketing document that expressly mentioned a price check based on prices generated after Deutsche Bank received orders. Ex. 3 at 153:20-154:5 (Prata); Ex. 7 at 153:9-154:12 (O'Flaherty).

Moreover, Deutsche Bank was misleading in the way it used the term "last look" in public communications. Last look is an FX industry term generally used to describe the period between order receipt and trade execution where a trade might be rejected by liquidity providers. Ex. 21 at 37:5-20 (Wood). But Deutsche Bank used the term to muddy the waters between the well-known and customary post-receipt verifications that could result in trade rejections (e.g., systems, liquidity, and credit checks), and the opaque processes hidden in Deutsche Bank's execution algorithms that used post-receipt price changes to selectively reject unprofitable trades at the expense of unwitting counterparties.

In 2011, for example, Deutsche Bank's Phillip Wood participated with representatives from other liquidity providers in drafting a Bank of England "best practices" guide that ostensibly sought to justify "Last Look." Ex. 21 at 34:5-35:13 (Wood). In the Bank of England Non-Investment Product Codes, Deutsche Bank and others included the following vague and self-serving statement: "Using a 'last look' mechanism is within best practice when showing genuine interest at specific price levels or when providing a support price, in order to mitigate technological anomalies and latencies." *Id.*, Ex. 22 at 14. Deutsche Bank employees then cited this self-serving description of last look when explaining trade rejections based on price movements. *Id.*, Ex. 23 at 01621455. There was, of course, no "technological anomal[y]" or latency that prevented Deutsche Bank from making execution decisions based on prevailing prices at the time it received counterparty orders, as opposed to subsequent prices.

11

To illustrate, Axiom understood that there were some checks being performed on trade instructions after they were received, using the term "look back," "last look," and "dealer protection" at times. But they did not understand those checks were being used as cover for Deutsche Bank to conduct a delayed one-sided price check based on post-receipt prices. Axiom instead believed that trades were rejected because of price only if the price changed during the unavoidable latency period before Deutsche Bank received their orders.[6] In fact, when Axiom asked Deutsche Bank about its trade acceptance practices in 2009, Deutsche Bank responded that its trades were processed "immediately." Ex. 26. That was not the case in 2009, and even less so after Deutsche Bank imposed an additional hold time on Axiom and other class members.

## PROPOSED CLASSES

To obtain relief for FX counterparties that were injured by Deutsche Bank's breaches of contract, Axiom respectfully requests that the Court certify two classes under Rule 23(b)(3):

**1.      The Express Contract Class**

All persons who (1) entered into a Service Level Agreement or Electronic Platform Terms with Deutsche Bank that contained a provision calling for the application of New York law; (2) submitted an FX order to Deutsche Bank on or after December 21, 2011, via an application programming interface on ABFX, RAPID, or an ECN subject to Electronic Platform Terms; and (3) had their order rejected by Deutsche Bank because of a price generated after Deutsche Bank received the order.

**2.      The Implied Contract Class**

---

[6] Ex. 24 at 123:3-126:10, 135:23-137:8, 336:6-25, 117:10-14 (Gildor); Ex. 25 at 292:4-25 (Kirchgaesser). Plaintiffs testified that to the extent they understood anything about "last look," "lookback," and/or "dealer protection," they understood those terms to apply to Liquidity Providers that reject trades because the offered liquidity had been taken elsewhere and/or on an ECN allowed the Liquidity Provider to determine the identity of the trader and reject the deal. Ex. 24 at 309:19-312:25, 328:14-329:9, 355:18-357:2 (Gildor).

All persons who (1) submitted an FX order to Deutsche Bank on or after December 21, 2011, on an ECN not subject to Electronic Platform Terms; (2) had their order rejected by Deutsche Bank because of a price generated after Deutsche Bank received the order; and (3) were either (a) domiciled in the United States, or (b) if domiciled elsewhere, had their order routed over a Deutsche Bank or ECN server based in New York.

## LEGAL STANDARD

Class actions promote judicial economy by aggregating the common claims of numerous victims that suffered similar legal violations and that otherwise would not be able to assert their claims efficiently, if at all. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015) (noting that Rule 23 strives to "achieve economies of time, effort, and expense."). "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility[.]" *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *see also In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *5 (S.D.N.Y. Mar. 31, 2017) (quoting *Giuliani* as above); *Pichardo v. Carmine's Broadway Feast Inc.*, 2016 WL 4379421, at *4 (S.D.N.Y. June 13, 2016), *adopted* 2016 WL 5338551 (Sept. 23, 2016) ("Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *29 (E.D.N.Y. Oct. 15, 2014), *adopted* 2015 WL 5093503 (July 10, 2015) ("Courts in this circuit employ a liberal rather than restrictive construction of Rule 23."). Therefore, "[d]oubts concerning the propriety of class certification should be resolved in favor of class certification." *Ballinger v. Advance Magazine Publishers, Inc.*, 2014 WL 7495092, at *3 (S.D.N.Y. Dec. 29, 2014).

Under Rule 23(a), a proposed class must satisfy requirements for numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Plaintiffs must also demonstrate that a proposed class satisfies the requirements of at least one subsection of Rule 23(b). Because Plaintiffs seek to certify

both their classes under Rule 23(b)(3), they must show that "questions of law or fact common to class members predominate over any questions affecting only individual class members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A court is to determine whether the requirements of Rule 23 are met by a preponderance of the evidence, but Rule 23 is not a "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).

## ARGUMENT

### 1.      The Proposed Classes Are Sufficiently Numerous

Both of the proposed classes readily satisfy the numerosity requirement of Rule 23(a). In the Second Circuit, "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Based on Plaintiffs' preliminary analysis of trade data produced by Deutsche Bank, there are at least 500 counterparties who had their trades rejected by Deutsche Bank because of a post-receipt change in price. McFarlane Decl., ¶ 33. And at least 100 such counterparties traded via an API through an ECN not subject to Electronic Platform Terms, meaning that they are members of the Implied Contract Class. *Id.*

The members of each class are also "objectively ascertainable" using Deutsche Bank's records. In the Second Circuit, the ascertainability requirement means "only that a class [should] be defined using objective criteria that establish membership with definite boundaries." *In re Petrobas Secs.*, 2017 WL 2883874, at *8 (2d Cir. July 7, 2017); *see also Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2017 WL 1331288, at *8 (S.D.N.Y. Apr. 4, 2017) (plaintiffs need not "identify a comprehensive roster of putative class members at the certification stage"; instead, they must show only that "class members will be, at some point, readily identifiable without resort to individualized hearings"). The proposed class definitions rely only on objective criteria in Deutsche Bank's records

14

that will readily identify class members. Deutsche Bank's records (including, but not limited to the contracts themselves) show which counterparties entered into express contracts, the exact times that counterparties placed orders and Deutsche Bank received those orders, and which orders were rejected due to price changes generated after Deutsche Bank received the orders. McFarlane Decl., p. 8, fig. 4.

## 2.   Multiple Questions of Law and Fact Are Common to All Members of Each Class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Even "a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality exists even if there are "some factual variations among class members' specific grievances." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. 2009).

Because this case centers on whether Deutsche Bank's uniform trade execution policy breached standardized contracts that are materially identical for all class members, the commonality test is easily satisfied. *Oakley v. Verizon Commc'ns, Inc.*, 2012 WL 335657, at *14 (S.D.N.Y. Feb. 1, 2012) ("Of course, when a group of plaintiffs suffer under a uniform policy, the commonality test is often satisfied, even after *Dukes*."). The common questions of law and fact shared by members of the proposed classes include the following:

- Whether Deutsche Bank conducted price checks for members of both classes based on prices generated after Deutsche Bank received their orders;
- Whether Deutsche Bank rejected class members' trades based on price changes occurring after Deutsche Bank received their orders;
- Whether Deutsche Bank's trade execution practices breached the Service Level Agreements and Electronic Platform Terms;
- Whether implied-in-fact contracts were formed with members of the Implied Contract Class at the time that ECN algorithms matched class members' orders with Deutsche Bank's streaming prices; and
- Whether Deutsche Bank's trade execution practices breached implied-in-fact contracts formed on ECNs.

## 3.   Axiom's Claims Are Typical of the Claims of All Class Members

To establish typicality, class plaintiffs need only show that "each class member's claim arises from the same course of events and that each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). This typicality requirement is "not demanding." *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012). "The focus of the typicality inquiry is not on the plaintiffs' behavior, but rather on the defendant's actions." *Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010). Therefore, "minor variations in the fact patterns underlying individual claims" do not defeat typicality. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, the typicality requirement is easily satisfied for both proposed classes. Axiom's claims and the claims of all class members arise from Deutsche Bank's uniform conduct of using post-receipt price changes to reject otherwise executable trades.[7] The members of each class assert the same legal theories and arguments for why Deutsche Bank's conduct amounts to a breach of contract under New York law. Axiom is a member of both of its proposed classes and it was damaged by Deutsche Bank's trade execution practices both on venues that were governed by express contracts and venues that were not. Typicality cannot seriously be disputed.

### 4.    Axiom and its Counsel Will Adequately Protect the Interests of Both Classes

The adequacy inquiry serves to determine that "the class members [do] not have interests that are 'antagonistic' to one another." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). But "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite

---

[7] *See, e.g., In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *32 (E.D.N.Y. Oct. 15, 2014), *adopted* 2015 WL 5093503 (July 10, 2015) (noting that differences in the amount, date, size, and manner of purchase will not defeat class certification "when the plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class.").

must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001).

There is no conflict between Axiom and the members of either of its proposed classes, much less a "fundamental" conflict. Axiom has the same interest in obtaining redress for Deutsche Bank's violations of both standardized provisions in written contracts and implied-in-fact contracts as do members of both classes.

Axiom is knowledgeable about electronic FX trading and has to date actively participated in the prosecution of this matter. Axiom has gathered and produced no fewer than 72,000 documents, and eight former Axiom employees have sat for depositions. Axiom has a firm grasp of the facts underlying this case and is committed to vindicating both its own rights and the rights of absent members of each proposed class. Ewing Decl., Ex. 24 at 115:9-117:25 (Gildor).

Axiom's counsel from Korein Tillery and Scott+Scott would likewise adequately protect the interest of absent class members. This Court appointed these same firms as class counsel in a similar matter, *Axiom v. Barclays Bank PLC*, 1:15-cv-09323 (S.D.N.Y.), where they secured a $50 million settlement for class members. The firms have substantial experience in complex class actions, including breach of contract and unjust enrichment class actions; they conducted extensive investigatory work before filing this lawsuit; and they have spent over two years vigorously prosecuting these claims on behalf of absent class members. Zelcs Decl., Ex. A and B.

**5.    Common Issues of Law and Fact Predominate Over Any Individual Ones**

A proposed class satisfies the predominance requirement so long as the "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.* 729 F.3d 108, 118 (2d Cir. 2013). It is not enough for the opposing party to show that some individualized evidence

could be relevant; to preclude certification, "the balance must tip such that these individual issues predominate." *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015). Put another way, a proposed class with common questions of law and fact will fail to satisfy the predominance requirement only if "it is clear that individual issues will overwhelm the common questions." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 245 (E.D.N.Y. 1998).

Both of Axiom's proposed classes satisfy the predominance requirement. Both classes focus on a uniform course of conduct where, regardless of trading venue, Deutsche Bank's algorithms made trade execution decisions based on price changes occurring after Deutsche Bank received counterparty orders. Both classes seek to evaluate the legality of that conduct by reference to contracts that do not vary materially among class members and that uniformly rely on New York law. The damages suffered by the members of each class can be calculated mechanically without the need for mini-trials. Nor does Deutsche Bank have any plausible individualized defenses to the contract-based claims of either class.

Take, for example, the Express Contract Class. By definition, all class members were not only exposed to Deutsche Bank's uniform course of conduct, but also damaged by it—subsection (3) of the class definition requires counterparties to have had trades rejected due to a change in prices occurring after order-receipt. The standardized contracts these class members executed (Service Level Agreements and Electronic Platform Terms) were consistent in providing that Deutsche Bank's streaming prices "shall be effective and may be used in a trade instruction," that the "[e]xecution of a trade instruction … shall occur upon receipt of such instruction … [and] shall constitute a binding agreement … on the terms of such instruction," and that the execution price "shall be the latest price received by Client" so long as it "shall not have expired, been withdrawn, or been superseded" at the time Deutsche Bank received the instruction.

Because the resolution of class members' breach-of-contract claims depends on evaluating uniform conduct in light of materially identical provisions in a form contract, individualized issues will not enter into the analysis. *See Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action."); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37-38 (E.D.N.Y. 2009) (collecting cases); *Claridge v. N. Am. Power & Gas, LLC*, 2016 WL 7009062, at *3 (S.D.N.Y. Nov. 30, 2016); *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 428 (N.D. Ill. 2007). The Second Circuit has held that certification is appropriate for breaches of multiple contracts when the relevant provisions "were substantially similar." *In re U.S. Foodservice Inc.*. 729 F.3d at 124-26.

That is true even if Deutsche Bank chooses to argue that some class members may somehow have known that Deutsche Bank was rejecting trades based on price changes occurring after order receipt. As an initial matter, such knowledge would not absolve Deutsche Bank of liability for breaching the unambiguous provisions of a written contract, particularly one that can only be modified in a writing signed by both parties. But even if Deutsche Bank's contracts were arguably ambiguous, their interpretation would still not vary based on individualized extrinsic evidence. These were not individually negotiated agreements, but rather form contracts drafted by Deutsche Bank for the purpose of creating a uniform set of rules. It cannot be that Deutsche Bank's identical conduct breached the standardized provisions for some class members, but not others. Such form contracts should be interpreted "wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211(2) (1981) (emphasis added).[8]

---

[8] *See also id.* ("Courts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it. The result may be to give the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute.").

Courts have repeatedly held that, "in the context of standard form contracts … extrinsic evidence is especially irrelevant," and that "claims involving the interpretation of standard form contracts are particularly well-suited for class treatment." *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756–57 (3d Cir. 2017); *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 440–41 (1st Cir. 2013) ("Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant.").[9] Thus, even if extrinsic evidence does become relevant, it will be objective and generally applicable evidence: "that some customers might have superior knowledge is immaterial" to class certification. *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 642 (S.D. Fla. 2015).

Common issues of law and fact likewise predominate for members of the Implied Contract Class. Indeed, the preliminary determination of whether an implied-in-fact contract was formed when counterparty orders were matched to Deutsche Bank's streaming prices on ECNs depends entirely on generalized proof related to the characteristics of trading on ECNs. *Fed. Ins. Co. v. Distinguished Properties Umbrella Managers Inc.*, 721 F. Supp. 2d 293, 302 (S.D.N.Y. 2010) ("An implied-in-fact contract 'rests upon the conduct of the parties and not their verbal or written words.'"). Those relevant characteristics (e.g., counterparty anonymity, the fact that streaming prices are equivalent to executable "limit" orders, that counterparties could not cancel orders once they had been matched to a Deutsche Bank streaming price, etc.) are the same for all class members. *See* Feller Decl., ¶¶ 36-40.

As with the claims governed by Deutsche Bank's standardized agreements, it would make little sense for identical conduct taking place on a trading platform governed by uniform rules of

---

[9] Amongst extrinsic evidence, generalized proof predominates based on Deutsche Bank's uniform technical integration guides, which were the "rules of road" provided to Deutsche Bank's API clients.

engagement to be treated as a breach of implied contract for some counterparties but not others. That these implied contracts, and the express contracts, are both governed by the U.C.C., which only "further supports the … conclusion that common issues will predominate" because "plaintiffs' contract claims will focus predominately on common evidence to determine whether [defendant's conduct] departs from prevailing commercial standards of fair dealing so as to constitute a breach." *In re U.S. Foodservice*, 729 F.3d at 125.[10] Courts have certified claims for breach of implied contracts where the terms of those contracts were derived from a standard common to all class members. *See Mahon v. Chicago Title Ins. Co.*, 296 F.R.D. 63, 78 (D. Conn. 2013) (certifying a class based on breach of implied-in-fact contracts because the nature and means of transacting were materially the same for all class members).[11]

The alternative claim for unjust enrichment on behalf of the Implied Contract Class also satisfies the predominance requirement.[12] Because class members' unjust enrichment claims focus on uniform conduct, if Deutsche Bank's "retention of a benefit was unjust with respect to one class member, it was unjust with respect to all class members." *Menocal v. GEO Grp., Inc.*, 2017 WL 880882, at *8 (D. Colo. Feb. 27, 2017); *see also Dupler*, 249 F.R.D. at 46-47 (certifying a class asserting unjust enrichment claims); *Mahon*, 296 F.R.D. at 77 (same). The "universal thread throughout all common law causes of action for unjust enrichment" is a focus on defendant's gains, *Keilholtz v.*

---

[10] Implied-in-fact contracts are also governed by the same U.C.C. principles of fair dealing that will apply to the express contract claims. *See Jinno Intern. Co. v. Premier Fabrics, Inc.*, 2013 WL 4780049, at *2 (S.D.N.Y. May 24, 2013).

[11] *See also Slapikas v. Mezzo Land Servs., LLC*, 250 F.R.D. 232, 245-46 (W.D. Pa.2008); *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 304-05 (E.D.N.Y. 2006); *Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 5 (D.D.C. 1992).

[12] Unjust enrichment requires a showing that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Intellectual Cap. Partner v. Int'l Credit Partners LLC*, 2009 WL 1974392, at *8 (S.D.N.Y. July 8, 2009).

*Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010), which necessarily is proven by generalized common evidence.

As with the claims based on the Service Level Agreements and Electronic Platform Terms, the implied contract claims and the alternative unjust enrichment claims asserted on behalf of Implied Contract Class members are both governed by New York law. Deutsche Bank's conduct causing the breach occurred on its New York-based servers, and it was unjustly enriched as a result of its misconduct in New York. Thus, New York is "the only state that has an interest not only in compensating its citizens, but also in regulating a resident corporation." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 59 (D.N.J. 2009).

To the extent that Deutsche Bank asserts defenses to the claims of either the Express Contract Class or the Implied Contract Class, those defenses are not individualized. By limiting the class period to cover only those orders received on or after December 21, 2011, Axiom has eliminated any individualized statute-of-limitations defenses or the need to assess whether Deutsche Bank's fraudulent concealment equitably tolled the limitations period for some or all class members. Consistent with the Court's ruling on the motion to dismiss, all orders falling within the class period are timely under the U.C.C.'s four-year statute of limitation.

### 6.     Damages Can Be Calculated Mechanically Without the Need for Individual Proofs

It is "well-established Second Circuit precedent that the fact that damages have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). In fact, "[a]t the class certification stage, [plaintiffs] need only assure the court that this burden could be carried using predominantly common proof, or if it cannot, that the need for individualized proof will not overwhelm the rest of the evidence." *In re Air Cargo*, 2014 WL 7882100 at *271 (E.D.N.Y. Oct. 15, 2014).

22

Deutsche Bank's liability to members of both proposed classes will be decided on a class-wide basis. Once that determination is made, calculating the individual damages of each class member will be a mechanical exercise based on a formula with variables that come from Deutsche Bank's own trading data. Those variables include the prices (if any) specified in the orders placed by class members, Deutsche Bank's prevailing prices at the time of order receipt, and Deutsche Bank's prevailing prices at the time of the execution decision. Where trades were rejected solely because of post-receipt prices, the damages will equal the difference between the contract prices—the "matched" prices at the time of receipt—and the prices at the time of rejection or execution. This is a formulaic calculation that relies only on Deutsche Bank's own trade data. McFarlane Decl., ¶ 51.

**7.    A Class Action is the Superior Method of Adjudicating this Controversy**

A class action is the best way of resolving this controversy because the amounts at stake for individual class members relative to the complexity and expense of litigating this matter render individual actions impractical and inefficient. Even though recoveries for some class members will be substantial, those individual recoveries represent only a small fraction of the expenses and resources necessary to litigate individual lawsuits. This case has already been ongoing for more than two years and has involved nearly 20 depositions, the production and review of nearly 354,000 documents, and the hiring of multiple experts. No individual actions have been filed by other class members despite substantial publicity for this lawsuit and Axiom's settlement of similar claims against Barclays.

Because all claims involve the application of New York law, it is preferable to have this litigation managed in a New York district court rather than through disparate actions throughout the country. Finally, there is no evidence of any manageability issues; even if there were, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored

23

and should be the exception rather than the norm." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001).

## CONCLUSION

Axiom's proposed classes should be certified under Rule 23(b)(3) because they seek to adjudicate the legality of Deutsche Bank's uniform course of conduct by reference to standardized terms in form contracts and objective, commercially reasonable standards of fair dealing. Not only do the common questions of Deutsche Bank's liability predominate, any individual issues are largely hypothetical and have been eliminated by Axiom's narrow crafting of its proposed class definitions. Finally, certifying Axiom's proposed classes is the only realistic way that class members can recover the damages they have incurred from Deutsche Bank's misconduct, further evidencing the superiority of adjudicating these claims through the class mechanism.

Dated: January 15, 2018

                                    /s  Aaron M. Zigler
                                    One of the Attorneys for Plaintiffs

Christopher M. Burke
Walter W. Noss
Kristen M. Anderson
Kate Lv
Scott+Scott, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Phone: (619) 233-4565
Fax: (619) 233-0508

David Scott
Sylvia Sokol
Thomas K. Boardman
Scott+Scott, Attorneys at Law, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

George A. Zelcs
Robert E. Litan
Randall P. Ewing, Jr.
Korein Tillery LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9751

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Michael E. Klenov
505 North 7th Street
Suite 3600
St. Louis, MO 63101
Phone: (314) 241-4844
Fax: (314) 241-3525

24

Michael D. Hausfeld
Reena A. Gambhir
Jeannine M. Keeney
Hausfeld, LLP
1700 K Street, NW
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201

Bonny E. Sweeney
Michael P. Lehmann
Hausfeld, LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Phone: (415) 633-1908
Fax: (415) 358-4980

Linda P. Nussbaum
Bart D. Cohen
Bradley J. Demuth
Nussbaum Law Group, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Phone: (212) 702-7053
Fax: (212) 681-0300