**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AXIOM INVESTMENT ADVISORS, LLC, by and through its Trustee, Gildor Management, LLC, and AXIOM INVESTMENT COMPANY, LLC, by and through its Trustee, Gildor Management, LLC,<br><br>                             Plaintiffs,<br>      vs.<br><br>DEUTSCHE BANK AG,<br><br>                       Defendant. | Case No. 15-cv-09945 (LGS) |

---

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT**
**OF THEIR MOTION FOR CLASS CERTIFICATION**

---

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ **II**

**INTRODUCTION** ....................................................................................................................... **1**

    **1. Axiom is an "adequate" and "typical" class representative of the Express Contract Class because Axiom had a Service Level Agreement with Deutsche Bank.** .......... **1**

    **2. Axiom had numerous ECN trades that Deutsche Bank rejected and is thus an "adequate" and "typical" class representative of the Implied Contract Class.** ...................... **2**

    **3. Deutsche Bank has identified no individual questions that would predominate over questions common to all class members of the Express Contract Class.** ........................ **2**

    **4. Deutsche Bank has identified no individual questions that predominate over questions common to all class members of the Implied Contract Class.** ................................ **7**

    **5. There are no individualized choice-of-law questions that defeat certification of the Implied Contract Class.** ......................................................................................... **9**

    **6. Individualized damages calculations, even if necessary, would not preclude class certification.** ........................................................................................................................ **11**

    **7. Axiom's theory of recovery—that Deutsche Bank improperly used post-receipt pricing to reject trade orders—has been the same from the inception of the lawsuit.** ......... **13**

    **CONCLUSION** ...................................................................................................................... **13**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
  234 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................................13

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................................12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................................................................12

*Crawford v. Tribeca Lending Corp.*,
  815 F.3d 121 (2d Cir. 2016)...................................................................................................1

*DeAngelis v. DeAngelis*,
  962 N.Y.S.2d 328 (2013) ........................................................................................................6

*Gillis v. Respond Power, LLC*,
  677 F. App'x 752 (3d Cir. 2017) ............................................................................................5

*Kolbe v. BAC Home Loans Servicing, LP*,
  738 F.3d 432 (1st Cir. 2013)...................................................................................................6

*Lauture v. Int'l Bus. Machines Corp.*,
  216 F.3d 258 (2d Cir. 2000)....................................................................................................9

*Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010)....................................................................................................4

*Mandarin Trading Ltd. v. Wildenstein*,
  16 N.Y.3d 173 (2011) .............................................................................................................9

*In re Mercedes-Benz Antitrust Litig.*,
  213 F.R.D. 180 (D.N.J. 2003)..................................................................................................7

*Metropolitan Life Insurance Company v. Noble Lowndes International, Inc.*,
  84 N.Y.2d 430 (1994) .........................................................................................................6, 7

*Rapoport-Hecht v. Seventh Generation, Inc.*,
  No. 14-CV-9087 (KMK), 2017 WL 5508915 (S.D.N.Y. Apr. 28, 2017) ............................11

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)..................................................................................................12

*S. Union Co. v. Liberty Mut. Ins. Co.*,
   581 F. Supp. 2d 120 (D. Mass. 2008) ..................................................................................1

*Schwartz v. Liberty Mut. Ins. Co.*,
   539 F.3d 135 (2d Cir. 2008).......................................................................................10, 11

*Steinberg v. Nationwide Mutual Insurance Company*,
   224 F.R.D. 67 (E.D.N.Y. 2004) .........................................................................................6

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011)...............................................................................................7

*In re U.S. Foodservice Inc. Pricing Litig.*,
   No. 3:06-CV-1657 CFD, 2011 WL 6013551 (D. Conn. Nov. 29, 2011), *aff'd,*
   729 F.3d 108 (2d Cir. 2013)..............................................................................................10

*In re U.S. Foodservice Inc. Pricing Litigation*,
   729 F.3d 108 (2d Cir. 2013).................................................................................4, 5, 6, 10

*Vaccariello v. XM Satellite Radio, Inc.*,
   295 F.R.D. 62. (S.D.N.Y. 2013) ........................................................................................9

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)...............................................................................................12

*Yang v. Focus Media Holding Ltd.*,
   No. 11 CIV. 9051 CM GWG, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ......................7, 8

**Statutes**

N.Y.U.C.C. § 1-303 ...............................................................................................................10

N.Y.U.C.C. §7-713(1)............................................................................................................10

**Other Authorities**

Fed. R. Evid. 1004 ...................................................................................................................1

Federal Rule 44.1 ...................................................................................................................10

Restatement (Second) of Contracts § 211(2) (1981) ..............................................................6

Rule 23 .....................................................................................................................................8

Rule 23(b)(3)............................................................................................................................1

## INTRODUCTION

Deutsche Bank opposes class certification on three broad grounds. First, it claims that Axiom cannot bring claims asserted on behalf of either class and thus is not an "adequate" or "typical" representative. Second, Deutsche Bank contends that individual questions overwhelm the questions that are admittedly common to the classes, thus defeating the Rule 23(b)(3) predominance requirement. Third, Deutsche Bank maintains that Plaintiff has changed legal theories from one alleged in the complaint to one that is not. Deutsche Bank is wrong about all three.

**1. Axiom is an "adequate" and "typical" class representative of the Express Contract Class because Axiom had a Service Level Agreement with Deutsche Bank.**

Deutsche Bank's insistence that Axiom does not share the claim of the Express Contract Class, merely because neither Axiom nor Deutsche Bank could locate a copy of their written contract, is contradicted by the testimony of Deutsche Bank's own managing director and head of eFX sales for the Americas. She testified (and as Plaintiff explained in its opening memorandum (at 5-6)) that "an API user" who traded on Autobahn—like Axiom indisputably did thousands of times—was required to sign a Service Level Agreement, and that Deutsche Bank specifically provided Axiom with a Service Level Agreement.[1] Deutsche Bank does not dispute that Axiom traded on Autobahn; indeed, Axiom can document over 8,000 such transactions during the class period. McFarlane Supp. Decl. at ¶ 69. Under Federal Rule of Evidence 1004, "an original is not required, and secondary evidence may be admitted to prove the content of a writing, if 'all the originals are lost or destroyed, and not by the proponent acting in bad faith.'" *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126-27 (2d Cir. 2016) (citing Fed. R. Evid. 1004(a)); *see also S. Union Co. v. Liberty Mut. Ins. Co.*, 581 F. Supp. 2d 120,

---

[1] Ewing Decl. Ex. 3 at 35:5-8, 73:4-9, 182:14-19, 252:19-23 (Prata) ("Q. For API users, were they required to sign the terms and conditions? A. Nope, if we show it to them where – again, where it is, on – on the web – the DB website, and then they are required to sign the SLA, the API SLA; Q. Now, when Axiom began trading eFX with Deutsche Bank using the API, what additional materials did you provide to Axiom? A. We would have had the—the API SLA agreement.").

129 (D. Mass. 2008) (evidence that insurance company used standardized policies coupled with copies of the standardized contracts).

Deutsche Bank ignores the secondary evidence of Axiom's Service Level Agreement with Deutsche Bank, consisting of 1) Axiom's 8,000-plus Autobahn transactions as an "API user"; 2) Deutsche Bank's own eFX U.S. sales head's testimony that API users were required to sign a Service Level Agreement; and 3) copies of Deutsche Bank's standardized Service Level Agreements. Axiom is thus a typical and adequate representative of the Express Contract Class.

### 2. Axiom had numerous ECN trades that Deutsche Bank rejected and is thus an "adequate" and "typical" class representative of the Implied Contract Class.

Deutsche Bank also contends (at 14-16) that Axiom is neither typical nor adequate to represent the Implied Contract Class because "there is no evidence that it submitted any trade request to DB through an ECN after December 20, 2011." Deutsche Bank is wrong. A comparison of rejected ECN trades after December 20, 2011 from Deutsche Bank's data with Axiom's trading records shows 92 trades for the same currency pairs in the same amounts at the same time that were rejected by Deutsche Bank because of a post-receipt price change. Beevers Supp. Decl. ¶ 8 and Ex. 1. Axiom can thus easily demonstrate by a preponderance of such evidence that, during the class period, it had many ECN trades rejected by Deutsche Bank because of a post-receipt price change; it is therefore a typical and adequate representative of the Implied Contract Class.

### 3. Deutsche Bank has identified no individual questions that would predominate over questions common to all class members of the Express Contract Class.

Deutsche Bank argues (at 16) that "whether [its] use of a post-receipt price check breached the SLAs and EPTs … cannot be answered on a class-wide basis." Deutsche Bank assumes "the SLAs and EPTs [are ambiguous because they] contain language similar to that found in the Ts&Cs," language the Court thought was ambiguous when it denied Deutsche Bank's motion to dismiss. DB

Mem. at 17. But the T&C language that Deutsche Bank introduced and unsuccessfully relied on then is not the language upon which Axiom relies; indeed, it is not even the same document.[2]

The SLA contains terms the T&C do not, and its express terms limit when Deutsche Bank can reject a trade instruction. First, the SLA requires a trade instruction to comply with the following "limitations": it must contain the currency pair, the principal amount to be traded, and "the *latest price received by Client for such Currency Pair from Deutsche Bank*." Pl. Ex. 5 (Def. Ex. 21) at DB-Axiom 02368550 ¶ 3(b) (emphasis added). It also provides that "Deutsche Bank shall have no obligation to accept any trade instruction which does not comply with the limitations set forth above," while simultaneously limiting Deutsche Bank's discretion to reject a trade instruction--"Deutsche Bank may reject a trade instruction" only if:

1. The trade instruction does not comply with the limitations and requirements set forth in section 3(a) und (b) of this Service Agreement.
2. The price shall have expired, been superseded by a subsequent price or has been withdrawn or is an untradable price.
3. The terms of the trade instruction cannot be determined with certainty by Deutsche Bank.

*Id.* Nowhere does the Deutsche Bank SLA provide that Deutsche Bank may reject a trade because of a post-receipt price change. Deutsche Bank has instead limited itself to rejecting a trade based on price changes if a price expires, is superseded, or is withdrawn during the technologically unavoidable pre-receipt "latency period"—the time between the client's transmission of the instruction and Deutsche Bank's receipt of it. The agreement does *not* authorize Deutsche Bank to reject an otherwise valid trade instruction on the basis of price expiration *after* it receives the instruction.

---

[2] As Axiom explained in its opening memorandum (at 5 n.3), the Autobahn Terms and Conditions only apply to counterparties that connected to Autobahn using a GUI, and GUI users are not part of either of the proposed classes.

The SLA provides that the prices Deutsche Bank streams to the client "*shall be effective and may be used in a trade instruction* prior to the earlier of its expiration time, the provision of a new price and the time, if any, at which it is otherwise withdrawn by Deutsche Bank." *Id.* at 02368548 (emphasis added). Irrespective of any ambiguity there may be in the T&C, the language of the SLA[3] expressly limits Deutsche Bank's discretion whether to accept a trade instruction and that "[e]xecution of a trade instruction by Deutsche Bank (which *shall occur upon receipt of such instruction by Deutsche Bank and verification by Deutsche Bank that such instruction complies with the requirements of this section 2*) shall constitute a binding agreement by Client and Deutsche Bank to a Transaction between them *on the terms of such instruction* …." *Id.* at 02368550 (emphases added). Where, like here, "consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 300 (2d Cir. 1996)).

Deutsche Bank does not address this (or the EPT's) contractual language and instead merely assumes that because the SLA and EPT contain language similar to that the Court believed to be ambiguous in the T&C, the SLA and EPT are also ambiguous. As discussed, they are not, but even if they were, that would not lead inexorably to the conclusion that interpretation of standardized contract language gives rise to certification-defeating individual questions. Deutsche Bank's attempt to distinguish *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013), is unconvincing. The case is directly on point. There, like here, the defendant contended that interpreting the ambiguous terms of "contracts … [that were] substantially similar in all material respects" would

---

[3] As Axiom explained in its opening memorandum (at 6), the EPT is even more explicit, providing that the execution price "shall be the latest price received by Client" so long as, "at the time the applicable trade instruction is received by Deutsche Bank," that price "shall not have expired, been withdrawn, or been superseded on Deutsche Bank's server by another price." *See, e.g.*, Pl. Ex. 6 at 01469972. Deutsche Bank does not respond to this point, effectively conceding it.

"require 'reference to individualized extrinsic evidence,'" "that resolution of the issue of breach can therefore not be attained through generalized proof," and "that resolving the contract claims will require introduction of evidence of contract negotiations and course of performance evidence to determine whether individual customers knew about [the defendants' practices] and 'acquiesce[d] in it without objection.'" *Id.* at 124. The Second Circuit was "not persuaded." *Id.*[4]

Like here, however, the defendant in *Foodservice* merely argued that interpreting the contract would require individualized extrinsic evidence, but "[s]ince the record does not indicate the existence of material differences in contract language or other significant individualized evidence," the court "conclude[d] that the district court did not abuse its discretion in concluding that common issues will predominate over any individual issues."[5] *Id.* at 126. What little evidence Deutsche Bank has proffered is not "significant individualized evidence" nor suggests that such evidence will swamp the common evidence. And Deutsche Bank's attempt to distinguish *Gillis v. Respond Power, LLC,* 677 F. App'x 752 (3d Cir. 2017), on the grounds that "there [was] no relevant individual extrinsic evidence" is simply a misreading of the case. The court of appeals held that the extrinsic evidence there—"Plaintiffs' individualized understandings of Respond's standard form contract," the same kind of extrinsic evidence Deutsche Bank theorizes would defeat certification here—was irrelevant evidence, not non-existent as Deutsche Bank tries to portray it. *Id.* at 753 ("Because the District

---

[4] Deutsche Bank makes no serious effort to contest that the SLAs and EPTs are not standardized form contracts. Deutsche Bank simply says they are "individually negotiated," but cites only to a template in support. Of course, standardized agreements often have blanks for information such as the client's name, and filling in those blanks does not turn an otherwise standardized agreement into an "individually negotiated" agreement, especially where, as here, the information to be filled in is immaterial to the claims of the parties. Further, the fact that some clients agreed to SLAs and EPTs providing for the application of English law is irrelevant because API trades made by those clients are not included in the Express Contract Class.

[5] Also here, in *Foodservice* "[t]he fact that each of these contracts is governed by the UCC, … further support[ed] the … conclusion that common issues will predominate in the adjudication of these contract claims." 729 F.3d at 125.

Court based its denial of class certification on irrelevant evidence of Plaintiffs' individualized understandings of Respond's standard form contract, we will vacate and remand.")

Deutsche Bank also contends that Axiom's reliance on *Steinberg v. Nationwide Mutual Insurance Company*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004), for the proposition that "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action" is misplaced because that case turned on the doctrine of *contra proferentem,* requiring an ambiguous, standardized insurance provision to be construed against the insurer in favor of the insured. But the doctrine of *contra proferentem* is not limited to the insurance context, as Deutsche Bank implies. "'It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem,* against the party who prepared or presented it.'" *DeAngelis v. DeAngelis*, 962 N.Y.S.2d 328, 330 (2013) (quoting *151 W. Assoc. v. Printsiples Fabric Corp.,* 61 N.Y.2d 732, 734 (1984)).

And Deutsche Bank ignores cases like *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 440-41 (1st Cir. 2013), which hold that "[b]ecause uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant." This common-sense rule is embraced in this Circuit and the Restatement.[6]

Deutsche Bank also contends (at 20) that a provision in the SLA and EPT limiting its liability to "willful misconduct" would present individualized questions. It also maintains (at 21 n.87) proof that Deutsche Bank "concealed and obfuscated" its last look practices in its marketing materials and reject messages would be "insufficient to prove willful misconduct as a matter of law," citing *Metropolitan Life Insurance Company v. Noble Lowndes International, Inc.*, 84 N.Y.2d 430 (1994). *Metropolitan*

---

[6] *Kolbe* cites a Second Circuit case for the proposition. *Id.* (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir.1982); *see also* Restatement (Second) of Contracts § 211(2) (1981).

*Life* does not, however, bear the weight Deutsche Bank tries to place on it. Rather, it interpreted a different but similar provision that limited the defendant's liability to "'willful acts' … as referring to conduct similar in nature to the 'intentional misrepresentation' and 'gross negligence' with which it was joined as exceptions to defendant's general immunity from liability." *Id.* at 438. "[T]he conduct necessary … must 'smack[] of intentional wrongdoing.'" *Id.* at 438-39.

And the notion that the issue of Deutsche Bank's "willful misconduct" would raise class-certification-defeating individual questions turns traditional notions of (b)(3) predominance on its head. "[C]ommon issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members." *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 187 (D.N.J. 2003); *see, e.g.*, *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 299 (3d Cir. 2011) ("[C]ommon issues [] predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did.") (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002)); *Yang v. Focus Media Holding Ltd.*, No. 11 CIV. 9051 CM GWG, 2014 WL 4401280, at *13 (S.D.N.Y. Sept. 4, 2014) ("Because the central and predominant focus of the action is Defendants' alleged fraudulent conduct, each Class Member is similarly situated and common questions predominate over individual questions."). But whether Deutsche Bank engaged in "willful misconduct" is a question common to the class and it will predominate at trial over any individual questions.

### 4. Deutsche Bank has identified no individual questions that predominate over questions common to all class members of the Implied Contract Class.

Deutsche Bank contends (at 22) that because ECN trading is typically anonymous, "few, if any, putative class members could establish an implied-in-fact contract." It bases that assertion on the proposition that there can be no implied contract between parties who have no relationship. It makes the same argument (at 23) with respect to the unjust enrichment claim: "Axiom's allegation that the Implied Contract Class members traded with DB anonymously shows that there was no

relationship between DB and any such class members, much less one that could have 'caused reliance or inducement.'" Notably, these are not Rule 23, class certification or predominance arguments; they are an attack on the sufficiency of Axiom's allegations, but not persuasive ones.[7] The anonymity of one party to a trading relationship is not the same thing as a lack of a relationship between parties. Nor does the anonymity of the counterparty mean there cannot be an implied contract between the parties, or reliance or inducement.

Deutsche Bank insists (at 22) that "an individualized inquiry is needed to determine whether the conduct of DB and each anonymous counter-party who traded on an ECN gave rise to an implied contract, and what its terms were." But Deutsche Bank does not identify what those individualized inquiries would be or how they could swamp the common questions. It also argues (at 23) that "[i]ndividual *discovery and inquiry into each class member's dealings* with DB would be required to determine each class member's claim of reliance or inducement." But again, Deutsche Bank does not identify what individual inquiries would be necessary or how they would overwhelm the common questions this case presents. More importantly Deutsche Bank blithely ignores that the time for that "individual discovery" has passed. That also disposes of the argument that "DB's affirmative defenses of waiver, unclean hands, and *in pari delicto* also require individualized discovery into each class member's conduct, further defeating class certification." *Id.* at 22. Discovery is over.

There can be little doubt that when parties trade currency over an ECN, there is necessarily a relationship between them because they are parties to a transaction. Axiom has pled implied contract and unjust enrichment in the alternative. A contract is merely "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way

---

[7] It also misstates the nature of Plaintiffs' Implied Contract Class.  The Implied Contract Class covers all persons who submitted an order that was routed to Deutsche Bank and rejected because of a post-receipt price change over a third-party venue, which includes both disclosed *and* anonymous trading.

recognizes as a duty." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000) (quoting Restatement (Second) of Contracts § 1 (1979)). And as Deutsche Bank concedes, an implied contract "is derived from the presumed intention of the parties as indicated by their conduct." DB Mem. at 22 (quoting *Jemzura* v. *Jemzura,* 330 N.E.2d 414, 420 (N.Y. 1975)). While that could in some contexts raise individual questions, the conduct here is the same for all class members: the electronic submission of trade orders for currency and Deutsche Bank's trade acceptance price-checking practices with respect to those orders. That does not vary from class member to class member, and Deutsche Bank does not contend otherwise or identify any real differences that would have a material impact on claims in this case.

Similarly, "[t]he essential inquiry in any action for unjust enrichment ... is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). That inquiry does not present individual questions that vary from class member to class member and swamp the common questions. This case is therefore unlike *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 75. (S.D.N.Y. 2013), where the proposed class included class members who wanted automatic renewal of their satellite radio service in a case challenging XM's automatic renewal practice. Individual inquiries would have been necessary to separate those class members from those who did not want automatic renewal. Deutsche Bank has presented absolutely no evidence of a single class member who wanted Deutsche Bank to reject trades based on prices generated after Deutsche Bank's receipt of a trade instruction.

### 5. There are no individualized choice-of-law questions that defeat certification of the Implied Contract Class.

Deutsche Bank maintains (at 22-23) that choice-of-law considerations would overwhelm the common questions because the Court would need to determine what law governs the implied contract and unjust enrichment claims. "[T]he crucial inquiry is not whether the laws of multiple

jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013). In a diversity case, the choice-of-law rules of the state in which the district court sits governs, and under New York's choice of law rules, "[t]he first step ... is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 151 (2d Cir. 2008) (quoting *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 223 (1993)).

The implied contract claim presents a single overarching question—whether Deutsche Bank's use of post-receipt prices to reject trade orders breached the parties' contract—and that is a question governed by the UCC. N.Y.U.C.C. §7-713(1) (McKinney). Pursuant to section 1-303 of UCC Article 2, Axiom will present generalized class-wide evidence about the "usage of trade" in the foreign exchange market that participants expect trade orders to be accepted or rejected based on pricing as of the time of the receipt of the trade instruction. Every state except Louisiana has adopted Article 2 and section 1-303 in particular. Zig. Cert. Decl. Ex. 16. Deutsche Bank has not pointed to *any* conflicts in relevant contract law,[8] much less the kind "of significant variation in states' breach of contract law and states' adoption of the relevant UCC provision" necessary to preclude class certification. *In re U.S. Foodservice Inc. Pricing Litig.*, No. 3:06-CV-1657 CFD, 2011 WL 6013551, at *12 (D. Conn. Nov. 29, 2011), *aff'd,* 729 F.3d 108, 127 n.10 (2d Cir. 2013) ("Like the district court, we do not reach this choice of law issue in light of our conclusion that even assuming the laws of multiple jurisdictions apply, common issues predominate.")

---

[8] Deutsche Bank implies that the law of foreign countries may also be implicated, but Federal Rule 44.1 requires "[a] party who intends to raise an issue about a foreign country's law [to] give notice by a pleading or other writing," which Deutsche Bank has not done. *See* DB Mem. at 22 ("the Court would be required to determine the identity and domiciles of anonymous counter-parties who traded with DB on ECNs before conducting a choice-of-law analysis *for every domestic and foreign putative class member*") (emphasis added).

Similarly, as this Court has observed "numerous courts have certified nationwide classes based on a common claim of unjust enrichment." *Rapoport-Hecht v. Seventh Generation, Inc.*, No. 14-CV-9087 (KMK), 2017 WL 5508915, at *3 (S.D.N.Y. Apr. 28, 2017). "These cases can be rationalized on the reasoning that '[a]lthough there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences,' and regardless of which state's law applies, 'the focus of an unjust enrichment claim is whether the defendant was *unjustly* enriched.'" *Id.* (quoting *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009)). Whatever unidentified slight differences Deutsche Bank may have in mind about states' unjust enrichment law, "those differences do not materially affect the 'two fundamental elements' of an unjust enrichment claim—that 'the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.'" *Id.* (quoting *Mercedes-Benz*, 257 F.R.D. at 58). *See* Zig. Cert. Decl. Ex. 14 and 15.

Deutsche Bank merely assumes the existence of "inevitable variations in state law" (at 22) and that "the Court would need to apply multiple jurisdictions' laws," but it does not identify such conflicts. And having failed to identify any conflicts among state laws governing the kinds of breach of contract and unjust enrichment claims Axiom asserts here, Deutsche Bank has not even satisfied "the first step" of New York's choice-of-law analysis:  demonstrating that "there is an actual conflict between the laws of the jurisdictions involved." *Schwartz*, 539 F.3d at 151.[9]

**6.  Individualized damages calculations, even if necessary, would not preclude class certification.**

Deutsche Bank also contends that individualized issues of damages preclude certification, asserting that Axiom is required to "establish fact-of-damages 'for every class member through

---

[9] Nor has Deutsche Bank shown that, if the Court were to proceed further, the class members' domicile would in any instance be relevant by requiring the application of some state's law other than New York where, as here, the place of performance and of the breach was in New York.

proof common to the class.'" DB Mem. at 23 (citing *Bell Atl. Corp. v. AT&T Corp.,* 339 F.3d 294

(5th Cir. 2003) and *Comcast Corp. v. Behrend,* 569 U.S. 27 (2013)). It then launches into an attack on

Axiom's proposed damages model, insisting that the appropriate measure of damages would give

rise to individualized issues. Even if Deutsche Bank's damages arguments were correct, however,

individualized issues of damages would not preclude certification.

As this Court has explained, "[t]he Second Circuit has rejected a broad reading of *Comcast.*" *In re*

*Barrick Gold Sec. Litig.,* 314 F.R.D. 91, 100 (S.D.N.Y. 2016).

> *Comcast* ... did not hold that a class cannot be certified under Rule 23(b)(3) simply because
> damages cannot be measured on a classwide basis. ... *Comcast's* holding was
> narrower. *Comcast* held that a model for determining classwide damages relied upon to
> certify a class actually measure damages that result from the class's asserted theory under
> Rule 23(b)(3) must actually measure damages that result from the class's theory of injury;
> but the Court did not hold that proponents of class certification must rely upon a classwide
> damages model to demonstrate predominance .....

> To be sure, *Comcast* reiterated that damages questions should be considered at the
> certification stage when weighing predominance issues, but this requirement is entirely
> consistent with our prior holding that "the fact that damages may have to be ascertained on
> an individual basis is ... a factor that we must consider in deciding whether issues
> susceptible to generalized proof 'outweigh' individual issues." *McLaughlin* [*v. American
> Tobacco Co.*], 522 F.3d [215,] 231 [2d Cir.2008]. The Supreme Court did not foreclose the
> possibility of class certification under Rule 23(b)(3) in cases involving individualized
> damages calculations.[39]

*Id.* at 100 & n.39 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407-08 (2d Cir. 2015) (citing *In re*

*Deepwater Horizon,* 739 F.3d 790, 817 (5th Cir. 2014)); *see also Waggoner v. Barclays PLC,* 875 F.3d 79,

105-06 (2d Cir. 2017) ("We have since interpreted *Comcast* as precluding class certification 'only ...

because the sole theory of liability that the district court determined was common in that antitrust

action, overbuilder competition, was a theory of liability that the plaintiffs' model indisputably failed

to measure when determining the damages for that injury.") (quoting *Sykes v. Mel S. Harris & Assocs.*

*LLC,* 780 F.3d 70, 88 (2d Cir. 2015)). Indeed, in *Roach* the Second Circuit reversed a denial of class

certification "because we do not read *Comcast* as precluding class certification where damages are not

capable of measurement on a classwide basis." *Roach,* 778 F.3d at 409.

**7. Axiom's theory of recovery—that Deutsche Bank improperly used post-receipt pricing to reject trade orders—has been the same from the inception of the lawsuit.**

As this Court explained, "Axiom contends that the moment Deutsche Bank receives the trade instruction from the matching algorithm is determinative; Deutsche Bank can only look backward from that moment to determine whether the price has expired or was withdrawn." *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 535 (S.D.N.Y. 2017). Deutsche Bank contends that Axiom has improperly asserted a new legal theory because Axiom has conceded "that DB may use last look to reject trade requests based on a variety of post-receipt checks, but not a post-receipt price check." DB Mem. at 25. Axiom's acknowledgment that not all post-receipt "verification" of trade orders constitutes a breach, is not a change of theory, much less an improper one that warrants denial of class certification.

## CONCLUSION

For the foregoing reasons, the Court should grant Axiom's motion for class certification.

Dated: April 9, 2018                                    __/s Aaron M. Zigler_____

                                                        One of the Attorneys for Plaintiffs

Christopher M. Burke
Walter W. Noss
Kristen M. Anderson
Kate Lv
Scott+Scott, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Phone: (619) 233-4565
Fax:    (619) 233-0508


David Scott
Sylvia Sokol
Thomas K. Boardman
Amanda Lawrence
Scott+Scott, Attorneys at Law, LLP
405 Lexington Avenue, 40th Floor
New York, NY 10174-4099
Phone: (212) 223-6444
Fax:    (212) 223-6334

Michael D. Hausfeld
Reena A. Gambhir
Jeannine M. Keeney
Hausfeld, LLP
1700 K Street, NW
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201

Bonny E. Sweeney
Michael P. Lehmann
Hausfeld, LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Phone: (415) 633-1908
Fax:    (415) 358-4980

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Michael E. Klenov
Carol O'Keefe
Garrett R. Broshuis
Korein Tillery LLC
505 North 7th Street
Suite 3600
St. Louis, MO 63101
Phone: (314) 241-4844
Fax:    (314) 241-3525

George A Zelcs
Robert E. Litan
Randall P. Ewing, Jr.
Korein Tillery, LLC
205 North Michigan Plaza
Suite 1950
Chicago, IL 60601
Phone: (312) 641-9750
Fax:    (312) 641-9751

Linda P. Nussbaum
Bart D. Cohen
Bradley J. Demuth
Hugh Sandler
Nussbaum Law Group, P.C.
570 Lexington Avenue, 19th Floor
New York, NY 10022
Phone: (212) 702-7053
Fax:    (212) 681-0300