**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AXIOM INVESTMENT ADVISORS, LLC, by and through its Trustee, Gildor Management, LLC, and AXIOM INVESTMENT COMPANY, LLC, by and through its Trustee, Gildor Management, LLC,<br>     Plaintiffs,<br><br><br>  - against -<br><br>DEUTSCHE BANK AG,<br>     Defendant. | Case No. 15 Civ. 9945 (LGS) |

**SUPPLEMENTAL DECLARATION OF RETO FELLER IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1. I, Reto Feller, declare and state as follows:

2. I make the following statements on the basis of my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

I.    INTRODUCTION AND SCOPE

3. I make this Supplemental Declaration in further support of Plaintiff's motion to certify the class, and to respond to incorrect or misleading statements contained in Deutsche Bank's brief and the Declarations of Professor Hendershott and Mr. Weisberg.

4. My qualifications, compensation and previous testimony are set forth in my Initial Declaration and, for brevity, are not repeated here.

5. When a liquidity provider, such as Deutsche Bank, receives a trade request, it commonly performs a number of checks, which may include a credit check to ensure that the party has adequate credit to perform the trade, a systems check to verify that the request is in the correct format, and a price check to ensure that the requested trade is one on which the liquidity provider is willing to deal, subject to the agreement and expectations of the parties.

6. Deutsche Bank performed its checks, including its price check, after it received a client's trade instruction for all of its eFX trades. Because Deutsche Bank's price was frequently updated, Deutsche Bank may have updated its price between the receipt of a trade instruction and the time that Deutsche Bank performed its price check. (Zig. Fell. Decl. Ex.4 Oomen Dep.155:20-156:11). Deutsche Bank uses "the current client price, at the time of the trade acceptance decision." (Zig. Fell. Decl. Ex.4 Oomen Dep. 155:12-19). This price is often a price that was generated subsequent to the receipt of a trade request.

7. Deutsche Bank's Delayed Trade Acceptance ("DTA") further extends the time that elapses between the receipt of a trade request and its trade acceptance decision. The original specification document for DTA called the concept "Look ahead trade acceptance" (Zig. Weis. Decl. Ex.5 DB-Axiom_00379187, 91); the name is apt, as DTA effectively allows Deutsche Bank to "look ahead" and determine where the market is moving prior to making its trade acceptance decision.

8. DTA provides Deutsche Bank with an opportunity to perform multiple price checks before making its trade acceptance decision.

9. DTA delays Deutsche Bank's trade acceptance decision for a period of time equal to the lesser of the time required to perform a certain number of price updates, the time required for

1

the price to move outside a specified tolerance or a specified maximum delay. If the Deutsche Bank price moves more than the specified tolerance in Deutsche Bank's favor the trade is accepted and if the move is in the client's favor the trade is rejected. (Zig. Weis. Decl. Ex. 5 DB-Axiom_00379187, 91) (setting forth example); (Zig. McF. Decl. Ex.2 Carter Dep. 75:11 – 78:12).

10.    In the absence of such a move, a "vanilla trade acceptance decision" is made at the end of the DTA period (DB-Axiom_00427809, 841), meaning Deutsche Bank compares the client price that exists at the time of the decision with the price contained within the trade request.

11.    Although Deutsche Bank is correct when it states that DTA was generally applied to a subset of its clients, the allegations in this case are not limited to just DTA. Even in the absence of DTA, vanilla trade acceptance operates to cause Deutsche Bank to reject otherwise valid trades on the basis of a price generated after receipt of the trade request and utilize an asymmetric trade acceptance methodology; accepting trades where the price has moved in its favor and rejecting nearly all the trades where the price has moved in the client's favor.

12.    Deutsche Bank is correct when it says that it did not reject all trades where the price contained in the trade request did not match Deutsche Bank's price for that client at the time it makes an acceptance decision. (Def. MOL at 4, 6; Weisberg ¶58). However, it overstates the significance of its practices. In order to attract additional volume, Deutsche Bank accepted some trades that moved slightly against Deutsche Bank's interest. Deutsche Bank referred to this configuration as a "pip waiver tolerance." (Zig. Weis. Decl. Ex.10 DB-Axiom_02381613, 15) ("I believe we need to have a tool such as pip waivers with FIX connects to control the rejects for the profitable names for the client experience.")

13.    This parameter operates to accept a trade where the price has moved in the client's favor in an amount less than the specified tolerance. However, Deutsche Bank accepted all trades that moved in its favor no matter how significant the move. "DB accepts all trades which are in our favor, done on market rate, or in client favor but not more than Pip Waiver tolerance." (Zig. Weis. Decl. Ex.11 DB-Axiom_01314378, 82) (Def. Exh. 3). This pip waiver tolerance, however, was very narrow. As a result, while it can be said that Deutsche Bank accepted trades against it, the effect of these practices rejected far more trades than it accepted. The following charts illustrate the magnitude of these practices:







Post trade price movement, for GBPUSD rejected trades. ABFX data.

14.     These charts make it obvious that Deutsche Bank's practices served to reject unprofitable trades and accept profitable ones. Nevertheless, Deutsche Bank criticizes the claim that it used these practices to refuse to complete those trades it determined to be likely unprofitable at that time. Feller Decl. at ¶ 42.

15.     Deutsche Bank also criticizes Plaintiff's claims that Deutsche Bank's practices violate the expectations of market participants. Feller Decl. at ¶¶ 12, 40. Deutsche Bank and its expert Mr. Weisberg claim there is no expectation that a liquidity provider would honor a price that exists at the time of receipt of a trade instruction. Weisberg Decl. at ¶¶ 10(1), 10(6), 11, 16, 39; Def. MOL to Strike Feller at 1, 8-10.

16.     However, Deutsche Bank characterized its own e-trading as "fill or kill" in its literature, and through its sales and support personnel. Deutsche Bank's FIX API guides from 2010 through 2014 specify that "Trade requests" include a Fill or Kill tag. (Zig. Weis. Decl. Ex.12 DB-Axiom_01279877, 893; Ewing Decl. Ex. 19).  Documents produced by Deutsche Bank also reveal that its sales and support personnel told clients that Deutsche Bank accepted only fill or kill orders. (Zig. Weis. Decl. Ex.13 DB-Axiom_01699017) (Ivic in 2009, "all executions on our FIX server are 'fill or kill'…."); (Zig. Weis. Decl. Ex.14 DB-Axiom_01240020 at 21) (Ivic in 2009 "trading is only FILL or KILL and should always be done on the latest quote…."); (Zig. Weis. Decl. Ex.15 DB-Axiom_01630665 at 68) (Nozza in 2014 "all orders are FOK (fill or kill)."); (Zig. Fell. Decl. Ex.6 DB-Axiom_198844 at 45) (Ivic in 2012 "Our co-lo FIX API does not support market orders only

4

fill or kill."); (Zig. Fell. Decl. Ex.7 DB-Axiom_01572318 at 32) (Chris Yeung "We should only support FOK at the moment.")

17.    The NIPs Code highlights the pivotal importance of the time an order is received.  It defines a "fill or kill" order as "an order placed, under the condition that, when there is not an immediate match at the moment the order is received by the electronic venue, the order is then immediately cancelled." (Ewing Decl. Ex. 22 at n. 14).

18.    Deutsche Bank's documents reveal that it was Philip Wood, then Head of Deutsche Bank's eFX Trading department, who proposed and authored the NIPS Code definition, with its emphasis on matching at the moment the order is received. (Zig. Fell. Decl. Ex.8 DB-Axiom_00407848)

19.    The 2015 Fair and Effective Markets Report expressly states that combining asymmetric price acceptance with a price check based on post-receipt prices, i.e., market moves after the order is placed,  is an abusive practice:  "the Review shares the concerns raised in several responses to the consultation that last look, in its current form, could also potentially be abused by market makers, either by asymmetrically accepting or rejecting orders based on market moves after the order is placed, or by using the order to inform other trading activity prior to acceptance.. (Zig. Cert. Decl. Ex.2 Fair and Effective Markets Report at 31). The NIPS Code also provides: "The use of clear language is in the interests of all concerned." (Ewing Decl. Ex. 22 at Standard 35).

20.    However, Deutsche Bank took affirmative steps to masque the various components of its trade acceptance methodology.  In setting DTA parameters, Carter routinely considered the capacity of a human trader to detect latency.  (Zig. Cert. Decl. Ex.5 DB-Axiom_01802184) (Carter: "500ms is the next step to try to get two reuters updates, but humans can detect this latency (the system will just feel slow), so I don't use this unless I need it."); (Zig. Cert. Decl. Ex.4 DB-Axiom_00859729) ("I dont think we can get away with 2-3 seconds, user will realise this very quickly").

21.    In another example, Developer Gray Lorig explained to David Leigh:
Ah yes, the ACK delay gambit.  We made the decision a while ago to send the ACK back at decision time not when the order is accepted for processing by the TA.  This was done to obscure exactly how fast we were processing the underlying trade.  We could change this although there is coding involved and we would have to decide precisely how quickly we would want to respond – ACKing in 100us might reveal a little too much about our capabilities… Gray (Zig. Fell. Decl. Ex.9 DB-Axiom_00475574, 75)

22.     Likewise support personnel, who dealt directly with clients regarding rejected trades, were instructed not to disclose DTA to clients, and to attribute any issues to latency in the connection. (Ewing Decl. Ex. 20) (Ivic: "Under no circumstances should ECS/ECOM/GMe communicate to the client about this trade acceptance logic and reveal the true underlying reasons on what we see in MIS. As Maria has stated below, ECS should just communicate to the client that we reject the trade due to latency"); (Ewing Decl. Ex. 20) ("I would only describe this as a latency in the connectivity and if we dont hear back in a certain period of time then we reject."); (Zig. Cert. Decl. Ex.10 DB-Axiom_01340417) (Prata: "I don't think we should share the DTA information with them"); (Zig. Cert. Decl. Ex.13 DB-Axiom_01474798)(Schultz: "oh and Ben [Carter] says dont mention the 300 ms");  (Zigl. Fell. Decl. Ex.10 DB-Axiom_01316450) (Carter: "but dont tell the clients").

23.     Deutsche Bank's employees followed these directives. (Zig. Cert Decl. Ex.11 DB-Axiom_01320959) (Ivic: "Trying to mask the very slow booking times (i.e. DTA)); (Zig. Cert. Decl. Ex.12 DB-Axiom_01568759, 62) (Nozza: "Ignore the questions about the rejects – I told them about pip waiver…more or less.")

24.     When an employee accidentally sent a MIS report containing time and pricing information to a client, Carter suggested they create a more limited version and restrict access to the full report to senior sales and trading.  (Zig. Fell. Decl. Ex.11 DB-Axiom_02381642)

25.     Seeking to undermine my opinion that a rational FX trader would not agree to the use of a price check based on post-receipt prices, Deutsche Bank claims its "trading records prove conclusively that thousands of clients have voluntarily continued to trade with DB even after multiple public disclosures explicitly documenting DB's use of a post-receipt price check." (Def. MOL at 1)

26.     This claim is entirely misleading.  Deutsche Bank has done nothing to show that these disclosures were received, read or understood. The cited 2014 and 2015 disclosures refer only to the possible imposition of a delay in the trade acceptance process.  (Def. MOL at 4, n. 2). However, a delay does not necessarily implicate a price check based on post-receipt prices. Deutsche Bank could hold the trade for 10ms or 500ms, and at the end of that period, it still had a choice of which price to use in its check – the price at the time of receipt or the price at the time of decision.

27.     And because Deutsche Bank did not transmit the details of its trade acceptance and price checks to clients with its rejection notice, (Zig. Fell. Decl. Ex.5 Ivic Dep. 118:11-121:7), clients

6

had no means of discerning that anything other than the price at the time of receipt had been used in the trade acceptance process.

28.     Indeed, Deutsche Bank has still not disclosed all aspects of its trade acceptance practices involving price checks based on post-receipt prices, Asymmetric Trade Acceptance, and DTA.  None of its disclosures reveal that Deutsche Bank implements DTA around news and data events across large swaths of its client base for certain relevant currency pairs. As early as 2011, Defendant began manually applying a Data Scheduler component which applied DTA settings across currency pairs during the timeframe around data releases.  (Zig. Fell. Decl. Ex.12 DB-Axiom_01342353, 55; Zig. Fell. Decl. Ex.13 DB-Axiom_02397372; Ewing Decl. Ex. 15).

29.     Moreover, David Leigh does not claim that "thousands of clients" have remained as customers.  In his Declaration, Leigh only states that since 2011, 8-16% of DB's accounts have become inactive each year while new accounts ranged from 10-20% annually. (Leigh Decl. ¶2). Other than identifying a single consistent customer, Leigh does not describe the interplay between clients who have stayed and those who have left.  Indeed, given Leigh's broad approximations, nearly the entire client base could have turned over since 2011.  In contrast, it is clear that Deutsche Bank's share of the eFX market has declined dramatically in recent years. (Zig. Fell. Decl. Ex.2 Wood Dep. Ex. 71). In short, while Deutsche Bank may be maintaining a consistent number of eFX accounts, an ever increasing proportion of its eFX trading volume is going to DB's competitors.

I declare under penalty of perjury of the laws of the United States that the forgoing is true and correct.

_____
RETO FELLER

Executed in London, UK on Monday, April 9, 2018

7