**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AXIOM INVESTMENT ADVISORS, LLC, by and through its Trustee, Gildor Management, LLC, and AXIOM INVESTMENT COMPANY, LLC, by and through its Trustee, Gildor Management, LLC,

     Plaintiffs,

- against -

DEUTSCHE BANK AG,
Defendant.

Case No. 15 Civ. 9945 (LGS)

---

**SUPPLEMENTAL DECLARATION OF BRUCE MCFARLANE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

1. Introduction .................................................................................................................. 1

2. Qualifications ............................................................................................................... 2

3. Response to Dr. Hendershott's Opinions and Criticisms to McFarlane Initial Declaration ................................................................................................................. 2

    3.1. Assumes Formula for Damages .......................................................................... 2

    3.2. The But-For World ............................................................................................. 3

    3.3. Benefits Paid ....................................................................................................... 5

    3.4. Windfall Damages ............................................................................................ 11

    3.5. Change in Overall Relationship ....................................................................... 12

    3.6. Individualized Inquiry ...................................................................................... 13

    3.7. Market Price ...................................................................................................... 14

    3.8. Cover Trades ..................................................................................................... 16

    3.9. Unjust Enrichment ........................................................................................... 17

    3.10. Conclusion ........................................................................................................ 20

4. Deutsche Bank Supplemental Trade Order Data .................................................... 20

    4.1. Plaintiff Domicile .............................................................................................. 21

    4.2. Axiom Rejected Trade Orders during the Class Period .................................. 22

    4.3. Clients with Rejected Trade Orders during the Class Period .......................... 23

5. Documents / Data Considered ................................................................................. 23

1. I, Bruce McFarlane, being first duly sworn upon my oath, declare and state as follows:

2. I make the following statements on the basis of my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

1. **INTRODUCTION**

3. I have been retained on behalf of Plaintiff Axiom Investment Advisors, LLC ("Axiom") to provide an opinion regarding the damages that Axiom and a class of similarly situated participants who traded foreign exchange ("FX") with Defendant Deutsche Bank AG ("Deutsche Bank") and suffered damages as a result of Deutsche Bank's practice of failing to complete trade orders based on adverse price movement that occurred after receipt of the client's trade order.

4. In connection with my work on this matter, I submitted a declaration, dated January 15, 2018, in which I set forth the opinions I formed based on my analyses of the data that were available to me as of the date of my declaration ("Initial Declaration").

5. Subsequent to submitting my Initial Declaration, Deutsche Bank's expert, Dr. Hendershott, submitted a declaration, dated March 8, 2018, in which he set forth, *inter alia*, certain opinions and criticisms regarding my Initial Declaration ("Hendershott Declaration"). In this supplemental declaration, I set forth my responses to Dr. Hendershott's opinions and criticisms contained in his declaration.

6. In addition, subsequent to my Initial Declaration, Deutsche Bank supplemented its production of foreign exchange trade order data. In this supplemental declaration, I set forth additional opinions I have formed based on my analyses of Deutsche Bank's supplemental trade order data.

7.      I am prepared to testify in this matter, at trial or by deposition, consistent with the opinions set forth in this report. Additionally, I am prepared to supplement this report based upon any supplemental production of data by Deutsche Bank.

## 2.      QUALIFICATIONS

8.      My qualifications are set forth in my Initial Declaration and, for brevity, are not repeated here.

## 3.      RESPONSE TO DR. HENDERSHOTT'S OPINIONS AND CRITICISMS TO MCFARLANE INITIAL DECLARATION

9.      Dr. Hendershott states in his declaration that he was asked to "review and respond to Mr. McFarlane's Declaration in light of economic theory and evidence regarding how modern foreign exchange ("FX") markets functioned from December 21, 2011 until today."[1]  Given this charge, Dr. Hendershott submitted his declaration in which he presents certain opinions and criticisms of my Initial Declaration.  His opinions and criticisms, and my response to them, are set forth below.

### 3.1.      Assumes Formula for Damages

10.      In his declaration, Dr. Hendershott states:

> *Mr. McFarlane offers no independent conceptual reasoning, let alone reliable economic analysis, to justify the damages methodology he is asked to adopt. Instead, he simply adopts a damages methodology that Plaintiffs' counsel provided him, as he states that he has "been asked to adopt" the various assumptions underlying his damages formula.*[2]

11.      I acknowledge that as part of my analysis I appropriately adopt instructions from counsel regarding what is the *legal* measure of damages to which plaintiffs are entitled to recover

---

[1]   Hendershott Declaration, ¶1.
[2]   Hendershott Declaration, ¶22.

under their breach of contract and unjust enrichment claims.  As I stated at my deposition, like many damages experts, I too routinely adopt instructions from counsel regarding the law as it pertains to the calculation of damages.  Neither Dr. Hendershott nor I are qualified to render opinions regarding—as a matter of law—what is the proper measure of economic damages to which a plaintiff is entitled under a given cause of action.  Thus, when the assumptions I adopt are *legal* assumptions,[3] no "independent conceptual reasoning" or "reliable economic analysis" by me is necessary or warranted.

12.     In conclusion, Dr. Hendershott's criticism that I simply assume a formula for damages and that I offer no independent conceptual reasoning or reliable economic analysis to justify the damages methodology I was instructed to adopt—as a matter of law—is misplaced and ill-informed.

### 3.2.     The But-For World

13.     Dr. Hendershott contends that, absent DTA, Deutsche Bank would have either (1) changed the liquidity parameters that governed its trades with plaintiffs, which presumably would have resulted in plaintiffs having received less favorable pricing, or (2) stopped trading with plaintiffs altogether.[4]  In other words, according the Dr. Hendershott, in the "but for" world absent DTA, Deutsche Bank would potentially have changed both the *price* and the *quantity* of plaintiffs' trades.

14.     Given plaintiffs' breach of contract allegation, it is inappropriate to assume a "but for" world in which Deutsche Bank does not fulfill its contractual obligation, for to do so is to assume away the breached contracts and, therefore, liability.  It is akin to asserting that, had the

---

[3]   For example, Plaintiffs are entitled to recover as damages for breach of contract the difference between (1) the fair market value price of the currency to be exchanged as of the time of Deutsche Bank's breach ("Fair Market Value Price", or "$P_{FMV}$"), and (2) the price at which the parties contracted to exchange the currency ("Contract Price" or "$P_K$").

[4]   Hendershot Declaration, ¶30.

defendant known at the time he entered the contract that he could not subsequently act wrongfully, he would not have entered into the contract. Given plaintiffs' breach of contract allegation, it is necessary for purposes of calculating damages to assume that Deutsche Bank breached each contract relating to each wrongfully rejected trade order, and in the "but for" world it would have filled each trade order it wrongfully rejected at the contacted price and quantity.

15. Dr. Hendershott asserts that, absent DTA, Deutsche Bank may have changed the liquidity parameters of its trades with plaintiffs, including offering plaintiffs prices less favorable than those they actually received.[5] However, the methodology I use to calculate breach of contract damages is unaffected by any such potential change in price because it calculates damages based on the *change* in market price, as measured by the difference in the market price at the time of the contract and at the time of breach. Assuming, *arguendo*, that in the "but for" world absent DTA Deutsche Bank would have offered plaintiffs less favorable pricing, the change in pricing would apply to *both* prices I use to measure the change in market price. Thus, the change in market price that I calculate remains the same regardless of whether Deutsche Bank would have offered different prices in the "but for" world absent DTA.

16. In order to measure breach of contract damages in this matter, it is not necessary to know the nominal value of the market price at each relevant point in time. Rather, we need know only the *change* in the market price between the two relevant points in time. Because the change in Deutsche Bank's client price is correlated to the change in market price,[6] the change in Deutsche Bank's client price is a reasonable proxy for the change in market price.

---

[5] Hendershott Declaration, ¶30.
[6] Logically, Deutsche Bank's change in client price is correlated to the change in market price; otherwise, Deutsche Bank would be subject to arbitrage and risk of adverse selection. In his declaration, Dr. Hendershott states "a reasonable way to approximate the 'market price' is the price available at which the client can execute a trade" [Hendershott Declaration, ¶55]. He

17. Furthermore, Dr. Hendershott appears to have the mistaken belief that the "but for" world for purposes of calculating breach of contract damages must *exactly* mirror how the real world would have unfurled had the breaching party been permitted to renegotiate the agreement[7] (e.g., absent DTA, plaintiffs would have received faster response times; therefore, the "but for" world is assumed to have faster response times.). Such an assumption, however, is incorrect.

18. In conclusion, Dr. Hendershott's opinion that a proper framework for evaluating economic damages would need to consider how *all* liquidity parameters and trading activity would adjust absent the use of DTA is incorrect. Because the damages methodology I use calculates damages based on the change in market value, it is not necessary to consider how all liquidity parameters and trading activity would adjust absent the use of DTA.

### 3.3. Benefits Paid

19. Dr. Hendershott asserts that Deutsche Bank's use of DTA *may* have resulted in plaintiffs having received benefits, such as more favorable pricing, that plaintiffs would not have received absent Deutsche Bank's use of DTA, and that I fail to consider in my analysis such purported benefits over plaintiffs' "broader trading relationship" (i.e., *filled* as well as *rejected* trade orders) with Deutsche Bank.[8]

20. In order for Dr. Hendershott's criticism to be valid, two premises must be true: (1) plaintiffs *in fact* received such purported benefits from Deutsche Bank, and (2) Deutsche Bank

---

further testified that Deutsche Bank's streamed price is "a price they're indicating that they -- they're willing to trade at" and that when a client receives a price from Deutsche Bank, that price "is in some sense a market price." [Zig. Hend. Decl. Ex. 1 at 102:25-103:4]

[7] Hendershott Declaration, ¶27. ("Mr. McFarlane's proposed damages methodology assumes a "but-for" scenario without DTA, where everything else would be kept exactly the same.")

[8] Hendershott Declaration, ¶28.

"paid" the purported benefits to plaintiffs as compensation for bearing DTA trade order rejection risk.

21.     As an initial matter, any potential benefits plaintiffs may have received are "benefits" to plaintiffs only to the extent they were more favorable than what plaintiffs could have obtained from other liquidity providers.  For example, if Deutsche Bank offered more favorable pricing to a plaintiff in order to match competitors' prices, then Deutsche Bank's "more favorable pricing" is not a benefit to the plaintiff in the context of benefits Deutsche Bank "paid" to compensate the plaintiff for bearing DTA trade order rejection risk.

22.     There is no evidence in the record available to us to evaluate how the liquidity parameters plaintiffs obtained from Deutsche Bank using DTA compared to what was available to plaintiffs from other liquidity providers.  Absent such direct, quantitative evidence to support his assertion that plaintiffs *in fact* received such purported benefits from Deutsche Bank, Dr. Hendershott presents analyses in several exhibits to his declaration that reflect quantitative data, such as the number of clients by year on Deutsche Bank's RAPID platform (Exhibit 1), Axiom trading volume (Exhibits 2 and 3) and fill rates (Exhibit 4) with Deutsche Bank before and after Deutsche Bank activated DTA on Axiom's trade orders.  Dr. Hendershott's analyses in these exhibits, however, are invalid for supporting the inference for which he cites them because (1) they do not control for *all* variables that potentially affected Axiom's trading volume and fill rates during the before and after periods Dr. Hendershott uses (which Dr. Hendershott opines is required for a proper economic analysis[9]), and (2) Axiom did not have knowledge of Deutsche Bank's use of DTA

---

[9]   Hendershot Declaration, ¶25. ("[A] proper framework for evaluating economic damages would need to consider how *all* liquidity parameters and trading activity would adjust absent the use of DTA." (emphasis added))

during the post-DTA activation periods Dr. Hendershott uses for his analyses.[10] As such, Axiom was unaware of the "cost" of the DTA trade order rejection risk to which its trade orders were exposed. Logically, absent such knowledge, Axiom's trading activity during Dr. Hendershott's "after" periods relative to his "before" periods cannot be informative of Axiom's preference for trading with Deutsche Bank with versus without DTA.

23. Dr. Hendershott admitted that his analyses reflected in his exhibits do not control for all variables that could impact Axiom's trading volume.[11] Not surprisingly, Dr. Hendershott testified that he did not reach an "explicit conclusion" about whether Deutsche Bank would have offered plaintiffs more favorable pricing absent DTA.[12] For these reasons, Dr. Hendershott's exhibits 1 through 4 cannot and therefore do not establish that plaintiffs *in fact* received such purported benefits. Given the lack of evidence that plaintiffs *in fact* received such purported benefits, Dr. Hendershott appropriately hedges and qualifies his assertion by using language, such as "*potential* benefits"[13] that plaintiffs "*may* have"[14] or "*might* have" or "*could* have" received.[15]

24. Furthermore, Dr. Hendershott's assertion that plaintiffs received such purported benefits is also belied by the fact that Deutsche Bank's contemporaneous, pre-litigation analyses to measure the impact of DTA on its profits does not reflect any consideration of the cost of providing

---

[10] Zig. McF. Decl. Ex 1 at 230:25-231:9. (" Q. Prior to any conversations you had with plaintiffs' counsel in this case, was there ever a time that you suspected that Deutsche Bank might be using last look as that term is used in the complaint? A. And my answer is -- is I don't think so.")

[11] Zig. Hend. Decl. Ex. 1 at 83:3-86:12.

[12] Zig. Hend. Decl. Ex. 1 at 74:2-17; ("Q. And it's your opinion that the bid-ask spread will grow larger in the -- in your but for world; is that correct? A. I don't have -- **I don't know that I reached an explicit conclusion** about whether or not it would be -- whether the spread would be wider or narrower.")

[13] Hendershot Declaration, ¶23.

[14] Hendershot Declaration, ¶40.

[15] Hendershot Declaration, ¶10.

such benefits to clients.[16]  Logically, if offering more favorable pricing across a client's broader trading relationship was incremental to Deutsche Bank's use of DTA, it would have included the cost of providing more favorable pricing in its calculation of DTA's impact on profits.

25.     Dr. Hendershott maintains that I inappropriately failed to consider the benefits that Deutsche Bank "paid" to plaintiffs as compensation for its use of DTA.   Both the evidence and economic logic indicate that, to the extent plaintiffs did receive such purported benefits, they were not "paid" to plaintiffs as compensation for bearing DTA trade order rejection risk.

26.     First, the assertion that Deutsche Bank "paid" such purported benefits to plaintiffs as compensation for bearing DTA trade order rejection risk is belied by the absence of Deutsche Bank advertising and touting to clients its supposedly beneficial use of DTA.   If Deutsche Bank's use of DTA provided benefits to clients, Deutsche Bank would presumably advertise and tout to clients such benefits.   However, rather than extolling to clients the benefits of DTA, Deutsche Bank instead attempted to conceal its use.  For example, due to DTA Deutsche Bank rejected two trade orders from a client █████████████████  When the client inquired as to the reason for the rejections, Mark Fitzgerald of Deutsche Bank sent an email internally within Deutsche Bank inquiring "how best I should respond to ██████ as for the reason behind their initial trade rejections."[17] Aleks Ivic of Deutsche Bank responded stating:

---

[16]  DB-Axiom_01726366, Benedict Carter Deposition Exhibit 16; Zig. McF. Decl. Ex. 5. In his spreadsheet analysis, Mr. Carter analyzed ████████████████████████ ██████████████████ In his email, Mr. Carter further states ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ DB-Axiom_01726366; Zig. McF. Decl. Ex. 5.

[17]  DB-Axiom_01314483-87 at 85.

*[W]e actually tell the client in the FIX reject message that the quote they used was stale:*

*. . .*

*Under no circumstances should ECS/ECOM/GMe communicate to the client about this [DTA] trade acceptance logic and reveal the true underlying reasons on what we see in MIS. As Maria have [sic] stated below, ECS should just communicate to the client that we reject the trade due to latency. If they want to discuss more in-depth about the rejects, please forward them onto the sales rep (in this case Chris Robertson or Scott Offord).[18]*

27. Dr. Hendershott acknowledges that "there is [sic] no available data that allows for a direct comparison of the spreads Axiom received from specific liquidity providers, including DB."[19] As such, Dr. Hendershott cannot quantitatively measure the change in spreads Axiom received from Deutsche Bank before and after Deutsche Bank activated DTA on Axiom trade orders.

28. Lacking quantitative data, Dr. Hendershott cites anecdotal evidence to support his assertion that Axiom received more favorable pricing due to Deutsche Bank's use of DTA on Axiom's trade orders.[20] For example, Dr. Hendershott cites a Deutsche Bank internal email, which states:

*We just had a call with Axiom to check on how things were going with them post our changes (we'd tightened spreads by about a pip, reduced rejects to 3% and [have] become one of their top 3 banks - I think #1 after the ECNs Hotspot and Currenex).[21]*

29. By this Dr. Hendershott appears to infer that Deutsche Bank's tightening of its spread to Axiom "by about a pip" was *due to* its activation of DTA. However, the email Dr. Hendershott cites does not support such an assertion. Notably, there is not a single reference to

---

[18] DB-Axiom_01314483-87 at 84.

[19] Hendershott Declaration, ¶36.

[20] Hendershott Declaration, ¶36. ("However, available records demonstrate that Axiom did in fact receive more favorable spreads from DB after the introduction of DTA.")

[21] DB-Axiom 01726366-87 at 86. Zig. McF. Decl. Ex. 5.

DTA in the email.  Moreover, a reading of the *full* email shows that Deutsche Bank was aggressively

marketing to Axiom in order to increase trade volume.  To this end, the email states:

> *We suggested in the interim that [Axiom] might want to run an experiment*
> *where they remove ECNs from their aggregator (so bank only liq), and if we see*
> *an improvement in the quality of flow we see we would tighten spreads which*
> *would share the benefit back to Axiom.*

30.     Thus, Deutsche Bank's change in pricing to Axiom appears to be due to Deutsche

Bank's efforts to offer more competitive pricing in order to induce Axiom to increase its trade

volume and quality with Deutsche Bank as opposed to Dr. Hendershott's assertion that Deutsche

Bank offered Axiom more favorable pricing as compensation for Axiom bearing DTA rejection risk.

Dr. Hendershott acknowledged that Deutsche Bank's historical pricing to Axiom was not very

competitive: "[P]rior to the use of DTA, DB's notes on conversations with Axiom suggested DB

offered 'wide spreads' and their [sic] offering was 'not very competitive.'"[22]

31.     Despite the deficiencies of Dr. Hendershott's analyses in his exhibits and his

assertions discussed above, he asserts that plaintiffs "may have" received the benefit of more

favorable pricing *due to* Deutsche Bank's use of DTA.  This assertion, however, is a *post hoc* fallacy as

Dr. Hendershott cannot discern cause from effect—i.e., he does not know whether plaintiffs'

purported more favorable pricing, if any, was caused by Deutsche Bank's use of DTA, or whether

Deutsche Bank instead employed DTA after the fact in order to mitigate losses that resulted from

the more favorable pricing Deutsche Bank was compelled to offer in an effort to be more

competitive in the market.  This latter scenario is logically more compelling than the former given

that, regardless of DTA, a liquidity provider must offer competitive pricing in order to win trade

volume.

---

[22]  Hendershott Declaration, ¶37, citing DB-Axiom_01981707–09 at 08.

32. Rather than Deutsche Bank providing more favorable pricing as compensation to plaintiffs for bearing DTA rejection risk as Dr. Hendershott asserts, a more economically compelling explanation is that, to the extent Deutsche Bank provided plaintiffs more favorable pricing, it did so in response to competitive pressures and then employed DTA after the fact in an effort to mitigate the financial impact from the increase in negative value trades that resulted from the more favorable pricing.

33. Dr. Hendershott argues that it is necessary for purposes of calculating damages to account for benefits plaintiffs received due to DTA; however, he does not acknowledge in his declaration that plaintiffs also incurred "costs" as a result of DTA, such as slower response times and lower fill rates. Importantly, if the costs plaintiffs incurred due to DTA equal the benefits they received due to DTA, they wash and Dr. Hendershott's criticism that I failed to consider such benefits is moot.

34. Lastly, as explained previously, the damages methodology I employ is valid regardless of the veracity of Dr. Hendershott's criticism that I failed to consider benefits because the method I use calculates damages based on the *change* in market price, as measured by the difference in the market price at the time of the contract and the market price at the time of breach.

35. In conclusion, Dr. Hendershott's criticism that I failed to consider purported benefits plaintiffs may have received as a result of Deutsche Bank's use of DTA is unsupported, contradicted by evidence and economic logic and ultimately irrelevant given the damages methodology I use to compute damages.

### 3.4. Windfall Damages

36. In his declaration, Dr. Hendershott states:

*[B]y focusing narrowly on rejected trade requests and ignoring the potential benefits that clients might have received from DB under the liquidity provisions with DTA, Mr. McFarlane's proposed damages approach would yield an unjustified economic windfall for Class Members.*[23]

37. As I explained above, Dr. Hendershott's assertion that it is necessary to account for purported benefits plaintiff may have received from DTA in calculating damages is incorrect. Moreover, logically Dr. Hendershott cannot know *with certainty* whether my damages methodology would yield an unjustified economic windfall for class members unless he also knows with certainty that the value of the benefits plaintiffs purportedly received due to DTA exceed the costs (e.g., slower response time, lower fill rate) that plaintiffs incurred due to DTA. Since Dr. Hendershott has not performed such an analysis, he has no basis to conclude that my damages methodology would *in fact* yield an unjustified economic windfall for class members.

### 3.5. Change in Overall Relationship

38. Dr. Hendershott further asserts that I fail to account for the fact that some clients would have preferred a different overall trading relationship with Deutsche Bank absent DTA, or perhaps would have chosen not to trade with DB at all.[24]

39. In calculating breach of contract damages in this matter it is incorrect to assume a "but for" world without DTA in which plaintiffs would instead choose not to trade with Deutsche Bank. To do so assumes away breached contracts and, hence, liability. It is a standard tenet of breach of contract damages analysis to assume that, in the "but for" world, the defendant fulfills the contract. Thus, it is necessary to assume for purposes of damages that Deutsche Bank fulfills its contractual obligation and instead fills the wrongfully rejected trade orders at the contracted price and quantity. Accordingly, Dr. Hendershott's assertion that in calculating damages it is necessary to

---

[23] Hendershott Declaration, ¶29.
[24] Hendershott Declaration, ¶31.

account for the possibility that, absent DTA, some clients might have chosen not to trade with Deutsche Bank is wrong.

### 3.6.    Individualized Inquiry

40.    In his declaration, Dr. Hendershott makes much ado about the individualized nature of foreign currency trading and criticizes me for not taking this into account in my damages analysis.[25]  For the reasons I explain below, Dr. Hendershott's conclusion that the assessment of damages in this matter requires individualized inquiry is wrong.

41.    First, as explained previously, to properly measure breach of contract damages in this matter we assume in the "but for" world Deutsche Bank fulfills its contractual obligations and fills plaintiffs' valid trade orders that it wrongfully rejected.  As such, Dr. Hendershott's assertion that each client's trading patterns might have been different absent DTA —while potentially true—is irrelevant to the calculation of breach of contract damages in this matter.

42.    Second, while each client may have unique liquidity preferences, Deutsche Bank's client prices reflect those unique preferences.  Thus, Deutsche Bank's client price represents the best available evidence of what is a reasonable approximation of the market price given each client's liquidity preferences, for the specified currency pair, at the specified quantity at the time Deutsche Bank determined the client price.

43.    As explained previously, given (1) the methodology I employ to calculate breach of contract damages is based on the *change* in market price, and (2) whatever adjustment to its prices Deutsche Bank would have made as a result of changes, if any, in liquidity settings absent DTA would have been made to *both* prices I use to calculate the change in market price, whatever liquidity adjustment Deutsche Bank would have made absent DTA washes out of the damages equation.

---

[25]  Hendershot Declaration, ¶41.

13

Thus, the damages methodology I employ is unaffected by any change in liquidity settings Deutsche Bank might have implemented in another world absent DTA.

44.     In conclusion, because Deutsche Bank tailored its prices to each plaintiff's customized set of liquidity preferences, and that whatever price adjustment due to a change in liquidity settings Deutsche Bank might have made absent DTA would apply to both prices I use to calculate the change in market price, Dr. Hendershott's conclusion that the assessment of damages in this matter requires individualized inquiry is wrong.

### 3.7.     Market Price

45.     In his declaration, Dr. Hendershott offers the criticisms that (1) I failed to apply *what he understands* is the statutory methodology properly, and (2) I do not demonstrate that the necessary data exist in order to properly address [three salient] features of the statutory methodology.[26]  In other words, Dr. Hendershott's criticisms are that the damages methodology I employ does not comport with Deutsche Bank's counsel's interpretation of the law, which they instructed Dr. Hendershott to assume; as such, they are inappropriate legal opinions. I leave the legal contentions to counsel and limit my opinions to the economic analyses and data issues.

46.     The *economic* justification for this legal assumption is that Deutsche Bank's prices for each plaintiff represent the best available evidence of what is a reasonable approximation of the market price given each plaintiff's liquidity preferences, for the specified currency pair, at the specified quantity at the time Deutsche Bank established its client price.  Indeed, Dr. Hendershott states that "a reasonable way to approximate the 'market price' is the price available at which the

---

[26]  Hendershott Declaration, ¶49.

client can execute a trade . . . ."[27]  He further testified that Deutsche Bank's streamed price is "a price they're indicating that they—they're willing to trade at."[28]

47. The Non-Investment Products Code published by the Bank of England (NIPs Code), which provides guidance on what constitute good practice in foreign exchange markets, states that "[i]t is important that when an order is placed, there is an intent to deal, and when a quote is propagated, it is done in good faith."[29]  The FX Global Code, which contains global principles of good practice in the foreign exchange market that was developed by a partnership between central banks and market participants from 16 jurisdictions around the world, states that "[m]arket participants providing quotations should always do so with a clear intent to trade."[30]

48. Notably, Deutsche Bank itself characterized its most current client price as of the time it rejected a trade order due to DTA as the "market rate" for that particular trade order.[31]  Thus, Deutsche Bank's most current, updated price for a client prior to its decision to reject the trade order is the best available evidence of what is a reasonable approximation of the market price at the time Deutsche Bank rejected the plaintiff's trade order.

49. Dr. Hendershott further asserts that, for purposes of calculating damages, in order to determine a market price for a given plaintiff at the appropriate point in time, it is necessary to know all *alternative* prices that were available to the plaintiff at that appropriate point in time.[32]  Dr.

---

[27]  Hendershott Declaration, ¶55.
[28]  Zig. Hend. Decl. Ex. 1 at 103:8-12 ("Q. Is Deutsche Bank stream price a price at which Deutsche Bank intends to trade?  A. It's a price they're indicating that they--they're willing to trade at.").
[29]  The Non-Investment Products Code, November 2011, p. 14, ¶50.
[30]  FX Global Code, December 2017, Principle 12, pp. 17-18.
[31]  Deutsche Bank February 19th, 2018 data production ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮_archive_1.gz, ▮▮▮▮▮▮▮▮▮archive_2.gz, ▮▮▮▮▮▮▮▮▮▮▮▮▮archive_3.gz, ▮▮▮▮▮archive_4.gz; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[32]  Hendershot Declaration, ¶47.

Hendershott's conclusion that, to determine a market price, individualized inquiry is necessary in order to know what prices were available to a plaintiff from liquidity providers *other than Deutsche Bank* is wrong.

50. Dr. Hendershott's conclusion is wrong because the "market price" most economically relevant for calculating breach of contract damages in this matter is that market price that is most commensurate with the specific contract Deutsche Bank breached (i.e., the trade order Deutsche Bank wrongfully rejected). Given that each Deutsche Bank client price is tailored to the currency pair and quantity requested in the trade order, and also takes into account both Deutsche Bank's and the client's individualized liquidity preferences for each individual trade order, it is *Deutsche Bank's* price—as opposed to prices from *other* liquidity providers—that is the best available evidence of what is a reasonable approximation of the market price for a given wrongfully rejected trade order.

51. Lastly, with respect to Dr. Hendershott's criticism that I fail to appropriately capture the "market price," I explain in my Initial Declaration how to obtain from the Deutsche Bank data the market price at the time Deutsche Bank breached the contract.[33]

52. For these reasons, contrary to Dr. Hendershott, individual inquiry to determine the market price at the time of breach is unnecessary.

### 3.8. Cover Trades

53. Dr. Hendershott criticizes me for not considering the possibility of cover trades.[34] As are a number of his criticisms, his criticism here is again that the damages methodology I employ

---

[33] McFarlane Initial Declaration, §8.2.2, pp. 13-14.
[34] Hendershott Declaration, ¶57.

does not comport with Deutsche Bank's counsel's interpretation of the law, which they instructed Dr. Hendershott to assume; as such, it is an inappropriate legal opinion.

54. Furthermore, assuming it were necessary to consider cover trades, given the fungible nature of currency it is not practicable with respect to clients who engage in frequent trading to maintain specific identity and trace specific funds that would have been used in the rejected trades to purportedly cover trades. To do so would require speculating regarding the nexus between (1) a rejected trade and a subsequent cover trade, and (2) the specific currencies that would have been used to fund the rejected trade orders and currencies that were purportedly used to fund subsequent cover trades.

### 3.9. Unjust Enrichment

55. With respect to their claim for unjust enrichment, plaintiffs allege Deutsche Bank wrongfully used "Last Look to reject matched orders on Autobahn and ECNs in order to increase Deutsche Bank's FX profits at the expense of Plaintiff and Class members."[35] Given plaintiffs' allegation, the calculation of Deutsche Bank's unjust enrichment assumes a "but for" world in which Deutsche Bank fills the wrongfully rejected trade orders at the price and quantity requested. To assume otherwise is to assume away liability.

56. With respect to Deutsche Bank's prices, although it is speculative, I recognize that in another world absent DTA Deutsche Bank might have offered plaintiffs prices that are different than what it actually offered with DTA. As with my calculation of breach of contract damages, my reliance on the prices Deutsche Bank offered in the "actual" world as a reasonable proxy for the prices it would have offered in the "but for" world to calculate unjust enrichment damages is similarly valid because the damages methodology I employ is based on the *change* in market price.

---

[35] Complaint, ¶141.

17

Whatever change in price Deutsche Bank may have implemented absent DTA, the change would apply to *both* prices I use to measure the change in market price. Thus, the damages methodology I employ is unaffected by any change in price Deutsche Bank might have implemented in another world absent DTA.

57. Dr. Hendershott takes issue with the fact that I characterize—in an *accounting*, as opposed to an *economic*, context—the loss Deutsche Bank avoided by wrongfully rejecting a trade order due to DTA as an "unrealized" loss.[36] The characterization of Deutsche Bank's avoided loss as unrealized in an *accounting* context, however, is irrelevant to measuring the *economic* gain Deutsche Bank enjoyed from rejecting such trade orders.

58. He further argues that, "had DB accepted the trade request in the absence of DTA, DB could choose to hold the position created by the trade, during which time the price could have moved in either direction. Therefore, DB could have realized either a loss or a benefit eventually from that position."[37] The thrust of Dr. Hendershott's argument is that, in the "but for" world where Deutsche Bank instead fills the trade order, Deutsche Bank would have a long position in the "reference" currency of the trade, which would presumably generate a gain or loss on a subsequent trade, and this subsequent gain or loss in the "but for" world must be taken into account in calculating Deutsche Bank's unjust enrichment.

59. Dr. Hendershott's proposed unjust enrichment damages methodology is problematic for several reasons. First, in his "but for" world there would be not merely a single, next subsequent trade, but instead an endless chain of subsequent trades with each producing a gain or loss that— following Dr. Hendershott's logic—would need to be considered in the damages calculation. Speculating such a chain of subsequent trades in the "but for" world is simply not practicable,

---

[36] Hendershott Declaration, ¶64.
[37] Hendershott Declaration, ¶64.

particularly in light of the fungible nature of currency.  Second, there would also be an endless chain of subsequent trades in the "actual" world that, under Dr. Hendershott's logic, would similarly need to be considered in the damages calculation.  Speculating these subsequent "actual" trades would similarly be impracticable.  In short, what Dr. Hendershott opines is necessary in order to properly calculate damages would entail endless speculation.

60.  Contrary to Dr. Hendershott's proposed methodology, the method I proposed is tied directly to the facts of the case (i.e., actual trade orders rejected and Deutsche Bank's determined "market rate" for each rejected trade order) and provides without speculation a reasonable estimation of the gain Deutsche Bank earned as a direct result of its use of DTA to reject plaintiffs' trade orders.  Moreover, it is consistent with Deutsche Bank's contemporaneous, pre-litigation calculation of the profits it expected to earn from its use of DTA to reject negative value trades.[38]

61.  Furthermore, it is logical in this matter that Deutsche Bank's gain (i.e., unjust enrichment) is equal to plaintiffs' loss (i.e., breach of contract damages).  It is axiomatic that, whoever holds a commodity asset during a period of change in market value bears the corresponding gain or loss from that change in value.  Importantly, the amount of the gain or loss from the change in market value is the same irrespective of who holds the asset.  Here, by rejecting a trade order because of a post order receipt price movement favorable to a plaintiff, Deutsche Bank shifted the gain from the change in market value from the would-be new owner plaintiff to itself.  As a result, Deutsche Bank avoided incurring the loss that would have resulted were it to have filled the trade order at the then off-market contract price.  Accordingly, Deutsche Bank's gain from rejecting a given trade order is the flip side of a plaintiff's loss from the rejected trade order.  In

---

[38]  DB-Axiom_01726366, Benedict Carter Deposition Exhibit 16. Zig. McF. Decl. Ex. 5.

short, rejecting the trade order simply shifts the gain from the favorable (to the client) price movement post order receipt from the client to Deutsche Bank.

### 3.10. Conclusion

62.     For the reasons stated, none of Dr. Hendershott's criticisms, opinions or conclusions in his declaration cause me to change any of the analyses or opinions expressed in my Initial Declaration.

## 4.     DEUTSCHE BANK SUPPLEMENTAL TRADE ORDER DATA

63.     Subsequent to my Initial Declaration, Deutsche Bank supplemented its trade order data production and produced the following data files:

**Figure 1:    Summary of Deutsche Bank Supplemental Trade Order Data**[39]

| Folder | File Name | Total Number of Records | Time Period Start | Time Period End |
|---|---|---|---|---|
| **ABFX Data** | | | | |
| ███████████████archive_1.gz | subfile1.bin subfile2.bin | 38,329,527 | 11/30/2011 | 9/28/2017 |
| ███████████████_archive_2.gz | subfile1.bin subfile2.bin | 38,316,207 | 12/1/2011 | 9/27/2017 |
| ███████████████archive_3.gz | subfile1.bin subfile2.bin | 38,331,944 | 12/1/2011 | 9/27/2017 |
| ███████████████archive_4.gz | subfile1.bin subfile2.bin | 38,321,571 | 12/1/2011 | 9/27/2017 |
| | | **153,299,249** | **11/30/2011** | **9/28/2017** |
| **RAPID Data** | | | | |
| ███████████1.gz | subfile1.bin subfile2.bin | 24,725,909 | 4/26/2012 | 1/23/2018 |
| ███████████1.gz | subfile1.bin subfile2.bin | 24,724,057 | 5/1/2012 | 1/23/2018 |
| ███████████1.gz | subfile1.bin subfile2.bin | 24,729,670 | 4/26/2012 | 1/23/2018 |
| ███████████.1.gz | subfile1.bin subfile2.bin | 24,727,325 | 4/26/2012 | 1/23/2018 |
| | | **98,906,961** | **4/26/2012** | **1/23/2018** |

64.    I refer to the data files in Figure 1 collectively as the "Deutsche Bank Supplemental Trade Order Data."  Below I discuss certain analyses I have performed regarding the Deutsche Bank Supplemental Trade Order Data.

### 4.1.    Plaintiff Domicile

65.    In addition to the Deutsche Bank Supplemental Trade Order Data, I have reviewed spreadsheets created by Deutsche Bank employees and produced during document discovery. These spreadsheets reveal that Deutsche Bank maintained a number of data fields related to the domicile of each counterparty and the location of the server over which a trade was routed.

---

[39]  Exhibit 1.

66. Specifically, I have seen the field ███████ ████████ in spreadsheets that contain trade order data.[40] This field is associated with a ████████████ field and with the same ███████-██ identifiers that are used in the transactional databases I used for my damages calculation. I note that while Deutsche Bank's most recent productions, discussed above, anonymize the client data, its original productions did not. I further note that Deutsche Bank failed to produce the ████████████████ field in the Deutsche Bank Supplemental Trade Order Data.

### 4.2.    Axiom Rejected Trade Orders during the Class Period

67. Unlike in its previous data productions, Deutsche Bank anonymized the identity of the client in the Deutsche Bank Supplemental Trade Order Data. However, using the Deutsche Bank Supplemental Trade Order Data in conjunction with previously produced Deutsche Bank trader order and client data, I have identified Axiom trade orders contained in the Deutsche Bank Supplemental Trade Order Data.

68. The previously produced Deutsche Bank trader order and client data that I used and the methodology I employed to identify Axiom trade orders in the Deutsche Bank Supplemental Trade Order Data is illustrated in Figure 2 below:

**Figure 2:    Data and Methodology Used to Identify Axiom Trade Orders in the Deutsche Bank Supplemental Trade Order Data**



---

[40]  For example, DB-Axiom_01465377.xlsm. Zig. McF. Decl. Ex. 6.

69.     As illustrated above, using a client name list Deutsche Bank previously produced (DB-Axiom_01616221.nsf.xls), I identified three Client IDs associated with the name "Axiom." Next, I identified in FXT-248A all Trade IDs associated with the three Axiom Client IDs. Next, I identified in the Deutsche Bank Supplemental Trade Order Data all trade orders associated with the Trade IDs associated with Axiom's three Client IDs. This analysis resulted in my identifying in the Deutsche Bank Supplemental Trade Order Data a single Client ID Redacted Code associated with Axiom—"8656735464." Using this Client ID Redacted Code, I identified 8,539 Axiom trade orders contained in the ABFX portion of the Deutsche Bank Supplemental Trade Order Data. Of these Axiom trade orders, Deutsche Bank filled 8,233 and rejected the balance—306. Of these 306 rejected trade orders, 303 were rejected due to price movement adverse to Deutsche Bank post receipt of the trade order. Axiom's 303 rejected trade orders are listed in Exhibit 2. As shown in Exhibit 2, 299 of the 303 rejected trade orders occurred within the Class Period (i.e., on or after December 21, 2011).

### 4.3.     Clients with Rejected Trade Orders during the Class Period

70.     The ABFX data contained in the Deutsche Bank Supplemental Trade Order Data contains 32,415 unique Client IDs. Of these unique Client IDs, 10,012 (30.9 percent) have trades that Deutsche Bank rejected due to adverse price movement post receipt of the client's trade order.

### 5.     DOCUMENTS / DATA CONSIDERED

71.     An updated list of documents and data I have considered in performing my analyses and forming my opinions is contained in Exhibit 3.

I declare under penalty of perjury that the forgoing is true and correct.

Bruce L. McFarlane

Executed on Monday, April 9, 2018