**UNITED STATES DISTRICT COURT**
**FOR SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AXIOM INVESTMENT ADVISORS, LLC, by and through its Trustee, Gildor Management, LLC, and AXIOM INVESTMENT COMPANY, LLC, by and through its Trustee, Gildor Management, LLC,<br><br>            Plaintiffs,<br>v.<br><br>DEUTSCHE BANK AG,<br><br>            Defendant. | Case No. 15-cv-09945-LGS |

**DEUTSCHE BANK'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION TO EXCLUDE THE REPORT AND TESTIMONY
OF DR. TERRENCE HENDERSHOTT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION...................................................................................................................1

SUMMARY OF DR. HENDERSHOTT'S ANALYSIS AND OPINIONS............................2

ARGUMENT .........................................................................................................................3

I.     DR. HENDERSHOTT IS QUALIFIED TO OPINE ON MR. MCFARLANE'S
FLAWED DAMAGES METHODOLOGY ................................................................4

II.    DR. HENDERSHOTT OFFERS RELEVANT AND RELIABLE OPINIONS
REGARDING THE FLAWS IN AXIOM'S DAMAGES METHODOLOGY ............6

III.   DR. HENDERSHOTT DOES NOT PROVIDE IMPERMISSIBLE LEGAL
CONCLUSIONS ......................................................................................................14

CONCLUSION ....................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adesina v. Aladan Corp.*,
   438 F. Supp. 2d 329 (S.D.N.Y. 2006)........................................................................4

*Arista Records LLC v. Lime Grp. LLC*,
   2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...........................................................13

*Boyce v. Soundview Tech. Grp., Inc.*,
   464 F.3d 376 (2d Cir. 2006)....................................................................................14

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...................................................................................................3

*Eldesouky v. Aziz*,
   2015 WL 1573319 (S.D.N.Y. Apr. 8, 2015)............................................................15

*Henkel v. Wagner*,
   2016 WL 1271062 (S.D.N.Y. Mar. 29, 2016) ......................................................7, 8

*Hughes v. The Ester C Co.*,
   317 F.R.D. 333 (E.D.N.Y. 2016) .............................................................................10

*Indu Craft v. Bank of Baroda*,
   47 F.3d 490 (2d Cir. 1995).........................................................................................5

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
   2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015)..........................................................7

*MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*,
   2002 WL 31388716 (S.D.N.Y. Oct. 22, 2002) ........................................................11

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005).......................................................................................4

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   691 F. Supp. 2d 448 ................................................................................................10

*ROMAG Fasteners, Inc. v. Fossil, Inc.*,
   2014 WL 1246554 (D. Conn. Mar. 24, 2014) ...........................................................7

*State of New York v. United Parcel Serv., Inc.*,
   2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016)........................................................14

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Town of Halfmoon v. Gen. Elec. Co.*,
　2016 WL 866343 (N.D.N.Y. Mar. 3, 2016) ...............................................................8

*Washington v. Kellwood Co.*,
　105 F. Supp. 3d 293 (S.D.N.Y. 2015)......................................................................15

*In re Zyprexa Prods. Liab. Litig.*,
　489 F. Supp. 2d 230 (E.D.N.Y. 2007) ......................................................................7

**Statutes**

N.Y. U.C.C. § 2-712(2).........................................................................................15

**Rules**

Federal Rule of Evidence 702.............................................................................1, 3, 6

## INTRODUCTION

In a knee-jerk response to Deutsche Bank's ("DB") motion to strike Axiom's damages expert, Bruce McFarlane, Axiom has moved to exclude the report and testimony of DB's rebuttal expert, Terrence Hendershott.  But Dr. Hendershott's opinions easily meet the three requirements for admissibility under Rule 702—qualifications, reliability, and fit.  Dr. Hendershott, a Professor of Banking and Finance at the Haas School of Business at the University of California, Berkeley, with expertise in market microstructure and algorithmic and high-frequency trading, is plainly qualified to critique the damages methodology devised by Axiom and summarized by Mr. McFarlane.  Moreover, Dr. Hendershott's opinions are based on a reliable methodology—indeed, it is the same methodology used by almost every rebuttal expert.  Dr. Hendershott reviewed Mr. McFarlane's report, as well as documents, testimony, and trade data in the record, and then pointed out the flaws in Axiom's damages methodology, including that it fails to account for the *benefits* that putative class members derived from DB's use of "last look," or delayed trade acceptance ("DTA").[1]  Dr. Hendershott's opinions will assist this Court in evaluating the admissibility of Mr. McFarlane's opinions and, if necessary, will assist the trier of fact in determining the weight, if any, to be given to Mr. McFarlane's conclusions.

Axiom's motion to exclude Dr. Hendershott misconstrues the role of a rebuttal expert.  The crux of Axiom's motion is that Dr. Hendershott does not prove up the purported benefits that putative class members received as a result of DB's use of DTA.  Simply put, that is not Dr. Hendershott's burden.  As a rebuttal expert, Dr. Hendershott is not constructing his own damages model; instead, Dr. Hendershott is critiquing the damages model espoused by Mr. McFarlane.  As

---

[1] Throughout his report, Dr. Hendershott uses "DTA" and "last look" to refer to the alleged misconduct in this case—the use of a post-receipt price check.  *See* Hendershott Decl. at ¶ 19 & n. 33.

the party seeking class certification, it is Axiom's burden to offer a methodology for proving-up, through the use of common evidence, class-wide damages as a result of DB's use of DTA. Axiom failed to do so. That is because, as Dr. Hendershott demonstrates, such an exercise would require the type of individualized inquiry that cannot be conducted on a class-wide basis.

### SUMMARY OF DR. HENDERSHOTT'S ANALYSIS AND OPINIONS

In support of its motion for class certification, Axiom submitted the expert report of Mr. McFarlane, a purported damages expert. Notwithstanding that this is a contract case involving different contracts that were applied differently to individual class members, Mr. McFarlane opined that Axiom successfully developed a damages methodology that could measure damages on a class-wide basis. In response, DB retained Dr. Hendershott to "review and respond to Mr. McFarlane's Declaration in light of economic theory and evidence regarding how modern foreign exchange ("FX") markets functioned from December 21, 2011 until today ("Class Period"), and whether damages can be calculated without performing individualized inquiry as to each putative member of the classes ("Class Members")." Hendershott Decl. ¶ 1.

As detailed in his expert report, Dr. Hendershott holds the Willis H. Booth Chair in Banking and Finance at the Haas School of Business at the University of California, Berkeley, and teaches both undergraduate and graduate-level courses on high-frequency finance, operations management, and information-technology strategy, as well as market structure, trading strategies, foreign exchange, and market manipulation. He has particular expertise in "market microstructure," which includes "the role of information and technology in financial markets, over-the-counter markets, electronic communications networks and financial market design, regulation of financial markets, and algorithmic and high-frequency trading." Hendershott Decl. ¶ 5. He is a member of the Financial Industry Regulatory Authority's ("FINRA") market surveillance advisory group, and has consulted on issues related to market making and how trading

impacts prices for a number of exchanges, high-frequency trading firms, and investment firms. *See id.* ¶¶ 4-9; *see also id.*, Apps. A-C.

Dr. Hendershott determined that, contrary to Mr. McFarlane's opinion, Axiom's proposed damages methodology did not in fact reliably establish damages on a class-wide basis. Dr. Hendershott highlighted three fundamental flaws with that methodology. *First*, Axiom's methodology fails to consider expenses saved (or benefits received) by individual class members as a result of DB's use of DTA in the form of tighter spreads, and therefore lower costs. *Second*, Axiom's methodology fails to consider the "market price" of the trade at the time when customers "learned of the breach"; it also fails to consider the possibility of profitable "cover" trades subsequent to the rejected trade request. *Third*, Axiom's proposed methodology for unjust enrichment claims fails for the same reason as its breach of contract methodology—namely, it does not properly account for the trading practices of a liquidity provider and market participant in the but-for world. Hendershott Decl. ¶ 10. Dr. Hendershott further determined that correcting these flaws and accounting for the benefits that putative class members received as a result of DB's use of DTA would require an individualized inquiry into the specific trading parameters that liquidity providers offered each putative class member. Thus, Dr. Hendershott concluded that the damages methodology developed by Axiom and defended by Mr. McFarlane could not establish damages on a class-wide basis. *Id.* ¶ 57.

## ARGUMENT

Federal Rule of Evidence 702 permits expert testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Court serves a "gatekeeping" function by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 579, 597. As a gatekeeper, the Court must determine whether the following requirements

3

for admissibility are satisfied:  (1) the witness must be "qualified as an expert to testify as to a particular matter"; (2) the expert's opinion must be "based upon reliable data and methodology"; and (3) "the expert's testimony (as to a particular matter) [must] assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  These three requirements— "qualifications, reliability and fit," *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 341 (S.D.N.Y. 2006)—are readily satisfied in the case of Dr. Hendershott.

## I.   DR. HENDERSHOTT IS QUALIFIED TO OPINE ON MR. MCFARLANE'S FLAWED DAMAGES METHODOLOGY

Axiom cannot credibly argue that Dr. Hendershott is not competent to critique Axiom's damages methodology.  He is one of the leading economists in the nation, and his research focuses on the precise subjects at issue in this litigation—market microstructure, over-the-counter markets and algorithmic and high-frequency trading.  Hendershott Decl. ¶¶ 4-9.  Given Dr. Hendershott's extensive expertise in "market microstructure," it would be difficult to imagine a more qualified candidate to offer a rebuttal to Mr. McFarlane's damages model.

Axiom acknowledges that Dr. Hendershott "has taught microstructure and economics courses and authored publications on those subjects," yet nevertheless contends that he lacks the requisite qualifications because "he has never been retained as an expert to calculate potential damages in a matter."  Pls. Br. at 4.  This is a red herring.  If an expert witness can never testify a first time, there would be no expert witnesses.  More importantly, DB did not retain Dr. Hendershott to "calculate potential damages" in this matter.  Rather, DB retained Dr. Hendershott to review and respond to Mr. McFarlane's opinions and analysis.  *See* Hendershott Decl. ¶ 10.

As set forth in his report, Dr. Hendershott's research and expertise focuses on market microstructure.  His research emphasizes the impact of information technology on financial, over-the-counter markets (such as FX trading), including how information is incorporated into prices.

Hendershott Decl. ¶ 5.  He also researches how the activities of algorithmic and high-frequency traders affect liquidity provision.  *Id.*  This research is applicable across asset classes and permits Dr. Hendershott to teach and opine on subjects in equities, derivatives, and, most importantly, FX trading.  *See* Hendershott Tr. 47:20–48:3, 49:14-25, 53:21–56:17.

Dr. Hendershott's research on the impact of algorithmic and high-frequency trading on liquidity provision qualifies him to opine that liquidity providers unable to defend against strategies that capitalized on technological latencies would have changed other parameters of their liquidity offering (such as the bid-ask spread) or ceased trading with certain clients altogether.  Dr. Hendershott's expertise on how information technology affects price formation qualifies him to opine on a but-for world without DTA.  And Dr. Hendershott's experience and research qualifies him to analyze Mr. McFarlane's damages methodology and opine that not all clients were affected in the same way by rejections.  That is because different traders had different trading parameters and different liquidity sources, learned of the rejections at different times, and had different cover options at different market prices available to them.

Relying upon his experience and expertise, Dr. Hendershott concluded that Axiom's damages methodology fails to place the market participant "in the same economic position that it would have occupied absent the breach."  *See Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 498 (2d Cir. 1995).  According to Dr. Hendershott, Axiom's damages methodology fails to account for the benefits that putative class members may have received as a result of DB's use of DTA and, as a result, Axiom cannot establish the existence and extent of damages on a class-wide basis through common proof.  Axiom may disagree with, or even dislike, Dr. Hendershott's opinions, but that has no bearing on Dr. Hendershott's qualifications.  At best, Axiom's objections go to the weight of Dr. Hendershott's critiques, but they have nothing to do with admissibility.

The balance of Axiom's challenges to Dr. Hendershott's competence cast no doubt on his qualifications as an expert witness.  For example, Axiom argues that none of Dr. Hendershott's publications discussed foreign exchange markets "as the primary topic."  Pls. Br. at 4.  Axiom likewise points to instances during his deposition where Dr. Hendershott could not recall exact dates of events or recite from memory the substantial evidence cited in his report.  Pls. Br. at 4-5.  Such irrelevancies are hardly the basis for exclusion under Rule 702.

Axiom's attack on Dr. Hendershott's qualifications stands in stark contrast to its defense of Mr. McFarlane, who is a professional witness with no expertise in market microstructure or high-frequency trading.  In defending Mr. McFarlane's qualifications, Axiom argues that if an "expert has educational and experiential qualifications in a general field closely related to the subject matter in question," a court should not "exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  Pls. Mem. Opp. Mot. to Strike Decl. of McFarlane at 3.  Here, Dr. Hendershott's educational and experiential qualifications are not just "closely related" to the subject matter in question, they are ***directly*** related to that subject matter—market microstructure, over-the-counter markets, and algorithmic and high-frequency trading.  Given that Mr. McFarlane's qualifications pale in comparison to those of Dr. Hendershott, Axiom cannot credibly defend Mr. McFarlane's competence while simultaneously attacking Dr. Hendershott's.

## II.   DR. HENDERSHOTT OFFERS RELEVANT AND RELIABLE OPINIONS REGARDING THE FLAWS IN AXIOM'S DAMAGES METHODOLOGY

Lacking any credible basis to attack Dr. Hendershott's qualifications, Axiom next tries to attack the reliability of his opinions.  Axiom's primary challenge is that Dr. Hendershott fails to "set forth any reliable proof of the purported 'benefit' that clients received by having their trades

rejected because of DTA."  Pls. Br. at 2.  Axiom misapprehends—or chooses to ignore—the function of a rebuttal expert such as Dr. Hendershott.

As courts have recognized, the task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal expert, by nature, "criticizes the methodology and/or opinions of another."  *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *11-13 (S.D.N.Y. Sept. 16, 2015).  It is enough for a rebuttal expert to expose the flaws in the analysis of the opponent's expert; the rebuttal expert need not duplicate the work of an affirmative expert or offer a competing analysis.  *See Henkel v. Wagner*, 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) (a rebuttal expert "does not need a 'model or theory' to identify purported flaws" in the opponent's expert's testimony); *In re Zyprexa Prods. Liab. Litig*., 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts."); *ROMAG Fasteners, Inc. v. Fossil, Inc.*, 2014 WL 1246554, at *4 (D. Conn. Mar. 24, 2014) ("courts have permitted expert rebuttal testimony to critique an opponent's expert where the rebuttal expert did not conduct his or her own alternative analysis").

Here, Dr. Hendershott analyzed Mr. McFarlane's opinion that Axiom's proposed damages methodology can establish injury on class-wide basis.  Dr. Hendershott then highlighted the flaws in Mr. McFarlane's opinion, including Mr. McFarlane's failure "to consider whether and to what extent Class Members may have benefitted as a result of DTA over their broader trading relationships with DB."  Hendershott Decl. ¶ 28.  More specifically, Mr. McFarlane's methodology fails to consider that, far from suffering any injury, numerous putative class members benefited from the use of DTA.  As Dr. Hendershott demonstrates, such benefits (or expenses saved) could include better pricing or the ability to continue trading with DB.  Dr. Hendershott further concludes

that determining the expenses saved for each putative class member would require individualized inquiry into how DB's liquidity offerings for each putative class member would have been different without the use of DTA, and how each putative class member's trading patterns with DB would have changed as a result.

In its brief, Axiom does not dispute that putative class members may have received benefits from DB's use of last look, most notably in the form of tighter spreads, which lower transaction costs. Nevertheless, Axiom insists that Dr. Hendershott's opinions are unreliable because he is unable "to demonstrate" these potential benefits. Pls. Br. at 6. Again, as a rebuttal expert, that was not Dr. Hendershott's job. Dr. Hendershott is not constructing a "but-for" world to calculate or to quantify the extent to which putative class members in fact benefitted from DB's use of DTA. Dr. Hendershott is merely pointing out that Axiom's and Mr. McFarlane's proposed methodology fails to account for the fact that class members benefitted from DTA. That is the "core function" of a rebuttal expert. *See Town of Halfmoon v. Gen. Elec. Co.*, 2016 WL 866343, at *31 (N.D.N.Y. Mar. 3, 2016) ("Kerger's attempt to point out the alleged errors, shortcomings, or inconsistencies in the scientific methodology Carpenter has relied on … is the kind of core function a rebuttal expert is expected to perform.").

The remainder of Axiom's reliability attacks consist of nothing more than challenges to the bases for Dr. Hendershott's opinions and disagreements with his conclusions. Such attacks go only to the weight afforded an expert's testimony, not its admissibility. *See Henkel*, 2016 WL 1271062, at *10 ("While courts should exclude testimony that is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.") (internal quotation marks omitted).

*First*, Axiom contends that because Dr. Hendershott did not cite to "direct, quantitative evidence to support his assertion that class members actually received [] benefits" from DTA, and did not reach "an explicit conclusion" about whether DB would have offered Axiom more favorable pricing absent DTA, his opinions are "conjecture" and therefore unreliable.  Pls. Br. at 5-9.  Axiom is wrong both in fact and in law.

As a factual matter, Dr. Hendershott's Declaration demonstrates that Axiom itself "did in fact receive more favorable spreads from DB after the introduction of DTA."  Hendershott Decl. ¶ 36.  To arrive at this conclusion, Dr. Hendershott analyzed Axiom's produced data to evaluate how its overall trading relationship with DB changed upon the activation of DTA in its account setting, focusing in particular on changes in Axiom's trading volumes, market share, and fill-rates with DB.  That analysis revealed that after the use of DTA, DB tightened the spread of its indicative prices, *see* DB Mem. Opp. to Pls. Mot. Class Certification, Ex. 38, and Axiom's average daily trading volume with DB more than doubled, from $28–$38 million pre-DTA to $68–$109 million post-DTA.  Likewise, Axiom's percentage of overall average daily trading volume with DB increased from 4–7% pre-DTA to 13–17% post-DTA.  These statistically significant increases in trading volume and market share over an extended period of time suggest that Axiom viewed DB's adjusted liquidity offering (with DTA) more favorably than DB's original liquidity offering (without DTA) relative to other liquidity providers' offerings.  Given the direct cause and effect relationship between DTA and tightened spreads, and Axiom's subsequent increased trading volume, it is clear that, in accord with Dr. Hendershott's report, DTA did provide Axiom with a tangible benefit.  Moreover, the extended duration of Axiom's preference for DB's liquidity offering shows that this benefit cannot be explained by prices available from other liquidity providers alone.  Thus, Axiom's trading behavior is consistent with evidence from the record that

DTA enhanced the liquidity offering available to certain clients (including Axiom) by enabling DB to offer tighter spreads.  Hendershott Decl. ¶¶ 21-62.

Given that the one named plaintiff in this case indisputably received a benefit from DB's use of DTA, there is a very real (indeed, overwhelming) probability that other putative class members likewise would have received benefits in the form of narrower spreads or higher fill-rates on their overall portfolio of trades.  But as Dr. Hendershott points out, Axiom's damages methodology simply ignores this probability, thereby creating the risk that certain class members would reap windfalls at the expense of other class members.  This potential conflict among putative class members is an inescapable byproduct of Axiom's proposed methodology.

Contrary to Axiom's contention, Dr. Hendershott was not required to make an "explicit conclusion" about whether DB would have offered Axiom more favorable pricing absent DTA. "The fact that an expert witness speaks in probabilities . . . , rather than certainties, does not by itself make his testimony unreliable."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 472 (S.D.N.Y. 2010); *see also Hughes v. The Ester C Co.*, 317 F.R.D. 333, 341 (E.D.N.Y. 2016) ("Deference to experts is particularly appropriate when expert testimony concerns soft sciences like economics.  Because these disciplines require the use of professional judgment, expert testimony is less likely to be excluded because challenges may ultimately be viewed as matters in which reasonable experts may differ.") (internal citations omitted).

***Second***, Axiom criticizes Dr. Hendershott for failing to "control" for "relevant variable[s]" other than DTA that might have impacted Axiom's trading activity, such as "the pricing of another bank."  Axiom's argument is self-defeating.  The point of Dr. Hendershott's Declaration is that determining the benefits that each putative class member received from DB's use of DTA would

require an individualized inquiry into a host of variables, including that specific class member's trading parameters and "the pricing of another bank" available to that class member. By criticizing Dr. Hendershott for failing to control for these variables, Axiom effectively concedes the deficiency of its own damages methodology. The reason is that, as Dr. Hendershott explains, Axiom's own methodology fails to control for these "relevant variable[s]." The problem for Axiom is that it was its burden, not Dr. Hendershott's, to develop a methodology that could measure damages on a class-wide basis through common evidence. Implicitly acknowledging this defect in his methodology, Mr. McFarlane now attempts to supplement his declaration with an explanation that his methodology would still capture damages—i.e., the difference between market and contract prices in the but-for world—despite the fact that his methodology still does not account for prices offered by other liquidity providers.

**_Third_**, Axiom challenges several of the "assumptions" underlying Dr. Hendershott's conclusions, claiming they are unfounded. Pls. Br. at 8-9. As a threshold matter, "that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence." *MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002). Moreover, Dr. Hendershott's so-called "assumptions" are nothing of the sort—they are basic market facts amply supported by the record.

For example, Axiom challenges Dr. Hendershott's "assumption" that "but for DTA, the bid-ask spread would narrow or widen." Pls. Br. at 8. But the documents and testimony from this very case prove the point. *See, e.g.*, Fair and Effective Markets Review, Final Report 31 (2015) (the practice of a post-receipt price check was "developed to provide protection against unanticipated market movements and predatory trading practices, while allowing market makers to maintain tight bid-offer spreads for their clients"). As noted, after DB implemented DTA for

Axiom's trading accounts, DB was able to offer Axiom narrower spreads. DB Mem. Opp. to Pls. Mot. Class Certification, Exs. 37-38. Axiom criticizes Dr. Hendershott for relying on record testimony to develop his assumption, but Axiom has not challenged the verity of DB employees who testified regarding a trade-off between DTA and bid-ask spreads. *See* Hendershott Decl. at 15 n. 52. This unrebutted trade-off buttresses Dr. Hendershott's conclusion that Axiom's damages methodology fails to account for how adjustments to one parameter in a liquidity offering would likely affect other parameters of that liquidity offering.

Axiom likewise argues that Dr. Hendershott's "assumption" that market participants are "better informed than the liquidity provider" is "fatally flawed." Pls. Br. at 8. To begin, Axiom mischaracterizes Dr. Hendershott's testimony, which is that "market participants ***that trade in large order sizes*** present a higher risk of possessing asymmetric information because they are likely to be better informed than the liquidity provider and have the capability to break up larger orders into smaller trades to 'stack sweep' multiple venues in the market. This practice, sometimes also referred to as 'spraying the market,' allows these market participants to source liquidity without revealing their full trading interest." Hendershott Decl. ¶ 17 (emphasis added). Furthermore, Dr. Hendershott noted some market participants, including Axiom, utilize "aggregators" to view liquidity offerings across providers and pick-off quotes updated slowly. *Id*. (citing a document showing Axiom had access to pricing information from EBS, ECNs, Goldman Sachs, Credit Suisse, DB, and UBS). As Dr. Hendershott opines, these trading strategies create a very real risk of information asymmetry—an opinion supported by the market literature cited in Dr. Hendershott's Declaration, by Dr. Hendershott's experience, and by common sense. Indeed, there would be no need for market participants that trade in large order sizes to "spray the market" unless they had better information about their trading intentions than a liquidity provider. These

and other predatory strategies justify defensive measures such as a post-receipt price check.  *See* Consent Order Under New York Banking Law § 44, *In re Barclays Bank PLC* ¶¶ 6-7 (Nov. 17, 2015), *available at* https://www.dfs.ny.gov/about/ea/ea151117.pdf.  To the extent Axiom believes there is authority undermining Dr. Hendershott's opinion regarding information asymmetry, that may be fodder for cross examination, but it is not a basis for exclusion.  *See Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *17 (S.D.N.Y. May 2, 2011) ("Plaintiffs are, of course, free to challenge [an expert's] conclusions by pointing to studies that reach contrary conclusions. But that issue goes to the weight, not the admissibility of his testimony.").

*Fourth*, Axiom attacks Dr. Hendershott's testimony that "from an economic standpoint" the required damages model in this case "should account for a but-for scenario without post receipt price check where other aspects of the liquidity offering may have changed."  Pls. Br. at 9.  From this unremarkable testimony, Axiom jumps to the remarkable conclusion that, according to Dr. Hendershott, "to calculate damages in a breach of contract case, one must throw out the contracts and consider what the parties would have bargained for had they started from scratch."  *Id.* at 10. To the extent this is an argument to exclude Dr. Hendershott's Declaration, it fails.

Focusing on Dr. Hendershott's actual testimony, as opposed to Axiom's mischaracterization of that testimony, it is clear that there is nothing unreliable about it.  In fact, Dr. Hendershott's testimony that a damages model should account for a "but-for" scenario without DB's use of DTA—that is, without the alleged breach of contract—is just a reference to benefit of the bargain damages and is entirely consistent with the rule for measuring contract damages. "[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract."  *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006); *see also New York v. United Parcel Serv., Inc.*, 2016 WL

13

4735368, at *10 (S.D.N.Y. Sept. 10, 2016) ("The rationale for basing damages on a but-for world analysis is that in most cases—with the exception of cases involving punitive and treble damages—plaintiffs are not entitled to recoup windfalls, i.e., damages beyond the harm suffered.").  If Axiom believes that the literature contradicts Dr. Hendershott's "but-for" requirement, that is an issue that goes to weight, not admissibility.

## III.   DR. HENDERSHOTT DOES NOT PROVIDE IMPERMISSIBLE LEGAL CONCLUSIONS

Axiom's final claim is that Dr. Hendershott impermissibly opines "on the 'proper' requirements of the UCC to come to a damages methodology in this case." Pls. Br. at 11-12. Axiom's argument is flawed on a number of levels.  For one thing, as previously noted, Dr. Hendershott did not "come to a damages methodology in this case."  Instead, he critiqued the damages methodology concocted by Axiom and parroted by Mr. McFarlane.

Moreover, even a cursory review of Dr. Hendershott's Declaration makes clear that he is not purporting to invade the province of this Court by testifying on a question of law regarding the UCC.  To the contrary, as part of his analysis Dr. Hendershott merely sets forth his "understanding" of the requirements of the UCC:

> *I understand* that, according to the Uniform Commercial Code statutory methodology, damages are supposed to be measured as "the difference between the market price [of a rejected trade] at the time when the buyer learned of the breach and the contract price."
>
> *I understand* that according to the statute, damages assessment would need to also consider whether the non-breaching party "covered" for the rejected transaction, and if so, at what price.

Hendershott Decl. ¶ 48 (emphasis added).

Based upon this understanding, Dr. Hendershott then sets forth his opinions as to why he believes Mr. McFarlane's analysis is inconsistent with the concepts provided by the UCC.  Dr. Hendershott is plainly entitled to set forth his understanding of the law, and opine on whether Mr.

McFarlane's opinions adhered to that understanding.  *See Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 329 (S.D.N.Y. 2015) (rejecting challenge to rebuttal valuation expert testimony as "giving legal conclusions or interpreting regulations," and finding that "[rebuttal] opinions of whether and to what extent Mr. Barnes adhered to proper valuation standards, is in perfectly fair territory, as is Mr. Barnes's insistence that his calculations do not contain the errors Mr. Trugman suggests").  If Dr. Hendershott's understanding of that UCC framework is wrong, that will go to the weight of his analysis and not its admissibility.

In challenging Dr. Hendershott's opinions as "legal conclusions," Axiom again speaks out of both sides of its mouth.  Indeed, in opposing DB's motion to strike Mr. McFarlane's testimony, Axiom specifically sanctions the type of analysis undertaken by Dr. Hendershott:  "Nowhere in his report does Mr. McFarlane opine on the requirement or legality of a damages calculation – he simply demonstrates that one could be done without individualized inquiries."  *See* Pls. Mem. Opp. Mot. to Strike Decl. of McFarlane at 3-4 n.1.  Here, Dr. Hendershott does not opine on the requirements of the UCC; he simply demonstrates the flaws in Axiom's damages model pursuant to his understanding of those requirements.  Axiom's position is all the more untenable because Dr. Hendershott's understanding of the requirements of the UCC is exactly right:  "Plaintiffs are entitled to 'recover from the seller as damages the difference between the cost of cover and the contract price . . . less expenses saved in consequence of the seller's breach.'"  *Eldesouky v. Aziz*, 2015 WL 1573319, at *3 (S.D.N.Y. Apr. 8, 2015) (quoting N.Y. U.C.C. § 2-712(2)).  The fact that Dr. Hendershott based his opinions on a correct understanding of the applicable law is hardly a basis for exclusion.

## CONCLUSION

For all of these reasons, Axiom's Motion to Exclude the Report and Testimony of Dr. Hendershott should be denied.

Dated: May 9, 2018

Andrew M. Genser
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
andrew.genser@kirkland.com

G. Patrick Montgomery (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
patrick.montgomery@kirkland.com

Joseph Serino, Jr.
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

*Attorneys for Deutsche Bank AG*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2018, a true and correct copy of the foregoing was served upon Plaintiffs' Counsel as listed below via email at the following addresses.

Aaron Zigler, AZigler@KoreinTillery.com

Randall Ewing, Rewing@koreintillery.com

George Zelcs, GZelcs@KoreinTillery.com

Andrew M. Genser
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611

*Counsel for Deutsche Bank AG*

17